| | |
|---|---|
| 1 | Jonathan McNeal Smith (State Bar No. 292285) |
| | Email: JonathanSmith@jonesday.com |
| 2 | **JONES DAY** |
| | 555 South Flower Street |
| 3 | Fiftieth Floor |
| | Los Angeles, California 90071 |
| 4 | Telephone:  (213) 489-3939 |
| | Facsimile:   (213) 243-2539 |
| 5 | |
| 6 | John Froemming (admitted pro hac vice) |
| | Email: JFroemming@jonesday.com |
| 7 | **JONES DAY** |
| | 51 Louisiana Avenue NW |
| 8 | Washington, DC 20007 |
| | Telephone:  (202) 879-3939 |
| 9 | Facsimile:   (202) 626-1700 |
| 10 | Attorneys for Defendants |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Topalsson GmbH, | **Case No. 2:23-CV-01823-WLH-PVCx** |
| Plaintiff, | |
| v. | **DECLARATION OF EMMA BUTCHER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT ON FORUM NON CONVENIENS GROUNDS** |
| Bayerische Motoren Werke AG; Rolls-Royce Motor Cars NA, LLC; O'Gara Coach Company, LLC; Rusnak/Pasadena Corporation; indiGO European Motorcars, LLC; Orange County British Motorcars; and Westlake Coach Company, LLC, | |
| Defendants. | Date:      August 18, 2023 |
| | Time:      1:00 p.m. |
| | Courtroom: 9B |
| | Judge:     Hon. Wesley L. Hsu |

I, EMMA BUTCHER, hereby declare:

1. I am a solicitor of the Senior Courts of England and Wales and a Partner of Clarkslegal LLP of 5th Floor, Thames Tower, Station Road, Reading RG1 1LX, United Kingdom. I make this declaration in support of the Defendants' motion to dismiss on *forum non conveniens* grounds. I know the facts stated herein to be true based on my personal knowledge, having represented Rolls-Royce Motor Cars Limited ("RRMCL") in its defence of the claim brought against it by Topalsson GmbH ("Topalsson") and in RRMCL's counterclaim against Topalsson in the English High Court ("English Proceedings"). If called to testify as a witness, I could and would testify competently thereto.

**The Agreement Between Topalsson GmbH and RRMCL**

2. The Agreement between Topalsson GmbH and RRMCL provides that "The Parties hereby submit any dispute arising from[,] in connection with, or related to this Agreement or its enforceability to the exclusive jurisdiction of the Courts of England and Wales." (Clause 44.4 of Section 7 of the Agreement, which is Exhibit 2 to the Declaration of Dr. Timo Poser.)

3. The Agreement is expressly "for the benefit of RRMCL and any relevant BMW Group Companies." (*Id.* Section 7, clause 5.2.)

**BMW and RRNA Are Relevant BMW Group Companies**

4. "'BMW Group' means RRMCL and its Affiliates" and "Affiliate" means:

> "in relation to either Party, any subsidiary undertaking or holding undertaking of a Party or any subsidiary of such holding undertaking (where 'subsidiary undertaking' and 'holding undertaking' have the meanings given in section 1162 Companies Act 2006)." (*Id.* Section 6, clause 1.)

5.      Section 1162 of the Companies Act 2006[1] sets out the circumstances in which an undertaking will be considered a "parent undertaking" in relation to another, subsidiary undertaking. Section 1162(2) states as follows:

> "An undertaking is a parent undertaking in relation to another undertaking, a subsidiary undertaking, if-
>
>   (a)   it holds a majority of the voting rights in the undertaking".

6.      Further:

   a.   Pursuant to section 1162(3)(a), for the purpose of subsection (2), an undertaking shall be treated as a member of another undertaking if any of its subsidiary undertakings is a member of that undertaking; and

   b.   Pursuant to section 1162(5), a parent undertaking shall be treated as the parent undertaking of undertakings in relation to which any of its subsidiary undertakings are parent undertakings.

7.      Section 1159 of the Companies Act 2006[2] sets out the definition of a "subsidiary" and its holding undertaking. Section 1159(1) states as follows:

> "A company is a subsidiary of another company, its "holding company", if that other company –
>
>   (a)   holds a majority of the voting rights in it
>
> …
>
> or if it is a subsidiary of a company that is itself a subsidiary of that other company."

---

[1] https://www.legislation.gov.uk/ukpga/2006/46/section/1162
[2] https://www.legislation.gov.uk/ukpga/2006/46/section/1159

- 3 -

Case No. 2:23-CV-01823-WLH-PVCx
DECLARATION OF EMMA BUTCHER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

8. Further, section 1159(2) states that a company is a "wholly-owned subsidiary" of another company if it has no members except that other and that other's wholly-owned subsidiaries.

9. BMW AG is the ultimate beneficial owner of RRMCL, as it owns 100% of the shares and voting rights in RRMCL (via three holding companies, BMW Intec Beteiligungs GmbH, BMW Holding B.V. and BMW (UK) Holdings Limited). For the purpose of section 1162, BMW AG is therefore considered a member of RRMCL pursuant to section 1162(3)(a), and satisfies the definition of both RRMCL's parent undertaking and holding undertaking in accordance with section 1162(2)(a) and section 1159(1).

10. Similarly, BMW AG is the ultimate beneficial owner of RRNA, as it owns 100% of the shares and voting rights in RRNA (via four holding companies, BMW Intec Beteiligungs GmbH, BMW Beteiligungs GmbH & Co. KG, BMW International Holding B.V. and BMW (US) Holding Corp). It too therefore satisfies the definition of RRNA's parent undertaking in accordance with section 1162 and holding undertaking in accordance with section 1159.

11. BMW AG and RRNA therefore fall within the definition of "BMW Group" because BMW AG is both a "parent undertaking" and a "holding undertaking" of RRMCL, and RRNA is a "subsidiary undertaking" of BMW AG in accordance with sections 1159 and 1162 of the UK Companies Act of 2006.

**English Proceedings**

12. Topalsson's First Amended Complaint ("FAC") includes allegations as to the nature of the alleged infringement which were not included in its original Complaint. At paragraph 13 of the FAC, Topalsson alleges that its software creates a unique visual view including "certain stitching textures and locations, illuminations, screen layouts, thumbnails, overlay "dots", navigation bars, rear seat entertainment mechanics, wheel angles, and summary image page generation."

These features which Topalsson alleges were infringed all appear to be examples of data, information and images which RRMCL either supplied to Topalsson pursuant to the Agreement, which Topalsson worked on as part of the Deliverables due under the Agreement, and/or which are data owned by RRMCL.

13. At the trial of the English Proceedings in October-November 2022, the court heard evidence as to these features, for example:

    a. Mr Scott Litster, one of RRMCL's employees and a witness for RRMCL at the trial, explained at paragraphs 16 to 22 of his witness statement (a copy of which is attached as Exhibit 1) the process of 3D model creation, including the delivery by RRMCL to Topalsson of CAD data and the provision by RRMCL to Topalsson of sample textures for use in the 3D data preparation process.

    b. At paragraph 14 of his witness statement, Mr Litster dealt with Topalsson's obligation to produce thumbnail images of RRMCL's vehicle options within the Point of Sale Configurator and Closed Room Configurator (part of Delivery Package 4 of the Agreement).

    c. In an email exchange between Mr Litster and Ms Mariangela Cesaroni of Topalsson between 8 and 16 January 2020 (a copy of which is attached as Exhibit 2), Mr Litster provided Topalsson with documents for the piping and stitching measurements for its Wraith and Dawn model vehicles. There followed a further exchange in which Topalsson requested images and photos of materials from RRMCL.

    d. Topalsson's IT expert, Mr Mark Britton, commented in his responsive expert report at paragraph 74 (the relevant extract of

      which is attached as Exhibit 3) that some data, such as "lists and names of optional features that could be applied to vehicles, was imported from RRMC systems … Other data (such as thumbnail images, camera points of view and definitions of how the features would be grouped for selection) needed to be generated especially for the configurator but were also dependent on the 3D Data and other RRMC data being complete and accurate."

    e.    Rolls-Royce UK's IT expert, Dr Gill Hunt, was asked questions by Topalsson's Counsel at trial on the distinction between data and software (the relevant extract from the transcript of her testimony is attached at Exhibit 6, cross-examination by Topalsson's Counsel, Mr Bergin, begins on page 111, line 12). She agreed with the statements made by Topalsson's Counsel that the following categories of material constituted data, and not software: 3D models; textures and colours; marketing data; camera angles; hotspots; and camera flights. She further agreed with the statements made by Topalsson's Counsel that the source of this data was Rolls-Royce UK.

14.    The questions of ownership of and intellectual property rights in the data and images making up these features is one of the issues awaiting determination in the English Proceedings.

**Adequacy of a Forum in England**

15.    Clause 44.1 of section 7, and Section 6 of the Agreement collectively and pertinently provide that the Agreement shall be governed by the law of England and Wales. Self-evidently, the English court and its judiciary are more familiar with the law of England and Wales and more experienced in its application than the courts of any other country could be.

16. A specialist division of the High Court of England and Wales, known as the Intellectual Property List of the Chancery Division, exists for the resolution of claims concerning intellectual property, including copyright infringement and trade secret misappropriation claims. It hears only cases concerning intellectual property, and a specialist procedure applies to such claims. (See Part 63 of the Civil Procedure Rules which can be found here: https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part63)

17. At a hearing which took place in July 2022, prior to the trial of Topalsson's contract claim against RRMCL in the High Court of England and Wales, Topalsson sought an adjournment of the upcoming trial (which was listed to take place over five weeks from October to November 2022) in order that it could amend its claim to introduce breach of copyright and breach of confidence claims. Specifically, Topalsson requested to introduce claims in respect of RRMCL's alleged sharing of Topalsson Deliverables and Topalsson Confidential Information with Mackevision GmbH (a third party German limited liability company with its principal place of business in Germany) (see paragraphs 36.2 and 40-42 of Topalsson's skeleton argument for the hearing on 29 July 2022, a copy of which is attached as Exhibit 4). The Court made an order on 29 July 2022 that if Topalsson wanted to pursue its intended application to adjourn the trial date and/or amend its Particulars of Claim within the English proceedings to add such copyright and confidence breach claims, it should do so by 12 August 2022 (see paragraph 10 of the Order of Veronique Buerhlen QC (sitting as a Deputy High Court Judge) dated 29 July 2022, a copy of which is attached as Exhibit 5).

18. Despite being granted this time, Topalsson did not in fact make any such application, and its alleged claims for breach of confidence and breach of copyright were not tried by the English court at the trial of the claim which took place from October to November 2022 (although one of RRMCL's witnesses, Mr

Jan-Hendrik Hoffmann, gave evidence (*i.e.*, testified) at trial on the issue of what data and material had been shared with Mackevision).

19. Topalsson did not at that time state any intention to bring claims for copyright infringement against defendants other than RRMCL. Nonetheless, Topalsson would still have an adequate forum in England for its copyright infringement claims, whether against RRMCL or the remaining named defendants to this claim. The Court's order of 29 July 2022 imposing a time limit on Topalsson to make any application to adjourn the trial date and/or amend its Particulars of Claim was made to prevent an application by Topalsson from disrupting the trial of its claim and RRMCL's counterclaim. The order does not bar Topalsson from pursuing a claim in the courts of England and Wales in relation to allegations of copyright infringement, whether against RRMCL or any of the remaining defendants, and this course of action remains open to it, subject to any available defences of RRMCL and the other defendants.

20. Copyright law in England and Wales is principally governed by the Copyright Designs and Patents Act 1988[3] ("CDPA"). The UK is also party to a number of international treaties and agreements dealing with copyright protection, including the Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention"), to which the United States and Germany are also party. The Berne Convention extends English law copyright protection to copyright works which originate in other contracting states. Topalsson's software, which originated in Germany, would therefore be afforded the same level of protection under English law as copyright works originating in England and Wales.

21. In summary, the elements of a copyright infringement claim under CDPA are as follows:

---

[3] https://www.legislation.gov.uk/ukpga/1988/48/contents

        a.    A primary act of copyright infringement occurs where a person, without the consent or licence of the copyright owner, copies (or distributes, rents, lends, performs, shows or adapts) the whole or a substantial part of a copyright work. Software is a literary work which attracts copyright protection (section 3(1) CDPA).

        b.    A primary act of copyright infringement is a strict liability tort – it is not necessary to show any knowledge or intention in order for a defendant to be found liable.

        c.    Secondary acts of copyright infringement can also occur where a person deals with an infringing copy in a variety of ways (for example, imports it into the UK, sells or distributes it) with the knowledge or belief that it is an infringing copy.

22.    If Topalsson were to (i) bring claims for breach of copyright before the English High Court; and (ii) such claims were to be successful, the remedies available to the Court include: injunctions restraining copyright infringement (pursuant to the court's inherent equitable jurisdiction); destruction or delivery up of infringing goods; orders for the payment of damages or an account of profits (pursuant to sections 96-100 of the CDPA); and publicity orders (pursuant to paragraph 26.2 of Practice Direction 63 of the Civil Procedure Rules[4]).

23.    I am not aware of any published statistics detailing the average length of time taken for a claim in the Intellectual Property List to progress from issue to trial, and this will depend on many factors including the complexity of the claim and the length of the trial required. However, in my general experience from 12 years of practice I would expect a trial to be listed between 18 and 24 months after issue. This is consistent with the latest lead time information available for the

---

[4] https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part63/pd_part63#IV

1 Chancery Division, which provides that as at today's date, trials of more than 10
2 days in duration are being fixed for October 2024 onwards.
3     I declare under the penalty of perjury and under the laws of the United States
4 of America that the foregoing is true and correct and that I signed this declaration
5 on June 28, 2023 in Reading, England.

*Emma Butcher*

EMMA BUTCHER