# Exhibit 2

Re-Amended Defence and Counterclaim by Order of Veronique Buehrlen QC (sitting as a Deputy High Court Judge) dated 24 June 2022

Claim No. HT-2020-000334

IN THE HIGH COURT OF JUSTICE

IN THE BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

TECHNOLOGY AND CONSTRUCTION COURT

B E T W E E N:-

TOPALSSON GmbH

Claimant

- and -

ROLLS-ROYCE MOTOR CARS LIMITED

Defendant

_____

RE-AMENDED DEFENCE AND COUNTERCLAIM
_____

**OVERVIEW**

1.      By an agreement dated 11 October 2019 ('the Agreement'), the Defendant contracted the Claimant to supply, implement and maintain digital visualisation software, and to replace its existing car configurator landscape in accordance with a timeline and milestones described in the Implementation Plan which formed part of the Agreement. The new systems and the timing of their implementation and rollout were critical to the Defendant's 2020 worldwide sales process and the launch of its new 'Ghost' model.

2.      The Claimant's performance was disastrous from the outset. It failed to perform its obligations timeously and in accordance with the Implementation Plan and the other terms of the Agreement.

3.      Time was of the essence in relation to delivery and milestone dates agreed with and/or notified to the Claimant to ensure that the Point of Sale ('POS') Configurator was available to be rolled out to the Defendant's event teams and dealerships around the world in April

2020, and that the Web Visualiser would support product marketing, with ordering starting for existing models (model year 2021) in May 2020 and for new models in June 2020. The importance of these dates and events to the Defendant was known to the Claimant before the Agreement was entered into.

4.    As part of its first Delivery Package ('DP1'), the Claimant was required to refine the Implementation Plan. It failed to do so within the agreed timescale. The revised Implementation Plan was finally agreed in December 2019 ('the December Implementation Plan'). It represented a compromise. The Claimant had been unable to deliver the full scope contracted by the dates originally agreed and in time for the critical events referred to above. The Defendant was left with no choice but to defer some functionality.

5.    The Claimant's performance continued to be inadequate and contractually non-compliant and delays continued to occur. In early March 2020, in a last ditch attempt to save the project, the Defendant again deferred functionality to allow the Claimant to deliver limited critical components and functionality in time for rollout and the key sales events and it allowed the Claimant a short extension of time in which to do so. The Claimant again failed to achieve even these tasks and deliverables by the extended delivery dates. By this time, all trust and confidence in the Claimant and its ability to deliver the project had been lost.

6.    By notices dated 16 and/or 22 April 2020, the Defendant accepted the Claimant's repudiatory breach of the Agreement and terminated it at common law or alternatively pursuant to its terms.

7.    The Defendant has sought to mitigate its loss by modifying its existing systems to support the launch of the Ghost and by implementing and rolling out the minimum functionality required for the sales events. Such work continues. These temporary systems will need to be operational for at least a year, but will be replaced in due course.

8.    By reason of the matters aforesaid, the Defendant has suffered loss and damage amounting to €18,662,872 €12,613,157.

9.    Further and/or alternatively, the Defendant was induced into the Agreement by false representations made by Kubilay Topal ('Mr Topal'), the Claimant's founder and CEO, as to the work the Claimant had carried out for Audi AG ('Audi') on a configurator project and

its relationship with Audi. The Defendant claims damages in lieu of rescission in the sum of €5,546,097 €5,547,888.

10.   References to paragraph numbers in this Defence and Counterclaim refer to the Particulars of Claim save where appears to the contrary.

**THE PARTIES**

11.   Paragraphs 1 and 2 are admitted. Until around December 2019, the Claimant's subcontractor was the Retail Performance Company GmbH ('RPC').

**THE AGREEMENT**

12.   As to paragraph 3:

12.1.   The Agreement was for the provision of a 'Future Configurator Landscape', including necessary back-end systems, to enable the Defendant, its dealers and customers to model vehicles with 3D photo realistic images, generated in real-time and incorporating personal choices or options.

12.2.   The Agreement incorporated the Defendant's Invitation to Tender ('the Tender Document') as appears from page 5 of the Agreement:

*'For the avoidance of doubt the Tender Document titled TE4427 Invitation to Tender: Future Configurator Landscape, issued on 21.05.2019 is also deemed incorporated into this Agreement except where expressly excluded, amended or varied.'*

12.3.   Further, by clause 2.1 of Section 7:

*'This Agreement is formed of and incorporates its Sections, the Tender Document and any Purchase Orders.'*

12.4.   Save as aforesaid, paragraph 3 is admitted.

13.   As to paragraph 4:

13.1. It is admitted that the Agreement identified 'Deliverables' and 'Services' in 12 Delivery Packages or DPs. It is admitted that there was no DP12 and that the final Delivery Package was called DP13.

13.2. It is admitted and averred that there were eight non-optional Delivery Packages and four optional Delivery Packages. It is assumed that the reference to 12 non-optional packages is in error.

13.3. The precise ways in which the Delivery Packages are said to be '*tightly interwoven*', the individual components comprehended and the consequences of any interweaving are unclear and the Claimant is put to proof of the same.

13.4. In any event, by section 6.3 of the incorporated Tender Document it was agreed that:

> '*Each of the defined Delivery Packages must be delivered in a way the result is usable by itself, with the only exception that it is assumed that DP1, DP2, DP3 and DP10 are implemented first. All other DP's then define additional scope on top of those DP's listed above. This means that each DP will deliver a defined scope of new systems and will integrate or replace existing systems or parts of their functionality.*'

13.5. Save as aforesaid, paragraph 4 is denied.

14. As to paragraph 5:

14.1. The tender phase was preceded by a request for information phase, which began in April 2019 and in which the Claimant was involved (among other responders). Detailed requirements were shared during that initial phase.

14.2. The Claimant was further provided with the detailed requirements that appear in the Tender Document at section 6 and in its appendices, including the MS Excel spreadsheet entitled '*Detailed Business Requirements mapped to Delivery Packages*', v.2.

14.3. Pursuant to its obligations under DP1, the Claimant was required to address and refine the Defendant's business requirements to provide a '*profound target picture*' with a particular focus on how the business requirements would be delivered (see section 6.5 of the Tender Document). It was envisaged that DP1 would allow the parties to refine the approach to be adopted and reduce the amount of effort required for subsequent DPs (see sections 10.2 and 10.3 of the Tender Document, as well as clause 14.2 of Section 7 to the Agreement).

14.4.  The Claimant had plenty of time to address any issues it believed there to be with the Defendant's requirements prior to entering into the Agreement.   Moreover, the Claimant was afforded a significant headstart:

   (a)  In around March 2019, the Claimant provided a 3D visual representation of the Defendant's 'Phantom' model, allowing insight into the Defendant's product data structure and master data structure.

   (b)  In addition to the documentation shared as part of the request for information and tender phases, numerous meetings were held between the parties.

   (c)  By email on 26 June 2019 at 17:13, Mr Topal stated that the Claimant had used the long preparation time to be well prepared.

   (d)  In July 2019, connections began to the BMW Group network, further detailed information regarding the project was supplied (including access to the 'Knowledge Library' and a 'RR21 Visualisation Brief and Design Handbook'), and the Claimant was given the use of a BMW computer for ease of access.

   (e)  On 6 and 7 August 2019, following a Purchase Order raised on or around 30 July 2019, the project kick-off meeting took place. For the next two months, the Claimant worked on DP1, as well as DPs 10 and 13, and it invoiced the Defendant for the same.

   (f)  The Agreement was ultimately countersigned on 10/11 October 2019, with a Commencement Date of 11 October 2019.

14.5.  The Defendant is unable to respond further to the matters pleaded at paragraph 5 until such time as further information is provided as to the requirements which are said not to have been articulated in detail at the date of the Agreement and the significance of the same (if any).

14.6.  Save as aforesaid, paragraph 5 is denied.

15.  As to paragraph 6:

15.1.  It is admitted that the Agreement was divided into seven Sections.

15.2.  It is admitted that Section 7 is headed 'General Terms'. Such terms were extensively negotiatied by the parties. For the purposes of such negotiations, the Claimant was advised by its solicitors, CMS.

15.3.  It is admitted that Defendant put forward a set of terms for negotiation.

15.4.   The Agreement also incorporated: the Tender Document (see paragraph 12 above); the BMW Group ITPM guidelines ('ITPM'; see section 7.1 of the Tender Document); and the RRMC and BMW rules relating to IT security dated 1 March 2019 (also referred to in section 7.1).

15.5.   Save as aforesaid, paragraph 6 is denied.

16.   Paragraph 7 is noted. The Defendant will also rely on the entirety of the Agreement for its full terms meaning and effect.

**PRICE AND PAYMENT OBLIGATIONS**

17.   As to paragraphs 8, 9 and 10:

17.1.   Paragraph 8 is admitted.

17.2.   It is admitted that the Defendant chose the standalone model referred to in paragraph 9. The standalone model still involved substantial interfaces with BMW group and third-party systems. It is admitted that the charges set out in the table are the relevant charges.

17.3.   The text of the clauses set out at paragraph 10 are admitted.

17.4.   However, the Claimant's description of the terms governing price and payment in paragraphs 8, 9 and 10 relevant to the matters in dispute are incomplete (and paragraph 15 above is repeated).

17.5.   In particular, the Claimant has failed to mention that payment rights and obligations were linked to the proper performance of its obligations and to the milestones set out in the Tender Document:

(a)   Further, by clause 5.3.7 of Section 7, the Claimant was obliged to *'complete the Services and deliver the Deliverables on time and <u>in full</u>'* (emphasis added). Having done so, by clause 14.3 of Section 7, it was agreed that: '*The* [Claimant] *shall promptly invoice* [the Defendant] *in accordance with the agreed milestones set out in the Tender Document and appendix…'*.

(b)   By section 10.4 of the Tender Document as incorporated into the Agreement, it was agreed:

6

*'The payment schedule will be defined based on the defined milestone plan for the project (see appendix ""). This milestone plan might be amended based on the initial analysis phase (Delivery Package 1). Periodically incurring invoicing rates are not permitted.'*

17.6. As set out at paragraph 21 below, *'the agreed milestones'* and *'the defined milestone plan'* refer to the Implementation Plan.

17.7. Save as aforesaid, paragraphs 8, 9 and 10 are denied.

18.   As to paragraph 11:

18.1. Clause 14.6 of Section 7 expressly stated that, unless otherwise provided, *'Charges shall be payable only upon acceptance by* [the Defendant] *of the Services or Deliverables to* [the Defendant's] *satisfaction'* (Emphasis added).

18.2. It is admitted that this provision did not entitle the Defendant to delay or refuse payment unreasonably (in the 'Wednesbury' sense) or capriciously. It did not do so.

18.3. The Agreement provided the Defendant with numerous other rights in connection with late, sub-standard or non-conformant performance by the Claimant, and thereby to delay, refuse or recoup payments, including under Section 7:

(a)  By clause 13.10, it was agreed that:

*'[The Defendant] may reject any of the Deliverables which in its reasonable opinion do not conform with the Specification or Purchase Order or are otherwise incomplete, delivered late or damaged or do not comply with the terms of this Agreement. …'*

(b)  By clause 13.11, it was agreed that:

*'If in the reasonable opinion of* [the Defendant] *the* [Claimant] *fails to perform the Services in accordance with this Agreement or to deliver Deliverables by the applicable delivery dates or milestone dates or if* [the Defendant] *rejects the Deliverables, without limitation to any other of its rights or remedies,* [the Defendant] *shall have the following rights:* …

*13.11.3      to terminate this Agreement in whole or part with immediate effect by giving written notice to the* [Claimant]*;*

*13.11.4      to refuse to accept any subsequent performance of the Services or Deliverables which the* [Claimant] *attempts to make;* …

13.11.5    *to perform the relevant Services itself or purchase substitute services from a third party and recover from the* [Claimant] *any loss and additional costs incurred in doing so;*

13.11.6    *to have all relevant Charges associated to the specific failure to supply the Deliverables or perform the Services previously paid by* [the Defendant] *to the* [Claimant] *under this Agreement refunded by the* [Claimant].

13.11.8    *to hold the* [Claimant] *accountable for any costs, loss or expenses incurred by* [the Defendant] *…'*

(c) By clause 14.8, it was agreed that:

'[The Defendant] *shall be entitled to set off any Charges due to the* [Claimant] *under this Agreement against any amount owed by the* [Claimant] *to* [the Defendant] *under this Agreement…'*

(d) By clause 14.9, it was agreed that:

'[The Defendant] *shall be entitled to withhold payment of any Charges in whole or in part without breaching this Agreement where it determines that there is a dispute regarding the Services or Deliverables or if any invoice is inaccurate.* [The Defendant] *shall pay the balance of any invoice which is not disputed by* [the Defendant]. *…'*

18.4.    In the premises, the Claimant has failed to construe clause 14.6 of Section 7 of the Agreement in the context of the Agreement as a whole. The construction contended for is irrelevant and there is no basis for the implication of the term alleged.

18.5.    Save as aforesaid, paragraph 11 is denied.


**CONTRACTUAL OBLIGATIONS AS TO TIME**


19.    As to paragraphs 12 and 13:

19.1.    The text of the clauses from the Agreement are admitted.

19.2.    The emphasis that the Claimant has added to such text is misplaced as explained below.

20.   As to paragraph 14:

20.1.  Timely performance was a condition of the Agreement for <u>any</u> applicable or duly notified delivery date, not just those contained in the Implementation Plan. So much is apparent from:

(a)  Clause 5.8 of Section 7 by which it was agreed (with emphasis added) that:

*'Time shall be of the essence regarding <u>any date for delivery</u> by the* [Claimant] *of any good or service specified in this agreement and the Completion Date.'*

(b)  Clause 5.3 of Section 7 by which it was agreed (in expansive terms) that (with emphasis added):

*'In performing this Agreement the* [Claimant] *shall:*

5.3.7      *complete the Services and deliver the Deliverables on time and in full and by <u>any applicable milestone date or delivery date</u>, if delivery dates or timescales are not specified, within or by <u>any reasonable delivery date or time period</u> that is notified by* [the Defendant]…'

20.2.  Further or alternatively, the circumstances of the Agreement made time of the essence. At all material times, the Claimant knew that the project was time critical and vital to the Defendant's 2020 worldwide sales process, including for the launch of the new Ghost model at events in April 2020 and the start of product ordering in May 2020 for existing models and June 2020 for new models.

20.3.  The Defendant told the Claimant about the dates and events referred to in the previous sub-paragraph, and their importance, for example: at the Claimant's presentation on 22 May 2019 and then, after the Claimant was downselected, at a joint project meeting on 27 August 2019. The Claimant (Mr Topal) said it would deliver in time to meet the dates. The dates and events referred to in the preceding sub-paragraph were central to subsequent planning. And the Claimant incorporated them in its presentations from September 2019, and – at the joint planning meeting on 7 October 2019 – referred to the stages of the Configurator '*that should be guaranteed in order to meet the main project deadlines*' (page 4 of the minutes). See further at paragraph 62.2 below.

20.4.  By clause 13.7 of Section 7 of the Agreement, it was agreed that:

*'If any delivery is delayed at the request of, or because of the acts or omissions of* [the Defendant]*, the Implementation Plan shall be amended to take account of such delay in accordance with clause 9.5....',*

20.5.   On a true construction of the Agreement, the relevant delivery and milestone dates were to be found initially in the Implementation Plan forming part of the Agreement and subsequently in the December Implementation Plan which the Defendant accepted. The absence of fixed delivery dates is inconsistent with the Defendant's business need for the systems to be in place for particular business events. It is also inconsistent with the terms of the Agreement which is predicated on delivery and payment milestones, the Claimant's performance against those milestones and time being of the essence in respect of the same.

20.6.   Further or alternatively, the relevant dates for the delivery of Services and/or Deliverables were those notified by the Defendant to the Claimant pursuant to clause 5.3.7 of Section 7.

20.6A.   Moreover, on a true construction of the Agreement, the Claimant was only entitled to additional time if critical delay to delivery was caused either by a request of the Defendant (solely at its own convenience) or by the acts or omissions of the Defendant (amounting to a breach of its contractual obligations). The Claimant otherwise bore the risk of all delays. Any alleged delays by the Defendant needed to be reported by the Claimant pursuant to its obligations under clauses 5.4, 9.4 and/or 9.5 of Section 7 (quoted at paragraphs 42.2, 42.5 and 42.6 below).

20.7.   Save as aforesaid, paragraph 14 is denied.

21.   As to paragraph 15:

21.1.   It is admitted and averred that the 'Implementation Plan' is defined in Section 6 of the Agreement as: *'the time schedule and sequence of events for the performance of this Agreement set out in Section 2 and in accordance of the BMW ITPM'.*

21.2.   The BMW ITPM (also defined in Section 6) is a set of BMW Group IT project management guidelines. As the Claimant notes at paragraph 15.4, it did not itself contain a plan but the underlying provisions as to delivery steps and quality.

21.3.   Clause 8 of Section 2 of the Agreement is headed 'Implementation Plan' and states: *'Refer to Tender Document and appendices. This will be <u>refined</u> further in DP1'* (emphasis added). Such words confirm the existence of an Implementation Plan at the

10

date of the Agreement and the same was incorporated into the Agreement by reference. The Claimant's obligation to <u>refine</u> the Implementation Plan were expanded upon and explained in section 6.5 of the Tender Document.

21.4. The references comprehended by clause 8 of Section 2 of the Agreement comprise section 10.4 of the Tender Document headed *'Payment Schedule − Delivery Packages'* and section 11 of the Tender Document headed *'Appendix'*:

(a) Section 10.4 of the Tender Document refers directly to a *'milestone plan'* and directs the reader to the Appendix at section 11:

> *'The payment schedule will be defined based on the defined milestone plan for the project (see appendix " "). This milestone plan might be amended based on the initial analysis phase (Delivery Package 1). Periodically incurring invoicing rates are not permitted.'*

(b) Section 11 of the Tender Document contains a table of the appendices forming part of the Tender Document. The title and eleventh row appear as follows:

| Format | Description | File Name or URL | Version |
|--------|-------------|------------------|---------|
| PDF | High-level Project Roadmap | Transformation map_v2 | 2.0 |

21.5. The document with the file name *'Transformation map_v2'* was provided to the Claimant as part of the Tender Document and the Claimant referred and responded to it in its response. It comprised a PDF of a MS PowerPoint document of 11 pages which on page 2 included a Gantt chart headed *'OUR TIMELINE AT A GLANCE'* with an activity bar and timeline for each Delivery Package (DP1-DP13) ending with a diamond to signify the completion milestone. The pages that follow comprise an explanation of the work in each Delivery Package up to DP10 against the relevant timeline with a square to denote the completion date.

21.6. On a true construction of the Agreement, the *'High-level Project Roadmap'* comprising *'Transformation map_v2'* is the Implementation Plan defined in the Agreement and incorporated by reference at clause 8 of Section 2 of the Agreement.

S O'Callaghan Declaration Exhibit 2 - Page 126

21.7.   The completion dates for the delivery for the relevant non-optional Delivery Packages as set out in the Implementation Plan, for which time was agreed to be of the essence, were as follows:

| Delivery Package | Milestone /Delivery Date |
|---|---|
| DP1 (Analysis & Alignment), p.1 | End of Q3 2019 − i.e. 30 September 2019. |
| DP2 (Initial Back-End and Rule Engine), p. 3 | End of January 2020 − i.e. 31 January 2020. |
| DP3 (POS Configurator), p.4 | (i) Development milestone (or pre-milestone) − end of Q4 2019 − i.e. 31 December 2019;<br><br>(ii) a Dealer Roll-out milestone - end of Q1 2020 − i.e. 31 March 2020. |
| DP4 (Web Configurator), p.5 | During Q2 2020 − i.e. 15 May 2020. |
| DP6 (Ordering Integration), p.6 | End of Q4 2020 − i.e. 31 December 2020. |
| DP7 (Pricing Integration), p.8 | End of Q3 2020 − i.e. 30 September 2020. |
| DP10 (3D Data Preparation), p.11 | During Q1 2020 − i.e. 31 January 2020 |

21.8.   Contrary to its assertion, the Claimant fully understood that the *'High-level Project Roadmap'* comprising *'Transformation map_v2'* was the Implementation Plan. For example, in its Tender Response dated 5 June 2019, the Claimant stated at section 1.1: *'The assumed timeline to deliver the project … has followed your proposal.'* Further, at a joint meeting on 7 October 2019, the parties discussed the refinement of the Implementation Plan for DP1, referring to '*the initially agreed plan*', '*the initially agreed milestones*' and '*the base plan (as according to tender)*' (original emphasis; see the minutes at pages 2 and 6). The Implementation Plan was objectively understood to be the bedrock of obligations as to time, until revisions were accepted pursuant to DP1 or otherwise agreed or notified.

21.9.   The Claimant's criticisms of the *'High-level Project Roadmap'* comprising *'Transformation map_v2'* are groundless and misplaced. It was incorporated into the Agreement by reference, as aforesaid, and is the Implementation Plan referred to and defined in the Agreement. The Claimant has not identified any other document or plan, the existence of which the Agreement plainly contemplated, as the Implementation Plan.

21.10. The Implementation Plan incorporated by reference into the Agreement is to be construed in the normal way, in the context of the Agreement as a whole against the relevant factual matrix known to both parties at the relevant time:

(a) The relevant factual matrix comprises those matters referred to at paragraphs 1, 3, 20.2 and 20.3 above: namely that the systems were a critical component of the Defendant's 2020 worldwide sales process, including the launch of its new Ghost model.

(b) The Claimant knew of these matters as aforesaid.

21.11. The Implementation Plan comprising *'Transformation map_v2'* provided a milestone completion date for Delivery Packages with sufficient clarity for a contract where time was of the essence. It was not *'too vague'* as alleged.

21.12. It is admitted that the Implementation Plan comprising *'Transformation map_v2'* was 'high level'. High-level implementation or project plans are commonly found in IT contracts. As part of DP1, it was the Claimant's obligation to refine the Implementation Plan (a process that should have been completed a full three months before any other delivery date) and such refinement would have identified individual Deliverables and delivery dates within the high-level timeframe set out in *'Transformation map_v2'*.

21.13. The reference to an 'anticipated timeline' that appears on page 2 of the *'Transformation map_v2'*, on which the Claimant relies, is readily understood in the context of a document which originally formed part of the Tender Document. The Claimant knew that was the case when it entered into the Agreement. Once the *'Transformation map_v2'* was incorporated into the Agreement as the Implementation Plan in respect of which the Claimant's delivery obligations were agreed, the dates for completion of each Delivery Package ceased to be anticipated dates, as a matter of construction, and became contractually binding.

21.14. The milestone date for completion of DP1 as shown on *'Transformation map_v2'* was the end of Q3, i.e. 30 September 2019. The Agreement was signed by the Claimant on 7 October 2019 and countersigned by the Defendant on 10 & 11 October 2019. While there had been some delay in signing the Agreement, the Claimant had already started work on the project from early summer 2019 and on 7 October 2019 produced a draft revised Implementation Plan as appears more particularly below.

13

21.15. All milestone completion dates apart from DP1 post-dated the Agreement. In that the Claimant signed the Agreement in the full knowledge that the Implementation Plan milestone completion date for DP1 had passed, the Claimant is to be taken as having been content to do so in the knowledge that the Implementation Plan was to be refined as part of DP1 and that a first draft had been produced.

21.16. Further, the Claimant had secured an extension. At a joint planning meeting on 7 October 2019, the Defendant's Product Owner for Digital Integration (Jan-Hendrik Hoffmann) noted that '[t]*he due date for DP1 was end of September'* (page 4 of the minutes). Without disagreement, the Claimant's CEO, Mr Topal stated that the '*project plan can be defined within 2 weeks*' (page 5). The Defendant's Project Lead (Ida Biot) then agreed to that extension (page 6).

21.17. The '*Transformation map_v2'* was produced in MS PowerPoint, the format suggested for the refined Implementation Plan under DP1 (see section 6.5 of the Tender Document).

21.18. Save as aforesaid, paragraph 15 is denied.

**REVISED IMPLEMENTATION PLANS**

22.   On 7 October 2019, pursuant to its DP1 obligations, the Claimant presented its first incomplete draft of the revised Implementation Plan. The parties then worked together intensively over the next two months in order to develop that plan, so that it would be accepted.

23.   By November 2019, it had become clear that the Claimant could not perform its obligations in accordance with the Implementation Plan forming part of the Agreement. Delays for which the Claimant was responsible threatened (among others things) the launch events for the new Ghost model in April 2020. In order to mitigate this threat and support the Claimant, the parties revised the Implementation Plan to ensure that a minimum viable product went live in time for the key business events. Certain critical components were prioritised via a 'Pre-Release' mechanism and content was reduced (being pushed back to later Releases). Following this further collaboration, at meetings on 27 and 28 November 2019, the Claimant presented a first substantial refinement of the Implementation Plan for acceptance (again, pursuant to its DP1 obligations). The Claimant made minor revisions to the revised Implementation Plan which it produced to the Defendant on 6 December 2019.

24.     The Defendant accepted the revised Implementation Plan. As anticipated at the 28 November 2019 meeting, Ms Biot presented the revised Implementation Plan to the Steering Committee on 11 December 2019 and confirmed her acceptance of it as Project Lead. It was approved. At this stage, the revised Implementation Plan comprised the Claimant's Implementation Plan from 27 and 28 November 2019, together with the minor revisions made by the Claimant in the intervening period, provided on 6 December 2019 ('the December Implementation Plan').

25.     The December Implementation Plan included the following Technical Go-Live dates for the critical components. These represented binding delivery or milestone dates:

    25.1.   By 17 February 2020, as part of 'Pre-Release: IVT/CMS': (i) the Imagery Validation Tool ('IVT') used to ensure that imagery is accurate and correct prior to release to the configurator; and (ii) the Content Management System ('CMS') used to manage the visibility of the data.

    25.2.   By 30 March 2020, as part of 'Pre-Release: Closed Room Demo': The Closed Room Configurator, a pre-release version of the POS Configurator (i.e. the user interface and related functionality to allow for choice of configurator options and viewing of the car at the dealership or other premises), which was intended to demonstrate basic non-integrated configurator capability at the April 2020 launch events.

26.     The Claimant knew that the Defendant had accepted the December Implementation Plan and thereafter acted on the basis that it had been agreed. The Defendant relies on the following facts and matters:

    26.1.   As the Claimant was well aware, the acceptance of the revised Implementation Plan was integral to the formal Joint Business Proposal, which was a further review process pursuant to the ITPM – the Defendant would not have countenanced progressing that Proposal without agreement of the December Implementation Plan with the Claimant. With the Claimant's participation, this process started on around 12 December 2019 after the Steering Committee meeting and led to the submission of a Joint Business Proposal on 19 December 2020, incorporating and in reliance upon the accepted dates.

    26.2.   At a joint meeting on 20 December 2019, the parties discussed the delays against the December Implementation Plan. It was noted in the minutes that: (i) '*the majority of major milestones and deadlines are not met by* [the Claimant]' (page 2); and (ii) '[t]*o*

meet the necessary deadlines and agreed deliverables, it was agreed that the project will be staffed additionally at TPLSN side as of 2nd January' (page 1). By email to the Defendant on 7 January 2020 at 17:05, Mr Topal challenged the circulated minutes, stating: (i) 'It is not correct that we do not fulfil "Majority of Major Milestones and deadlines are not met". Rather, we see it that approvals are repeatedly not carried out'; and (ii) '[w]e have at no point in time said that we require additional people to stick to the time schedule' (emphasis added). The underlying premise (i.e. that the December Implementation Plan was binding and required adherence) was not disputed and a matter of consensus.

26.3.   Consistently, by email to the Claimant's Project Lead (Jens Wiedow) on 20 December 2020 at 20:19, the Defendant's Product Owner (Jan-Hendrik Hoffmann) noted the parties' 'joint agreement' on the project plan, and referred to dates in the December Implementation Plan.

26.4.   At a joint weekly management status meeting on 28 January 2020, it was noted by the Defendant's Project Lead (Ida Biot) that: 'A new project plan was agreed between [the Claimant] and [the Defendant] in Dezember [sic]' (see the minutes at page 1, which were shared with the Claimant).

26.5.   The Claimant's own Status Reports on 21 & 28 January 2020 and 4 & 11 February 2020 showed (among other things) fixed Technical Go-Live milestone dates for IVT/CMS, the Closed Room Configurator and POS Configurator in accordance the December Implementation Plan. The 11 & 18 February 2020 Reports referred to 'Milestones and status based on current project timing', but also 'possible adaptations after agreement of final replanning approach'. This re-planning was caused by the Claimant's delays.

26.6.   By email on 2 February 2020 at 21:49, Ms Biot stressed to Mr Topal that 'In addition to the new plan [i.e. the re-planning under discussion], top priority now is the further operational work, for the time being according to the old plan [i.e. the December Implementation Plan], so as not to lose any more time.'

26.7.   By email to the Claimant on 5 March 2020 at 16:30, the Defendant referred to the 'compromise plan' agreed and confirmed in December 2019.

27.   Further or alternatively, the Claimant is estopped from denying that the December Implementation Plan was agreed and contractually binding upon it. As appears above, the Claimant expressly represented that the December Implementation Plan had contractual

S O'Callaghan Declaration Exhibit 2 - Page 131

force as matters stood and, after 11 December 2019, the parties conducted themselves on the basis the December Implementation Plan was agreed and binding without any additional steps. But for the parties operating on such convention and/or the Claimant's representations, the Defendant would have taken any further steps that were necessary to ensure the December Implementation Plan was formally agreed. In the circumstances, it would be unjust and/or unconscionable for the Claimant to be permitted to act contrary to the convention and/or representations.

28. Further or alternatively, pursuant to clause 5.3.7 of Section 7, the Defendant notified the Claimant of reasonable delivery dates (adopted from the Claimant's own revised Implementation Plan) for among others the 'Pre-Releases' of critical components. Dates for these components had not been previously specified in the original Implementation Plan, *'Transformation map_v2'*.

## CLAIMANT'S PERFORMANCE – MARCH PLAN

29. Within weeks of acceptance or notification of the delivery dates in the December Implementation Plan, the Claimant indicated that they were no longer feasible (see further at paragraph 58.5 below).

30. As the Claimant's performance failures became obvious, in January 2020, the Defendant commissioned an external project audit, reflecting the Defendant's commitment to the project but also its serious concerns about the Claimant's conduct. The audit report was critical of the Claimant and stated that the '[n]*ew project plan (December 2019) cannot be adhered to based on previous experience*' (page 1).

31. After joint discussions to recover the project, the Claimant then made various proposals in a planning document dated 15 February 2020, which were refined further by the Claimant. Notwithstanding such discussions and document, the December Implementation Plan continued to apply.

32. By February 2020, the Defendant had serious concerns about the Claimant's ability to perform the Services in accordance with the Agreement or to deliver Deliverables by the applicable delivery or milestone dates. A further escalation meeting was therefore held

between the parties on 4 March 2020, attended by the Defendant's Chief Financial Officer (Timo Poser), Director of Sales and Brand (Henrik Wilhelmsmeyer) and Project Lead (Ida Biot) and Mr Topal. The Defendant rejected the Claimant's proposals for an overall new plan as they '*deviate*[d] *significantly from the compromise plan we have agreed and confirmed on 11th December*', i.e. the December Implementation Plan (as recorded in its email on 5 March 2020 at 19:55, i.e. the 'March Email' to which the Claimant refers). Nevertheless, in order to mitigate the consequences of the Claimant's on-going delivery breaches and in effort to obtain even limited functionality to support the key sales events, the Defendant agreed to allow the Claimant additional time in which to deliver a subset of the functionality contracted for as follows:

32.1. By 9 March 2020: IVT Technical Go-Live, now without the CMS.

32.2. By 1 April 2020: Closed Room Configurator Technical Go-Live, with a basic functionality as a temporary alternative to CMS.

32.3. By 23 April 2020: CoSy Replacement Image Service ('CRIS') Technical Go-Live, which is described further immediately below.

Together, these agreed dates are referred to as the 'March Plan' and each had been proposed by the Claimant.

33.    The CRIS was required to provide images for given configurations selected by the customer via any of the configurator front ends, as well as other interfacing systems. It had been planned for delivery as part of the Web Visualiser Release (which had a Technical Go-Live of 12 May 2020 in the December Implementation Plan) and not identified separately before. However, in order to mitigate the consequences of the Defendant's on-going delays, it was determined that the CRIS needed to be delivered as a separate critical component.

34.    The March Email recorded the parties' agreement to the March Plan or, alternatively, gave notice (pursuant to clause 5.3.7 of Section 7) of the three reasonable delivery dates in the March Plan for further reduced or adjusted packages. Time continued to be of the essence in relation to the March Plan pursuant to clause 5.8 of Section 7 of the Agreement. Further and/or alternatively, the March Email confirmed that time was of the essence, stating: '*Your achievement of completing these products within the milestones is a condition of our ongoing contractual relationship.*' Alternatively, it made time of the essence in respect of the delivery dates in the March Plan.

18

35.   The March Email was neither *'unilateral'* nor *'without warning'* as alleged at paragraph 21.2.6, but reflected discussions initiated by the Claimant due to its actual or anticipated breaches and the agreements reached.

36.   In any event, in light of the Claimant's breaches of contract in failing to provide the Deliverables and meet the milestone and delivery dates in the December Implementation Plan, the Claimant was entitled to allow the Claimant additional time to deliver limited components and functionality and to make time of the essence.

37.   In reply to the March Email at 21:19, Mr Topal stated: '*We guarantee you the provision and delivery of: ... Ivt ... Closed Rooms Configurator ... Cris ... According to the replanning plan, which we sent on 15.02.*' On a proper construction, this was confirmation of and written agreement to the March Plan.  Further or alternatively, Mr Topal was confirming, agreeing and guaranteeing dates that were same as those notified by the Defendant earlier in the day, and acknowledging time was of the essence in respect of the same.

38.   By way of summary of the aforesaid dates for the critical components in the March Plan:

| Component | Implementation Plan | | December Implementation Plan | | March Plan | |
|---|---|---|---|---|---|---|
| | Source DP | DP milestone(s) | Content | Delivery date | Content | Delivery date |
| IVT | DP10 | 31 Jan 2020 | Technical Go-Live. Pre-Release, including CMS. | 17 Feb 2020 | Technical Go-Live. Pre-Release, without CMS. | 9 Mar 2020 |
| Closed Room Config-urator | DP3 | 31 Dec 2019 (Pre-Milestone) 31 Mar 2020 | Technical Go-Live. Pre-Release. | 30 Mar 2020 | Technical Go-Live. Pre-Release, including basic functionality as a temporary | 1 Apr 2020 |

S O'Callaghan Declaration Exhibit 2 - Page 134

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | alternative to CMS. | |
| CRIS | DP4 | 15 May 2020 | Technical Go-Live. Part of the Visualiser Release | 12 May 2020 | Technical Go-Live. No longer part of the Visualiser Release | 23 Apr 2020 |

39. When the December Implementation Plan and March Plan were agreed or notified, time remained of the essence. The importance of timely delivery forced the Defendant to accept or give notice of dates for partial Deliverables to mitigate delay to critical functionality required for the 2020 worldwide sales process.

40. As to paragraph 16: Save that (if accepted) the drafts could have stood as refined Implementation Plans (and the December Implementation Plan was accepted and did so), the first sentence is admitted. The second sentence is denied for the reasons set out above at paragraphs 22 to 39.

41. Paragraph 17 is denied for the reasons set out above at paragraphs 20 to 39 above.

**OTHER CONTRACTUAL OBLIGATIONS RELATING TO THE SERVICES**

42. The Agreement also contained the following express terms under Section 7:

42.1. Clause 5.3:

'In performing this Agreement the [Claimant] shall: …

5.3.2  Provide the Services and the Deliverables faithfully, diligently with skill and care to a standard of Good Industry Practice, the BMW ITPM and any other reasonable written instructions of [the Defendant]; …

5.3.5  allocate and apply sufficient resources; …'

'Good Industry Practice' is defined under Section 6 as:

> '... the exercise of skill, care prudence, diligence and foresight to a standard that would ordinarily be exercised by skilled, experienced and competent businesses seeking in good faith to comply with their contractual obligations to provide services that are of the nature of the Services and complying with Applicable Laws...'

42.2.  Clause 5.4:

> 'The [Claimant] shall promptly notify [the Defendant] if it is unable or envisages that it may become unable for any reason to perform the Services or deliver the Deliverables in accordance with this Agreement providing [the Defendant] with the reasons for such inability and all other relevant information.'

42.3.  Clause 7.2:

> 'The [Claimant] warrants, represents and undertakes to [the Defendant] that:
>
> 7.2.2   The Services and Deliverables will conform with the standard of quality and will be fit for any purpose held out by the [Claimant] or made known to the [Claimant] by [the Defendant] under this Agreement;
>
> 7.2.3   The Services and Deliverables will be free from defects in design, material and workmanship;
>
> 7.2.4   It has the expertise, ability and resource to provide the Services and perform this Agreement ...'

42.4.  Clause 7.4:

> '[The Defendant's] rights under this Agreement are in addition to the statutory terms as to merchantability, satisfactory quality and fitness for purpose that are implied in favour of [the Defendant] or End Users under the Supply of Goods and Services Act 1982 and any other statute ...'

Accordingly, such terms were also implied.

42.5.  Clause 9.4:

> 'At the request of [the Defendant] the [Claimant] shall produce and provide [the Defendant] with written reports at frequencies, containing content, in such format and on such media as [the Defendant] may specify that provide accurate information on the performance of the Services and Deliverables.'

42.6.  Clause 9.5:

*'The* [Claimant] *shall produce and deliver to* [the Defendant] *monthly performance reports and* [the Defendant] *shall review the performance of the* [Claimant] *on a monthly basis against any Service Levels and any Acceptance Gateways as defined in the tender Document.'*

42.7.  Clause 16.1:

*'The* [Claimant] *warrants that its Personnel are appropriately experienced, qualified, capable, competent, trained and efficient to perform the Services in accordance with Good Industry Practice. ...'*

42.8.  Clause 16.2:

*'The* [Claimant] *shall appoint and allocate those of its Personnel who are specifically named as Key Personnel as its Personnel who shall be responsible for the matters allocated to such Key Personnel. The Key Personnel shall be those people who are identified by the Parties as being key to the success of the implementation, provision and/or operation of the Services and Deliverables for such time as each Key Personnel is required to perform the role which has been allocated to them. ...'*

42.9.  Clause 16.3:

*'The* [Claimant] *shall not remove or replace any of the Key Personnel unless:*

*16.3.1   requested to do so by* [the Defendant]*;*

*16.3.2   the person is declared to be on long-term sick;*

*16.3.3   the element of the Services in respect of which the individual was allocated has been completed to* [the Defendant's] *satisfaction;*

*16.3.4   the person resigns from their employment with the* [Claimant]*; or*

*16.3.5   the* [Claimant] *obtains the prior written consent of* [the Defendant].'

42.10. Pursuant to Section 1, the 'Key Personnel' included Dr Florian Reichl (Head of Software Development).

43.   Performance of clause 5.3.2 of Section 7, as well as compliance with the Tender Document and/or the IT Security Rules, included the timely achievement of TISAX security certification (a third-party standard, based on criteria developed by the German Association of the Automotive Industry):

43.0   By the Tender Document, the Claimant was required to '*comply with the guidelines, standards, requirements and regulations concerning security, data protection and confidentiality of Rolls-Royce Motor Cars communicated to him*' (p. 55) and specifically '*to observe the RRMC and BMW rules relating to IT security (dated 01.03.2019)*' (p. 50) (the 'IT Security Rules'). The IT Security Rules formed part of the Defendant's 'Security Policy' which the Claimant was also bound to comply with pursuant to clause 10.5 of Section 7.  The Defendant relies on paragraphs 1.2.3, 1.2.4 and 4.2 of the IT Security Rules. Further, the Tender Document stated (at p. 61) that access to raw CAD data, Parts Releases, and Product and Sales Data for the new 3D data preparation process (i.e. DP10 and the IVT) was contingent upon the Claimant obtaining '*relevant certification to deal with highly confidential data*'. Accordingly, the Claimant was required to '*include information about the relevant security certifications that are available for your service that allow you (the service provider) to process highly confidential construction data of new products before market launch*' in its tender response (the Tender Document, pp. 44-45).

43.1.   In a presentation to the Defendant on 22 May 2019, the Claimant stated that its application for TISAX security certification was '*currently ongoing*' (see page 4).

43.2.   On around 14 August 2019, the Defendant confirmed to the Claimant following assessment of protection needs that this certification was a requirement that was needed in order to access its IT infrastructure. It was also referenced in the 'TPL IT Security Conformity Statement' sent to the Claimant on 30 August 2019.

43.3.   As such, TISAX certification was required expressly, as a matter of Good Industry Practice and/or pursuant to the Defendant's reasonable written instructions, the Tender Document and/or the IT Security Rules. The Claimant assumed the contractual risk of failing to achieve timeous TISAX certification.

43.4.   This certification was necessary (among other things) for any Go Live and the handling of confidential data. As timescales were tight, it needed to have been applied for and be achieved promptly. It was incumbent on the Claimant diligently to monitor and progress the application.

43A.   The Claimant's hosting, deployment and use of the Defendant's data was subject to express obligations and restrictions, including compliance with Good Industry Practice (clause 5.3.2 of Section 7), the Defendant's instructions (clauses 5.3.2 and 5.3.8 of Section 7 and the Tender Document, p. 55) and ensuring safe and secure custody of relevant data (clause 5.3.8

for 'RRMC Data' and 'RRMC Materials', as well as clause 21.1 for 'Confidential Information' – all of Section 7). The Claimant did not ask for nor receive any instructions or approvals from the Defendant permitting it to deploy the Defendant's data (including the highly confidential data relating to the new Ghost) on the public cloud; nor would such instructions or approval have been given. Rather, insofar as 'Amazon Web Services' accounts were used, the Defendant was expressly instructed and required to deploy data to those provided and managed by BMW. For example:

43A.1.   In the joint IT Conformity Statement under item CR.2 ('*Cloud platforms and Cloud services must be certified in accordance with BMW Group Regulations*'), the Defendant confirmed: '*We use BMW AWS*'.

43A.2.   In turn, the Claimant's '*ConfiguRR – AWS Deployment and Testing Environments*' stated (at section 1.1.4) that: '*We only deploy to the AWS Accounts provided and managed by BMW (BMW AWS)*'. This statement was approved as part of the Business Proposal.

43A.3.   By email on 17 January 2020 at 14:58, it was emphasised by the Defendant to the Claimant's Mr Topal that the 3D models for 2021 and 2022 vehicles were '*highly sensitive and strictly confidential information*' which should not be on the public cloud.

43B.   By clause 42.1 of Section 7, the Claimant was not permitted to subcontract any of its rights and/or obligations under or pursuant to this Agreement without the prior written consent of the Defendant. Further, when subcontracting, the Claimant was required to: check with the Defendant as to the status of the Defendant's own supplier list and use the Defendant's preferred suppliers when required (clause 42.2); ensure that any authorised subcontractor provided its services in accordance with Applicable Law (defined under clause 1 of Section 6 to include the English and Welsh law) and Good Industry Practice (clause 42.4); and use all reasonable endeavours to ensure that the terms of any subcontract included the provisions under clause 42.5.

**TERMINATION RIGHTS**

44.     Section 1 provided (as a 'Key Term') that the Defendant *'may terminate this Agreement at its convenience at any time upon giving* [the Claimant] *at least six months prior written notice.'*

45.     Section 7 contained (among others) the following express terms:

45.1.  Clause 13.11 as quoted above.

45.2.  Clause 25.1: *'*[The Defendant] *may terminate this Agreement at its convenience (in whole or part) by exercising RRMC Termination at Convenience Rights.'*

## LIMITATION OF LIABILITY

46.     Section 7 contained (among others) the following express terms:

46.1.  Clause 20:

        *'Subject to clause* [20.1]*, the total liability of either Party to the other under this Agreement shall be limited in aggregate for all claims no matter how arising to the amount of €5m (five million euros).'*

46.2.  Clause 26.1:

        *'Upon termination of this Agreement by* [the Defendant] *for any reason:*

        *26.1.1* [The Defendant's] *sole liability shall be to pay the* [Claimant] *the proportion of the Charges applicable to the Services carried out prior to termination and any outstanding unavoidable commitments necessarily and solely incurred in performing this Agreement prior to termination that are not reflected in such Charges.*

        *26.1.2   ...* [The Defendant] *shall not be obliged to pay any Charges for Services which at the date of termination* [the Defendant] *is entitled to reject or has already rejected. ...'*

46.3.  Clause 40.4:

        *'Nothing in this Clause* [40] *shall limit or exclude either Party's liability for fraud or for any statements made fraudulently or negligently prior to the Commencement Date* [11 October 2019].*'*

S O'Callaghan Declaration Exhibit 2 - Page 140

**CLAIMANT'S DELAYS**

47.     There were serious delays by the Claimant in the performance of its obligations under the Agreement.

48.     In breach of clauses 5.3.7, 5.8, 13.1, 13.4 and/or 13.5 of Section 7, by 16 and/or 22 April 2020 (the dates of the First and Second Notice respectively), the Claimant had failed to deliver the IVT, Closed Room Configurator and/or CRIS components by the dates in the Implementation Plan, December Implementation Plan and/or March Plan (see paragraph 62.4 below).

49.     As time was of the essence, this was a repudiatory breach by the Claimant.

50.     The Defendant was not privy to the true cause(s) of delay, but in general terms:

51.     In repudiatory breach of its obligations under the Agreement, the Claimant failed to plan, manage and perform its Services and deliver the Deliverables either to the contractual standard or at all:

PARTICULARS OF BREACH

51.1.   <u>Planning and project management</u>: In breach of clause 5.3.2 of Section 7, the Claimant failed to plan the project or manage the project effectively or at all. The Claimant failed to produce the revised Implementation Plan required by the DP1 milestone date of 30 September 2019. By 7 October 2019, there remained no properly detailed Implementation Plan (or any other document) which identified the workstreams, activities, information and dependencies required to meet the milestones in the high-level Implementation Plan against which the parties contracted. On 7 October 2019, as aforesaid, it was agreed that the Claimant would provide the revised Implementation Plan within 14 days by 21 October 2019. It did not do so. Whilst the production of the revised Implementation Plan required the Defendant's cooperation and input, the Claimant had to be pushed repeatedly to provide such a Plan and it took the Claimant until the end of November to produce any sort of acceptable Plan and then only with very substantial help from the Defendant.

51.2. There was no effective project management at any time and the Claimant failed to adhere to any agreed timetable or plan at any stage. Moreover, the Claimant failed to report and/or measure progress accurately or notify the Defendant of delays as required by clauses 5.4, 9.4 and/or 9.5 of Section 7 of the Agreement.

51.3. Sprints, software development and/or configuration: In breach of clause 5.3.2 of Section 7, the Claimant failed to plan, organise or conduct the Sprints and otherwise undertake the process of development (and, to the extent there was any, configuration) properly. The Claimant showed little understanding of the Defendant's requirements and no adequate demonstrations of developed and/or configured software took place. In week commencing 20 January 2020 and in response to a request to see the current state of development, the Claimant only showed the external auditor what had been developed for the initial pitch presentation on 22 May 2019. By 11 March 2020, following a specific request by the Defendant to see the configurator and front-end user interface, the Claimant did demonstrate some software. Rather than being a configurator, it appeared to be a tool to display images and a basic choice of colours and trim, with no user interface. At a further demonstration a week later, the Claimant struggled to get the tool working. Its status was unclear as only limited functionality (chosen by the Claimant) was presented.

51.4. Software Deliverables: In breach of clause 5.3.2 of Section 7, the Claimant failed to deliver the software as contractually required. The Defendant reserves its position until after disclosure as to whether any contractually-compliant software was ever developed and/or configured by the Claimant. That which was delivered was not contractually compliant.

51.5. Personnel: In breach of clauses 5.3.2 and 5.3.5 of Section 7, the Claimant failed to apply and maintain sufficient numbers of appropriately qualified and experienced personnel for the project.

51.6. In breach of clauses 7.2.4 and 16.1 of Section 7, the Claimant did not have the expertise, ability and resource to provide the Services and perform the Agreement.

51.7. In breach of clauses 16.2 and 16.3 of Section 7, from mid-March 2020, Dr Reichl (one of the defined Key Personnel) was no longer available to the project and was not suitably replaced.

51.8. Such personnel that were supplied were subject to high turnover and rates of absence. They proved incapable of meeting project deadlines. In just under nine months (starting on 1 August 2019), those occupying central roles changed frequently:

27

| Role | No. of changes |
|------|----------------|
| Design Management | 1 |
| Requirements Management | 4 |
| Product Owner Development | 3 |
| Development Management | 1 |
| Operational Project Management | 2 |
| Test Management | 2 |
| Rollout/ Start-up Management | 2 |

51.9.   The high turnover of personnel resulted in loss of knowledge, overreliance on a few team members (such that they became 'bottlenecks') and repeated on-boarding processes, such as there were, required additional time and caused disruption.

51.10. One cause of the excessive turnover was the deterioration of the Claimant's relationship with its subcontractor, RPC. That relationship ended in around December 2019 as a result of the Claimant's mismanagement of the relationship. The Claimant lost resources as a result of the failure of the subcontract relationship.

51.11. For numerous periods (including at the outset), major roles remained unfilled or were subject to interim cover. For example, as an important omission, no Test Manager was appointed until the end of January 2020. This was far too late and was required from the start.

51.12. Testing: In breach of clause 5.3.2 of Section 7, the Claimant failed to develop any or any adequate test documents and/or test cases in good time or at all. Such components as the Claimant claims to have delivered were not adequately tested.

51.13. Security certification: In breach of clause 5.3.2 of Section 7, the Defendant's reasonable written instructions, the Tender Document and/or the IT Security Rules, the Claimant failed to apply for and/or obtain TISAX certification in time. The audit process for TISAX certification did not start until around 27 November 2019 and, as at 25 March 2020, the audit provider's on-site inspection had still not taken place and audit was not due for completion until June 2020, i.e. after the planned and agreed Go-live dates for the 'Pre-Release' functionality.

28

52.   In breach of clauses 5.3.2, 7.2.2 and 7.2.3 of Section 7 and statutory implied terms, such Deliverables as were provided were also of inadequate quality and not capable of acceptance. At termination, the crucial 'Pre-Release' components were still incomplete (see paragraph 62.4 below). The Defendant generally reserves its position on the software as aforesaid.

53.   As to paragraph 18:

53.1.   The vague allegations that the Defendant caused delay are denied – unlike the Claimant, the Defendant provided a skilled and consistent team throughout the project. In mitigation of the Claimant's breaches, it was forced to assume additional tasks.

53.2.   If the Claimant's allegations are pursued, they must be properly particularised, including as to contractual terms, breach and causation.

53.2A.   Moreover, in order to obtain additional time, the Claimant must prove that the Defendant's alleged acts or omissions (amounting to breaches of contract) caused critical delay (see paragraph 20.6A above).

53.3.   It is admitted and averred that the Claimant met its obligation under DP1 to refine the Implementation Plan and to obtain acceptance of the same from the Defendant.

53.4.   It is denied that the Claimant met any appropriate delivery dates and it must prove the true extent of work on the Delivery Packages.

54.   As to paragraph 19, if (which is denied) the Claimant was only required to perform in a reasonable time, it failed to do so and repudiated the Agreement as the delays went to the root of the contact, preventing the Defendant from having critical functionality to support the 2020 worldwide sales process (see paragraphs 1, 3, 20.2 & 20.3 above and 62.2 below).

54A.   In further repudiatory and material breach of its obligations under clauses 5.3.2 and 5.3.8 (non-conformance with Good Industry Practice and instructions), clause 5.4 (prompt notification of inability to comply), and clauses 5.3.8 and 21.1 (failure to hold relevant information safely and securely), the Claimant hosted the Defendant's 'Confidential Information', 'RRMC Data' and/or 'RRMC Materials' on the public cloud, including the Defendant's highly confidential 3D models for the new Ghost, without the Defendant's knowledge or consent.

54B.  In breach of clauses 5.3.2, 5.4, 42.1 and 42.2 of Section 7, the Claimant subcontracted parts of its obligations to third parties without the Defendant's knowledge and consent. Such contractors comprised Frog Design, Solvin, Uwe Zahn (t/a Minimyset) and TextGarage. Yet further:

54B.1.   In breach of clauses 5.3.2, 5.4, 5.3.8 and 21.1 of Section 7, the Claimant is thereby understood to have disclosed the Defendant's 'Confidential Information', 'RRMC Data' and/or 'RRMC Materials' to subcontractors contrary to the Defendant's instructions and without notifying the Defendant of the same. Such material was provided to subcontractors without adequate or appropriate protections, including only general NDAs to which the Defendant was not a party.

54B.2.   In breach of clauses 42.4 and 42.5 of Section 7, the Claimant did not ensure (or, in the case of (iii) use all reasonable endeavours to ensure) that all the relevant subcontracts: (i) were subject to the law of England and Wales; (ii) included a Good Industry Practice obligation to which subcontractor could be held; and (iii) contained the terms set out in clause 42.5.

55.  In the premises, by mid April 2020, as a matter of fact or, alternatively, reasonable opinion held by the Defendant, the Claimant was failing to perform the Services in accordance with the Agreement or to deliver Deliverables by the applicable delivery dates or milestone dates. The critical components addressed by the March Plan were relatively straightforward in terms of IT complexity, compared to the Deliverables to follow. Yet, the Claimant struggled with and failed to achieve even these relatively simple tasks. The Defendant no longer had any confidence in the Claimant's ability to deliver more complex functionality in the project's later stages, in accordance with required and/or reasonable timescales. In that regard, the Defendant relies upon the unreported matters under paragraphs 54A and 54B above as further support for the reasonableness of its opinion about the Claimant's performance failures.

## THE FIRST NOTICE OF TERMINATION

56.  By its First Notice, the Defendant terminated the Agreement with immediate effect for repudiatory breach pursuant to common law and justified by a failure to meet delivery dates, in respect of which (pursuant to clause 5.8 of Section 7) time was of the essence.

57.   Save that the First Notice was effective and (insofar as necessary) the Defendant may and does rely on alternative grounds for repudiatory breach as required, paragraph 20 is admitted.

58.   As to paragraph 21, the Claimant was in repudiatory breach as aforesaid. Taking each of the sub-paragraphs in turn:

58.1.   Paragraph 21.1 is denied. Paragraphs 20 and 21 above are repeated.

58.2.   Timely performance is a condition of the Agreement for <u>any</u> applicable or duly notified delivery date for Deliverables.

58.3.   Relevant delivery dates were contained in the Implementation Plan, the December Implementation Plan and/or then the March Plan. If (which is denied) any particular dates are not found the Court to be applicable, the Defendant relies upon the others. By 16 April 2020, the Claimant had (among others) missed the delivery or milestone dates for:

(a)   Under the <u>March Plan</u>: Technical Go-Live of the IVT (9 March 2020) and Closed Room Configurator (1 April 2020);

(b)   Under the <u>December Implementation Plan</u>: Technical Go-Live of the 'Pre-Release: IVT/CMS' (17 February 2020) and 'Pre-Release: Closed Room Demo' (30 March 2020); or,

(c)   Under the <u>Implementation Plan</u>: Completion of DP2 (31 January 2020), DP3 (31 March 2020) and DP10 (31 January 2020).

58.4.   The Claimant was in anticipatory breach of the CRIS Technical Go-Live date in the March Plan, as well as the milestone or delivery dates for the more complex functionality to follow.

58.5.   As to paragraph 21.2, the pleaded position is partial and inaccurate. There were applicable and/or duly notified delivery dates at all material times:

(a)   As confirmed before the Agreement was signed (for example, orally during tender meetings and at the joint meeting on 7 October 2019), the overall project methodology was 'waterfall'. However, the actual software development methodology could be 'agile', if the supplier so chose. On a proper construction, that was the position expressed in the Tender Document at section 6.1. The position was also confirmed at the 28 November 2019 meeting and via email on

31

5 December 2019 at 20:56, the Claimant acknowledged the '*Waterfall Approach + ITPM artefacts with the Agile Dev approach*'.

(b) In any event, none of the alleged matters prevented the Claimant from proposing delivery dates. Indeed, it did so, leading to the December Implementation Plan and the March Plan.

(c) Shortly after the December Implementation Plan had been accepted (or the relevant delivery dates had been duly notified), Mr Topal stated at joint meetings on 18 and 20 December 2019 that the Claimant would be unable to meet the accepted December Implementation Plan, if the '*BMW Quality Standards*' (i.e. the ITPM) was to be complied with. This was unacceptable to the Defendant: the Claimant had a contractual obligation (e.g. under clause 5.3.2 of Section 7) to provide its Services and Deliverables in accordance with the ITPM.

(d) The Claimant's performance worsened further into January 2020 as aforesaid.

(e) Furthermore, the Claimant wished to vary the Agreement to be paid for partial completion of Deliverables, rather than upon each delivery in full, and submitted billing schedules for this purpose. The Defendant was (rightly) cautious about the proposed variation.

(f) In light of these developments, it was necessary to understand when conformant Deliverables could actually be delivered and what assurance needed to be put in place. The Claimant was, for example, entitled to request a remediation plan under clause 13.11.7 of Section 7. These developments do not undermine the prior acceptance or notification of the relevant delivery dates in the December Implementation Plan.

(g) This was the immediate context for the emails on 19 December 2019 and 22 January 2020 upon which the Claimant relies.

(h) It is denied that, on 19 December 2019, the Defendant's Project Lead (Ida Biot) stated that an Implementation Plan was not in place. Rather, the Claimant was pushing for a separate <u>billing</u> schedule. If such a variation to the payment obligations was to be agreed, it needed to be premised on a plan that the Claimant would meet, and the Claimant's own conduct and comments had already placed its achievement of the accepted December Implementation Plan in doubt. A meeting the next day and follow up emails confirm the mutual agreement that the December Implementation Plan applied (see paragraphs 26.2 and 26.3 above).

(i)  On 22 January 2020, Ms Biot replied to the Claimant's further request for a billing schedule, saying '*it doesn't make sense to discuss a new billing plan if we don't have a <u>viable</u> delivery schedule that has been agreed upon and approved. The deliveries then arrive according to the plan*.' (Emphasis added.) An external audit would shortly confirm (as the parties already knew) that the Claimant would not achieve the agreed December Implementation Plan.

(j)  It is admitted that the Claimant proposed extensions to delivery dates in February 2020. As aforesaid, they were not agreed by the Defendant in full – it had no obligation to do so.

(k)  The proper context for and interpretation of the March Email is set out at paragraphs 29 to 39 above. The email followed an agreement to the March Plan at a joint meeting. If (which is denied) no relevant dates were agreed at that juncture and/or on the basis that they were for further reduced functionality, the Defendant was entitled to (and did) give notice of reasonable delivery dates for which time was of the essence as aforesaid.

(l)  Save that the Claimant guaranteed delivery by the dates in the March Plan in reply, it is admitted that no further delivery dates were agreed or notified thereafter.

58.6.  Paragraph 21.3 is denied:

(a)  The validity of the Defendant's termination at common law does not depend on identification of specific Deliverables in the notice.

(b)  In any event, on a proper construction, the First Notice concerned the Claimant's failure to meet delivery dates and, by implication, specific Deliverables.

58.7.  As to paragraph 21.4, the Claimant failed to meet the applicable delivery dates for the IVT and Closed Room Configurator components in the Implementation Plan (as part of Delivery Package dates), December Implementation Plan or the March Plan. The CRIS delivery date could not be met (see paragraph 62.4 below).

59.  Paragraphs 22 and 23 are denied. The Defendant had lawfully terminated the Agreement or, alternatively, the First Notice is inconsequential due to the Claimant's affirmation of the Agreement.

**THE DEFENDANT'S SECOND NOTICE OF TERMINATION**

S O'Callaghan Declaration Exhibit 2 - Page 148

60. Alternatively, by the Second Notice (served without prejudice to the first), the Defendant terminated the Agreement with immediate effect pursuant to clause 13.11.3 of Section 7 and/or at common law.

61. Save that the Second Notice was effective and (insofar as necessary) the Defendant may and does rely on alternative grounds for repudiatory breach as required, paragraphs 24 and 25 are admitted.

62. As to paragraph 26, the Claimant was in repudiatory breach as aforesaid. Taking each of the sub-paragraphs in turn:

62.1. Paragraph 26.1 is denied. Paragraph 58.1 above is repeated.

62.2. As to paragraph 26.2:

(a) The Claimant was well aware of these events and the systems required to support them – see paragraphs 20.2 and 20.3 above.

(b) These dates were confidential and therefore not shared with all bidders in the Tender Document itself, beyond identification of the fact that a new model would be launched in 2020 (page 44). However, during the Claimant's presentation on 22 May 2019 and more fully after selection (but still well before entering into the Agreement), the Claimant was informed of the events as aforesaid.

(c) As the Claimant well knew, each of these events was integral to project planning. As such, they informed the Implementation Plan and, after entering into the Agreement, the Claimant continued to identify them in planning documentation (for example, the presentations dated 22 November 2019 and 15 February 2020, leading up to the December Implementation Plan and the March Plan). The new Ghost launch led to, most obviously, the Closed Room Configurator for use at the event, as an attempted mitigation.

(d) The Second Notice identified these events for context, which by themselves would have made time of the essence. However, the Agreement already expressly did so.

(e) The intervention of COVID-19 does not excuse any late performance by the Claimant or effect how the delivery dates are to be interpreted. Marketing of the new Ghost model has taken place, beginning in June 2020. Ordering of existing models and the new Ghost model took place as planned.

34

62.3. Paragraph 26.3 is denied. If (which is denied) it was necessary to do so, the March Email made time of the essence:

(a) Under the December Implementation Plan (expressly referenced as *'the compromise plan we have agreed and confirmed on 11th December'*), the Claimant was required to deliver a pre-release version of the IVT (including CMS) by 17 February 2020, i.e. before the March Email. In breach of contract, it had failed to do so. The Claimant was in delay in respect of the predecessor activities for the Closed Room Configurator and CRIS Technical Go-Lives.

(b) Alternatively, if (which is denied) the December Implementation Plan does not apply, the Claimant had failed to deliver DP2 (i.e. the IVT) or DP10 by the milestone dates in the Implementation Plan.

(c) Further or alternatively, if (which is denied) no Implementation Plan applies, the Claimant had – by March 2020 – failed to deliver in a reasonable time, including the IVT, CMS and predecessor activities for the Closed Room Configurator and CRIS Technical Go-Live.

(d) The Defendant agreed (or notified the Claimant of) reasonable delivery dates for: (i) the IVT, now without the CMS; and (ii) the Closed Room Configurator, with a basic functionality as a temporary alternative for CMS consisting of an Excel spreadsheet. The new CRIS-related delivery date (which was no longer to be delivered as a part of the Visualiser Release) was consequential upon the Claimant's actual or anticipated breaches.

(e) That time was of the essence in relation to the March Plan was plain from the circumstances in which it was agreed. The March Plan and the March Email are to be construed against the relevant factual matrix known to the parties at the time, namely, the critical events and dates (referred to at paragraphs 1, 3, 20.2, 20.3 and 62.2 above), the terms of the Agreement relating to Deliverables and Milestones in respect of which time was made of the essence, the circumstances leading up to and the agreement of the December Implementation Plan, the Claimant's delays and breaches of the Agreement and the continuing critical need for the components and functionality referred to in the March Plan by the dates specified.

(f) The March Email confirmed that time was of the essence in respect of these delivery dates, by stating: *'Your achievement of completing these products within the milestones is a condition of our ongoing contractual relationship'*.

35

62.4.   As to paragraph 26.4, Technical Go-Live had not been achieved for any of these critical components <u>and it is denied that the Claimant was entitled to additional time under clause 13.7 of Section 7 or at all</u>. Without limitation and prejudice to the expert evidence that will be served in due course:

(a)   In order to achieve Technical Go-Live, the system needed to complete Systems Integration Testing ('SIT') and User Acceptance Testing ('UAT') successfully, with no blockers or significant defects (in high number or severity), and be deployed onto the intended production infrastructure (rather than the test environment) ready for use by the Defendant. In breach of contract, as aforesaid, TISAX security certification was also outstanding.

(b)   <u>IVT:</u> Work was still required, for example, on penetration testing issues and security backlog items. Further, only data for the Ghost was delivered, not the other vehicle models. It is denied that any failure to perform timeous access rights to the BMW proxy servers caused material delay. The Claimant had its own configuration issues. Moreover, while the proxy server was being configured, the Claimant had independent tasks to perform and, after configuration, there were further issues for the Claimant to resolve.

(c)   <u>Closed Room Configurator:</u> SIT and UAT were still incomplete. There were testcases left to be defined and approved. Further, the installer package to which the Claimant refers generates a fatal error and the software is not properly functional. A warning displays on certain screens (*'WARNING: This is a development server. Do not use it in a production environment'*), indicating that the Claimant did not consider the software to be production ready itself.

(d)   <u>CRIS:</u> The Claimant was incapable of meeting the CRIS delivery date of 23 April 2020. By its own Status Report on 21 April 2020, it is apparent that SIT had not started yet – planned activities included: *'Ongoing review of test cases … Review of test concept … Provide approach for performance test'*.

62.5.   Paragraph 26.5 is denied:

(a)   The right to terminate under 13.11.3 of Section 7 is premised on the Defendant forming *'the reasonable opinion'* that the Claimant *'fails* [1] *to perform the Services in accordance with the Agreement or* [2] *to deliver Deliverables by the applicable delivery dates or milestones'* (numbering added).

S O'Callaghan Declaration Exhibit 2 - Page 151

(b) In terms of [2], the Defendant reasonably held the opinion: <u>that</u> the dates in the March Plan were applicable delivery dates (given their derivation from the Claimant's planning, their mutual agreement on 4 March 2020, their acceptance or notification in the March Email, and the Claimant's guarantee on 5 March 2020 that the March Plan dates would be met); and <u>that</u> these dates had not been (or would not be) met.

(c) As for [1], the Defendant further relies upon its reasonable opinion that the Defendant was failing to perform the Services in accordance with the Agreement. Paragraphs 47 to 55 above are repeated.

63.    Paragraphs 27 and 28 are denied. The Defendant had lawfully terminated the Agreement.

**ALLEGED LOSS AND DAMAGE**

64.    As to paragraph 29, if (which is denied) the Defendant repudiated the Agreement, the Claimant must prove all loss and damage and the causation of the same. Without prejudice to the foregoing:

64.1.    The first sentence of paragraph 29 and whole of paragraph 29.1 are denied. Any damages are to be assessed on the basis of the minimum performance due, as this is all the Claimant has a strict right to receive.

64.2.    Accordingly, damages should be calculated on the basis that the Defendant was entitled to terminate or reject Services or Deliverables pursuant to its express contractual rights.

64.3.    The Defendant should therefore be taken to have exercised: (i) its express right of termination for convenience with six months' notice as at 22 April 2020 (pursuant to Section 1 and clause 25.1 of Section 7); ~~and~~ (ii) its wide discretion to refuse further Services or Deliverables for the remainder of the Term (see paragraph 18.3 above); and (iii) its rights known or unknown to terminate the Agreement at common law or under clause 13.11.3 of Section 7, as set out at paragraphs 48 to 55 above.

64.4.    For example, by relying on clause 14.6 of Section 7, the Defendant would not be required to make further payment. In doing so, it is denied that the Defendant would be acting unreasonably (in the 'Wednesbury' sense or at all) or capriciously: (a) no payment milestones were outstanding as at 22 April 2020 because none had been

agreed independently of the contractual documentation; and (b) after termination, the Defendant would derive little or no benefit from the Services or Deliverables.

64.5. Further or alternatively, given the delays for which the Claimant was responsible (and which are likely to have continued), it is denied that the Claimant would have succeeded in achieving any right of payment in the six months' notice period expiring on 16 October 2020. Leaving aside the delivery of functionality, the Claimant's claim includes DP13 for 'Operation and Maintenance' (€3.5m, representing over one third of the total, prior to any credits). DP13 was anticipated to cover a period from 1 April 2020 (when, in fact, nothing was live) until 20 December 2024.

64.6. The second sentence of paragraph 29 is denied as aforesaid.

64.7. As to the last sentence of paragraph 29, it is denied that the Claimant can maintain a claim for €6.4m. Pursuant to clause 20 of Section 7, any claims are limited to €5m in aggregate.

64.8. As to paragraph 29.2, it is admitted that credit should be given in the sum of €757,028 for previous payments.

64.9. As to paragraph 29.3, it is admitted that credit must be given for costs saved by the Claimant and it must prove the same.

64.10. As to paragraph 29.4, this is a claim for costs rather than damages and is not recoverable as such. Alternatively, a proportion of these costs would be incurred in any event, as the Claimant was bound to assist the Defendant in the case of a termination and is not entitled to further payment in respect of the same. Further or alternatively, the Claimant has no entitlement to these sums which go beyond the Charges: (a) by clause 41.1 of Section 7, it was agreed: '*Each Party shall be responsible for and pay its own respective legal and other costs incurred in relation to … performance of this Agreement*'; and (b) the Charges are the '*only, full and fixed remuneration*' for the Claimant (clause 14.1 of Section 7) and the Defendant '*shall be under no obligation to pay or reimburse any expenses incurred by the* [Claimant] *unless included in Section 5: Charges*' (clause 14.5).

64.11. As to paragraph 29.5, it is denied that the invoiced sum of €180,744 is due – see paragraphs 68 and 69 below.

65.   Paragraph 30 is noted. The Defendant's position is reserved.

66.   As to paragraph 31, which addresses the Defendant's lawful termination on the premise (which is denied) that there was no repudiatory breach:

66.1.   Under the clause 26.1.1, *'the proportion of the Charges applicable to the Services'* is a reference to completed Delivery Packages.

66.1A.   Further or alternatively, as at the date of termination, the Defendant would have been entitled to reject the Services (pursuant to clause 13.10 of Section 7) based on a reasonable opinion that they were delayed, non-conformant with the Specification or terms of the Agreement, and/or incomplete. Accordingly, by clause 26.1.2 of Section 7, no Charges are due.

66.2.   Further or alternatively, the Defendant relies upon clause 13.11.6 of Section 7 to recoup any Charges associated with the Claimant's failure to supply the Deliverables or perform the Services.

66.3.   Further or alternatively, the Claimant must prove the proportion of its Services carried out prior to termination, which — on a proper construction of clause 26.1.1 — must have been performed in accordance with the Agreement.

67.   The Defendant relies upon its counterclaim below and its right of set off under clause 14.8 of Section 7 to extinguish any sums due.

**UNPAID INVOICE**

68.   As to sub-paragraph 32.1:

68.1.   It is admitted that the Claimant performed certain work under DPs 1 and 10, including the refinement of the Implementation Plan (the costs of which — on the Claimant's own case — are claimed in their entirety).

68.2.   It is denied that the Claimant was entitled to raise an invoice for DP1 and DP10 as they remained incomplete (as expressly acknowledged in the invoice itself) and/or, in the case of DP10, the Deliverable contained outstanding defects. Accordingly, no Delivery Package had been signed off pursuant to clause 13.9 of Section 7 and section 8.1 of the Tender Document, as a pre-requisite to raising an invoice.

69.   As to paragraphs 32.2 and 32.3, if (which is denied) the Claimant was entitled to raise the unpaid invoice:

69.1.   The sums were not due and/or the Defendant was entitled maintain that the Services or Deliverables were not to its satisfaction (pursuant to clause 14.6 of Section 7) and/or there was a dispute entitling the Defendant to withhold payment (pursuant to clause 14.9 of Section 7).

69.2.   The Defendant is entitled to rely on its right of set off under clause 14.8 of Section 7 and the provisions in paragraph 18.3 above.

69.3.   In the circumstances, it is denied that the Defendant has acted unreasonably (in the 'Wednesbury' sense or at all) or capriciously as alleged.

70.   As to paragraph 32.4, paragraph 64 above is repeated.

**INTEREST**

71.   Paragraph 33 is admitted.

72.   Paragraph 34 is denied. Notwithstanding any contingent rights, the Claimant has no actual entitlement to interest under contract or statute.

**THE CLAIMANT'S CLAIM FOR DELIVERY UP AND DESTRUCTION OF COPIES**

73.   The software supplied by the Claimant is not functional and none of the software provided by the Claimant is to be used or is of use to the Defendant (save as evidence in these proceedings).

74.   Paragraph 35 is admitted. Further, the Agreement expressly provided as follows:

74.1.   Clause 6 of Section 2:

*'Bespoke Software means any software created pursuant to the terms of this Agreement to be used by* [the Defendant] *solely in relation to* [the Defendant's] *products…*

*For the avoidance of doubt, and notwithstanding any other provision of this Agreement, the Intellectual Property rights in any Bespoke Software shall be owned by* [the Defendant] *and* [the Defendant] *shall grant the* [Claimant] *an exclusive licence to use the Bespoke Software for the purpose of providing the Services for the duration of the Term of this Agreement.'*

74.2.   Section 6 further defines 'Bespoke Software' as *'software programs developed by the* [Claimant] *specifically for* [the Defendant] *under this agreement and listed in Section 2'.*

74.3.   Clause 23.1 of Section 7:

*'All right, title and interest including all Intellectual Property Rights that are legally capable of being assigned under Applicable Law in and to the Deliverables and any other product of the Services, shall immediately upon their creation vest in* [the Defendant]. *Accordingly, the* [Claimant] *hereby assigns with full title guarantee all such Intellectual Property Rights that the* [Claimant] *has now or may have in the future throughout the world to* [the Defendant] *absolutely so far as possible in perpetuity.'*

74.4.   Clause 23.8 of Section 7:

*'All right, title and interest including Intellectual Property Rights in and to all BMW Group Background IPR, RRMC Materials and RRMC Data is vested in and shall remain vested in BMW Group.'*

74.5.   Clause 26.6:

*'Upon expiry or termination of this agreement for any reason ... the following Clauses of Section 7: General Terms ...* [23] *(Intellectual Property Rights) ... and shall continue to have effect.'*

75.   As to paragraph 36:

75.1.   By letter dated 12 August 2020, the Defendant confirmed that it is not using and does not intend to make use of *'the Claimant's software'*. For avoidance of doubt, that confirmation relates to the Supplier Software and:

(a)   excludes Bespoke Software, Deliverables, other products of the Services and/or any software falling within clause 23.8 of Section 7 (the 'Defendant's Software')

in relation to which the Defendant retains all Intellectual Property Rights and the Claimant has no relevant rights to exert; and

(b) is not intended to prevent the preservation or inspection of relevant software as evidence in these legal proceedings.

75.2.  It is admitted that the Claimant has revoked the licence for Supplier Software. Such revocation cannot relate to the Defendant's Software.

76.  As to paragraph 37, the descriptions of clauses 24.7 and 24.8 are admitted, except that they relate to Licenced Software <u>only</u>. By Section 6:

'… *"Licenced Software"* *means the Supplier Software as specified in Section 2 (except the Third-Party Software…, the Modified Software (Supplier)… and the Bespoke Software) and all subsequent amendments and updates to, or new versions of, such Supplier Software as may be provided under the agreement…'*

77.  As to paragraphs 38 and 39:

77.1.  The *'Claimant's software'* is not a defined term. The Claimant has not and must plead what the phrase is said to represent.

77.2.  Assuming the Claimant is concerned with Supplier Software and excludes <u>the</u> Defendant's Software, then – subject to the sub-paragraph immediately below – it is admitted that the Defendant cannot make use of or now copy the same.

77.3.  Software that is materially relevant to this dispute is evidence in these proceedings. It is legitimate and permitted to preserve and inspect such software for the purpose of these proceedings, pursuant to the Copyright, Designs and Patents Act 1988 ('CPA'), s. 45(1) and/or to a term implied by necessity or obviousness.

77.4.  Further, there is no obligation under the Agreement to deliver up or destroy the Supplier Software and no other pleaded basis for the remedies sought.

77.5.  Nevertheless, the Defendant undertakes to destroy all copies within its possession or control of the Supplier Software (for avoidance of doubt, subject to the preservation of the Defendant's Software) under oath, after steps have been taken to ensure to the proper preservation and inspection of evidence. Such steps should be capable of agreement by consent and are best considered during the disclosure stage. In the meantime, the Defendant undertakes not to make any commercial use of the same.

**THE CLAIMANT'S CLAIM FOR A DECLARATION**

78.     Paragraph 40 and the quoted provision in paragraph 41 are admitted.

79.     As to the remainder of paragraph 41, the allegation that the Defendant is not entitled to make any use of any Deliverables unless there has been a payment is denied:

79.1.   Clause 23.1 of Section 7 prevails and provides (with emphasis added) that '[a]*ll right, title and interest including all Intellectual Property Rights ... to the Deliverables and any other product of the Services shall immediately upon their creation vest in* [the Defendant].'

79.2.   On a proper construction, all relevant rights in the Deliverables or any other product of the Services automatically and immediately vest in the Defendant upon their creation.

79.3.   Alternatively, clause 13.10 is only concerned with the discrete scenario where the specific Deliverables have been rejected.

79.4.   Further or alternatively (and subject to the Counterclaim), the Defendant has paid for Deliverables where a valid invoice has been raised, so the declaration serves no real purpose.

**COUNTERCLAIM**

80.     The Defendant repeats its Defence.

**MISREPRESENTATION**

81.     At a presentation on 22 May 2019, and in order to induce the Defendant to enter into the Agreement, Mr Topal represented to the Defendant that:

81.1.   The Claimant's previous experience included the 'Audi City Partner' project (see page 22 of its written presentation). At the meeting, Mr Topal said that this involved the roll out worldwide of a configurator which allowed for dynamic visualisation and real-time rendering of images.

S O'Callaghan Declaration Exhibit 2 - Page 158

81.2.   The Claimant had been an '*Audi Digitalisation Strategy Partner since 2010*' (see page 22 of its presentation). The representation was intended to give the impression of a substantial and on-going relationship with Audi and the Defendant so understood.

81.3.   The Claimant had done '*All 3D Model Deliveries for AUDI AG*' (see page 26 of its presentation) by which the Claimant intended the Defendant should understand (and the Defendant so understood) that the Claimant was the sole supplier, which was responsible for and had delivered all of the 3D models of Audi cars that Audi was using.

81.4.   The Claimant's experience included the '*Audi Training Center Airport Munich*', which involved an '*Audi City 3D Real Time 12K Powerwall*' i.e. a configurator as described above (see pages 22 and 29 of the presentation).

81.5.   By reference to the four sub-paragraphs above, the Claimant represented and intended the Defendant to understand (and the Defendant so understood) that the Claimant had a successful, substantial, on-going relationship with Audi, which had resulted in the worldwide (and local) roll out of a configurator which allowed for dynamic visualisation and real-time rendering of images.

Together, the 'Audi Representations'. The Audi representations were continuing representations to the date the Agreement was entered into.

82.   In reliance on the Audi Representations, the Defendant was induced into the Agreement:

82.1.   The selection criteria (under section 1.5.1.5 of the Tender Document) included: '*The Supplier's capability to fully support its proposal*'. The service provider requirements (under section 7.6 of the Tender Document) included '*Comprehensive automotive expertise among different brands*' and '*Experience in design and rollout of global IT systems*'.

82.2.   The Defendant had not worked with the Claimant on a project before, so its prior experience with other established automobile companies was important.

82.3.   Worldwide delivery to an automobile company was particularly significant, as many companies are capable of developing a solution, but not one that is scalable and proven through delivery worldwide. The rendering of 3D models on a worldwide basis is particularly challenging.

82.4.  That Audi, a very large car manufacturer with a global reputation, was the Claimant's client for the technology to be purchased and rolled out worldwide by the Defendant was a powerful endorsement of the Claimant's capability and *bona fides*.

83.    The Audi Representations were false:

PARTICULARS OF FALSITY

83.1.  The Claimant did not deliver the Audi City Partner project worldwide. During a pre-project phase involving around 20 other suppliers, the Claimant provided a proof of concept to Audi, but its proof of concept was not taken further by Audi and the Claimant was not involved in the actual project.

83.2.  The Claimant had not been and/or was no longer an '*Audi Digitalisation Strategy Partner*'. The phrase was meaningless and invented by the Claimant. At the time it was made, alternatively at the date of the Agreement, the Claimant did not have any sort of relevant or meaningful relationship with Audi.

83.3.  The Claimant was one of a number suppliers for the delivery of 3D images for Audi. As far as the Defendant is aware, Audi only used the Claimant for two (of many) car models as the Claimant's work was sub-standard. Audi relied upon its other suppliers for the rest.

83.4.  The Claimant only provided a video for the '3D Powerwall' at the Audi Training Center at Munich Airport.

83.5.  The Claimant did not have an on-going relationship with Audi of any substance or at all.

84.    The Audi Representations were made without reasonable belief in their truth and/or negligently:

PARTICULARS

84.1.  The Claimant (Mr Topal in particular) knew or ought to have known that the Claimant had not been retained by Audi to rollout the Claimant's configurator worldwide and had not done so.

84.2.  The Claimant (Mr Topal in particular) knew or ought to have known that, following submission of the Claimant's proof of concept, Audi had decided that the Claimant would not be part of its configurator project.

84.3.   The Claimant (Mr Topal in particular) knew or ought to have known that the phrase '*Audi Digitalisation Strategy Partner*' was not a real or substantial role.

84.4.   The Claimant (Mr Topal in particular) knew or ought to have known that Audi had only called off two car models from the Claimant and that the numerous other models that Audi required were obtained from other suppliers.

84.5.   The Claimant (Mr Topal in particular) knew or ought to have known that the Claimant did not have a meaningful or any continuing relationship with Audi.

**BREACH OF CONTRACT AND TERMINATION**

85.   The accrued and anticipatory breaches of contract pleaded at paragraphs 47 to 54 above are repeated.

86.   By the First or Second Notice, the Defendant duly terminated the Agreement either at common law or pursuant to its terms. Paragraphs 56 to 63 above are repeated.

**LOSS AND DAMAGE**

87.   By reason of the matters aforesaid, the Defendant has suffered loss and damage:

PARTICULARS OF LOSS AND DAMAGE

87.1.   For breach of contract, repudiatory breach and contractual termination, see the Schedule at Appendix 1 hereto.

(a) The Defendant urgently had to source a basic configurator and visualiser at short notice for the Ghost launch events, and to update and upgrade its existing systems for marketing and sales. These inferior systems will need to be replaced in due course.

(b) Further, the Defendant has incurred wasted costs and, without the systems for which it contracted, lost profits on vehicle customisations/options.

87.2.   For the misrepresentations, the same claim is maintained (except for Item 2). But for the Claimant's misrepresentations, the Defendant would have contracted with another bidder. Accordingly, it would not have incurred costs mitigating the Claimant's

breaches, not wasted costs on the Claimant or its system, and not been left without critical functionality in order to support the key sales activities.

88.    To the extent necessary, the Defendant relies on clause 13.11 of Section 7, pursuant to which it is expressly entitled:

    88.1.    to recover any loss and additional costs incurred in performing the Services itself or pursing substitute services from a third party (clause 13.11.5); and,

    88.2.    to hold the Claimant accountable for any additional costs, loss or expenses incurred by the Defendant (clause 13.11.8).

89.    Further or alternatively, pursuant to clause 13.11.6 of Section 7, the Claimant is entitled to be refunded for Charges paid, which are associated with specific failures to supply the Deliverables or perform the Services, amounting to €757,028 and any further sums pursuant to clause 26.1.1.

90.    The Defendant seeks compensation in Euros because this currency most truly expresses its loss and pursuant to clause 14.15 of Section 7: "*Unless otherwise specified all sums payable by either Party under this Agreement shall be paid in the currency of Euro.*" At the date of this re-amended counterclaim, €12,613,157 €18,662,872 is the equivalent of £11,239,584 £16,026,142.[1] Any currency conversion losses will be calculated when the sums due in respect of the claims identified are resolved.

**INTEREST**

91.    The Defendant is entitled to and claims interest on such sums as are found to be due at a rate of 4% per annum above the Bank of England base rate compounded monthly pursuant to clause 14.11 of Section 7. In respect of any element of the Defendant's counterclaim to which clause 14.11 does not apply, the Defendant claims interest from the dates the losses were suffered until the date of actual payment at such rate and with such rests as the Court shall think fit pursuant to s. 35A of the Senior Courts Act 1981.

---

[1] Using the currency conversion rate on www.xe.com (accessed on 21 June 2022 13 November 2020).

**THE DEFENDANT'S CLAIM FOR DESTRUCTION AND/OR DELIVERY UP**

92.   Pursuant to clause 6 of Section 2 and clauses 23.1 and 23.8 of Section 7 (quoted at paragraph 74 above), the Defendant has retained all right, title and interest including all Intellectual Property Rights in Bespoke Software, the Deliverables, any other product of the Services, BMW Group Background IPR, RRMC Materials and RRMC Data. Any right to make use of such software or materials ceased on termination or, alternatively, any licence is hereby revoked at the latest.

93.   Further, by clause 26.4 of Section 7:

'*Upon termination of this Agreement for whatever reason the* [Claimant] *shall:*

26.4.1          *... unless otherwise expressly authorised by* [the Defendant] *the* [Claimant] *shall cease using, return and deliver to* [the Defendant] *all physical and non physical property that belongs to* [the Defendant] *including all RRMC's Confidential Information, RRMC Materials, all RRMC Data, all RRMC Personal Data and all other documents and materials and copies thereof in the possession, power, custody or control of the* [Claimant].' '

94.   By its solicitors' letter dated 3 September 2020, the Defendant demanded return of its non-physical property pursuant to clause 26.4, attaching a list of the same (duplicated in Appendix 2 to this pleading). In breach of contract, the Claimant has failed to return that property.

95.   In addition, except for the purposes of this litigation, the Claimant has and can in the future have no legitimate use of the Defendant's Software (as defined at paragraph 75.1(a) above) in its possession, and any copying of the same would amount to infringement of the Defendant's copyright.

96.   In the premises and subject to the proviso at paragraph 97 below, the Defendant seeks an order (pursuant to the Agreement and/or CPA, ss. 99 and 114, the Court's inherent jurisdiction or otherwise) for:

96.1.  delivery up and/or destruction of the property referenced in the letter dated 3 September 2020 (and now in Appendix 2) in the Claimant's possession; and/or

96.2.  delivery up and/or destruction under oath of copies of the Defendant's Software in the Claimant's possession.

97.  To the extent that any of the above is relevant to these proceedings, the Defendant accepts that, first, steps must be taken to ensure to the proper preservation and inspection of evidence. The Defendant therefore does not invite any destruction until such steps are agreed or ordered. In the meantime, the Claimant may only use Defendant's Software and other property for the purpose of the proceedings.

**COMPLIANCE WITH INSURANCE OBLIGATIONS**

98.  The Claimant is required to obtain and maintain certain insurance cover (Section 7, clauses 19.1 and 19.2). The Defendant has the right to request and receive within 10 Business Days all such documentation necessary to prove the Claimant's compliance with its obligations to insure under clause 19 (clause 19.3). By letters dated 6 May and 9 June 2022, the Defendant has made such requests. In breach of contract, the Claimant has failed or refused to provide the requested documents. The Defendant therefore seeks the order set out at (vi) of the prayer for relief or such other order as the Court sees fit.

AND the Defendant counterclaims:

(i)  Damages for misrepresentation as aforesaid; and/or

(ii)  Damages for breach of contract consequent upon termination as aforesaid; and/or

(iii)  Damages for breach of contract as aforesaid; and/or

(iv)  Delivery up and/or destruction of the property and the Defendant's Software as aforesaid; and/or

(v)  Interest as aforesaid.

(vi)  An order or injunction requiring the Claimant to provide – to the extent relevant to coverage of the Counterclaim and/or costs thereof – copies of: the insurance certificate(s), policy schedule(s), policy terms that it has put in place pursuant to

clause 19; and documents (such as a written confirmation) to prove the Claimant's continuing compliance with its obligations to insure under clause 19.

ALEX CHARLTON QC

IAIN MUNRO

ALEX CHARLTON QC

IAIN MUNRO

ALEX CHARLTON QC

IAIN MUNRO

Served this 13th day of November 2020

Re-served this 23rd day of July 2021

Re-served this 29th day of June 2022

STATEMENT OF TRUTH

I believe that the facts stated in this Re-Amended Defence and Counterclaim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name: DR. TIMO POSER
Position: CFO
Date: 27.06.22

50