1               UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4       THE HON. WESLEY L. HSU, JUDGE PRESIDING

5

6  Topalsson GmbH,               )
                            )
7                 Plaintiff,   )
                            )
8        vs.            ) No. 23-cv-01823-WLH
                            )
9  Bayerische Motoren Werke AG,  )
   et al.,                  )
10                          )
                  Defendants.  )
11  _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          MOTION TO DISMISS CASE

16

17         Friday, August 18, 2023

18            10:58 AM

19

20         Los Angeles, California

21

22        Wil Wilcox, CSR 9178
      Official U.S. District Court Reporter
23       First Street Courthouse
      350 West First Street, Room 4311
24       Los Angeles, CA  90012
        wil.wilcox@gmail.com
25

```
1   APPEARANCES OF COUNSEL:

2
    FOR THE PLAINTIFF:
3
                        Ben M. Davidson
4                       Davidson Law Group
                        4500 Park Granada Boulevard, Suite 202
5                       Calabasas, CA 91302
                        310-473-2300
6                       Fax: 310-473-2941
                        Email: ben@dlgla.com
7
                        Caroline A. Bader
8                       Erise IP PA
                        7015 College Boulevard, Suite 700
9                       Overland Park, KS 66211
                        913-777-5600
10                      Fax: 913-777-5601
                        Email: carrie.bader@eriseip.com
11                      PRO HAC VICE

12                      Lydia C. Raw
                        Erise IP PA
13                      7015 College Boulevard, Suite 700
                        Overland Park, KS 66211
14                      636-357-0218
                        Email: lydia.raw@eriseip.com
15                      PRO HAC VICE

16  FOR THE DEFENDANT:

17                      John G. Froemming
                        Jones Day
18                      51 Louisiana Avenue, NW
                        Washington, DC 20001-2113
19                      202-879-3939
                        Fax: 202-626-1700
20                      Email: jfroemming@jonesday.com
                        PRO HAC VICE
21
                        Jonathan McNeal Smith
22                      Jones Day
                        555 South Flower Street 50th Floor
23                      Los Angeles, CA 90071
                        213-243-2559
24                      Fax: 2113-243-2539
                        Email: jonathansmith@jonesday.com
25
```

1          LOS ANGELES, CA.; FRIDAY, AUGUST 18, 2023

2                      10:58 AM

3                     - - - - -

4      THE CLERK:  Calling number two, CV-23-01823,

5    Topalsson GmbH v. Bayerische Motoren Werke AG, et al.

6          Counsel, please state your appearances, starting

7    with Plaintiff.

8      MR. DAVIDSON:  Good morning, Your Honor.

9          Ben Davidson from Davidson Law Group for

10   Plaintiff.  With me today is Carrie Bader from the Erise

11   Law Group, Ms. Lydia Raw from the Erise Law Group, and

12   Mr. Topalsson who is corporate representative for

13   Plaintiff.

14     THE COURT:  Thank you.

15     MR. FROEMMING:  Good morning, Your Honor.

16          Jones Day, John Froemming.  With me is my

17   colleague Jonathan McNeal Smith.

18     MR. SMITH:  Good morning.

19     THE COURT:  All right.  We're here on the

20   Defendants' motion to dismiss.  We issued the tentative

21   just briefly before the hearing.

22          Have both sides had sufficient time to review

23   the tentative?

24     MR. FROEMMING:  Yes.

25     THE COURT:  All right.  Then given the tentative,

1    Mr. Froemming, do you want to go first?

2          MR. FROEMMING:  Please.

3               *(Discussion held off the record.)*

4          MR. FROEMMING:  May it please the Court, having had

5    a few moments to review the tentative, I think there are

6    two or three main issues that jump out, Your Honor.

7          THE COURT:  Okay.

8          MR. FROEMMING:  The first is that we don't believe

9    the Court gave sufficient consideration to what we view as

10   the main holding of the Ninth Circuit line of cases

11   represented by *Manetti-Farrow*, that even where nonparties

12   are involved, that an exclusive jurisdiction clause may be

13   applied in the case where the dispute is closely related

14   to the contract or to the contractual relationship.

15          Second -- we'll get to this in order -- we also

16   believe that forum non conveniens is an independently

17   separate; that is, a conventional forum non conveniens

18   analysis, setting aside entirely the exclusive

19   jurisdiction clause of the agreement, is an entirely

20   independent basis supporting dismissal of the case.

21          And then third and finally, we believe there is

22   no personal jurisdiction over BMW AG, no specific personal

23   jurisdiction with respect to the claims in this case.

24          Our understanding of Ninth Circuit law, Your

25   Honor, is that whereas here, the allegations of the first

1    amended complaint are contested that the Court may not

2    assume those allegations to be true, and that the Court

3    may and should go beyond the pleadings to consider the

4    record.

5                Let me back up and start from the top.

6                Fundamentally, we believe this dispute is

7    closely related to the agreement.  Again, the Court cited,

8    I believe, in a footnote, one of the two holdings of

9    *Manetti-Farrow*, namely that federal law governs the

10   question of the scope of an exclusive jurisdiction clause.

11               There's another very important holding, however,

12   of *Manetti-Farrow* that has been followed countless times,

13   both in the Ninth Circuit and in district courts within

14   this state.  And that essentially is at page 513 and

15   page 514, Note 5 of the Ninth Circuit's decision from

16   1988.

17               Briefly, Your Honor, the Court held there that,

18   quote, Because enforcement of a forum clause necessarily

19   entails interpretation of the clause before it can be

20   enforced, federal law also applies to interpretation.

21               You noted that in the footnote.

22               But it went on.  The court there held that,

23   quote, A range of transaction participants, parties and

24   nonparties, should benefit from and be subject to forum

25   selection clauses.

1          That's from page 514, Note 5, with a citation

2    omitted.

3          The Court went on to state, We agree with the

4    District Court that the alleged conduct of the nonparties

5    is so closely related to the contractual relationship that

6    the forum selection clause applies to all defendants.

7          Let's take a couple seconds to drill a little

8    deeper on the Ninth Circuit's decision.  In that case,

9    Your Honor, the plaintiff had argued that the forum

10   selection clause could not apply to non-signatories to the

11   contract.  And the Court considered and rejected that

12   argument.

13         And indeed, the Court noted that -- at page 512,

14   the Court mentioned but did not follow the Third Circuit's

15   approach of, quote, Treating interpretation of forum

16   selection clauses as a contract issue to be resolved

17   according to state law.

18         Okay.  Now, we understand Your Honor's

19   observation in the footnote that federal law governs the

20   issue here.  But nevertheless, this is not merely a

21   question of contract interpretation, given the Ninth

22   Circuit's repeated holdings that nonparties can be held to

23   exclusive jurisdiction clauses as well.

24         Another --

25        THE COURT:  Okay.  But can I add a distinction?  I

1    don't have any quarrel with that -- that legal precept.

2    My issue is -- and maybe I didn't understand this from the

3    *Manetti-Farrow* case, is that the parties have to intend

4    that nonparties will be sweeped into the forum selection

5    clause.

6           In other words, yes, I have no problem with the

7    fact that non-signatories can be bound by a forum

8    selection agreement.  But doesn't the contract itself have

9    to contemplate that?  In other words, shouldn't the

10   contract have said, in an ideal world, This forum

11   selection clause applies to anyone that is related to

12   this -- to this contract?

13     MR. FROEMMING:  The short answer, Your Honor, is no.

14   The *Manetti-Farrow* rule, which has been repeated countless

15   times, does not talk about intent or focus on or consider

16   contemplation of the parties.

17          That black letter law test that's been repeated

18   over and over again is whether in the context of a dispute

19   about whether nonparties can be deemed subject to an

20   exclusive jurisdiction clause, the conduct at issue is

21   closely related to the contractual relationship.  That's

22   the test.  And there's no reference in that test to intent

23   of the parties or contemplation of the parties.

24          There's other Ninth Circuit law, Your Honor,

25   that -- that further fills out this point.  One case we

1    cited but didn't dwell on in our briefing is the *TAAG*
2    *Linhas Aereas de Angola v. Transamerica Airlines*.  That's
3    915 F.2d. 1351, 1354, Ninth Circuit, 1990.  And there,
4    this gets on to a different issue, but coincidentally,
5    Transamerica and the individual defendants did not object
6    to being governed by the forum selection clause, and they
7    had agreed to submit to the jurisdiction of the Swiss
8    courts.
9           There's a particularly interesting case we
10   didn't cite, to my knowledge, Your Honor.  But it was one
11   in which the Ninth Circuit affirmed a dismissal under
12   *Manetti-Farrow,* deeming an exclusive jurisdiction clause
13   to apply to nonparties even where those nonparties were
14   not even corporate affiliates.  That is *Manila Industries,*
15   *Inc., v. Ondova Limited Co*., 334 Fed Appendix 821 at 822.
16   That's Ninth Circuit, 2009.
17          There's also a corollary, Your Honor, that has
18   developed.  It's really the same point.  But in our brief,
19   we noted a couple of cases about how this applies,
20   particularly where the exclusive jurisdiction clause did
21   not -- did not refer to the parties or even when the forum
22   selection clause refers to the parties.  And that is -- we
23   cited *Products and Ventures International* as well as
24   *Graham Tech Solutions*.
25          In *Graham Tech*, for example, the conduct of GTSI

1    and Mr. Fuller were so closely -- were closely related to

2    the contractual relationship, and the forum clause was

3    held to apply to both of them in spite of the fact that

4    they were not signatories.

5            And there, for example, the parties had agreed

6    to submit to the exclusive jurisdiction over all disputes.

7    So even though there was no apparent contemplation that

8    they were going to be swept in by intent to the exclusive

9    jurisdiction clause, it was held to apply.

10           Further, Your Honor, there are holdings to the

11   effect that -- let me quote.  Quote, Forum selection

12   clauses that contain the phrase "relating to" cover

13   disputes that reference the agreement or have some logical

14   or causal connection to the agreement.

15           That's a color switch, Your Honor, which was

16   cited in our brief, from 2020, Ninth Circuit, *Sun v.*

17   *Advanced China Healthcare* from Ninth Circuit, 2018, also

18   holds to the same effect.

19           I mentioned that, Your Honor, because here,

20   the -- Topalsson was obliged to submit, quote, Any dispute

21   relating to this dispute to -- relating to the agreement

22   to adjudication under the courts of England and Wales.

23           Further to how the dispute is closely related to

24   the agreement under this second holding of *Manetti-Farrow,*

25   we went through this in the brief, Your Honor, but we

think it's clear that any evaluation of what software is

at issue and infringed, if at all, depends on who owns

what under the agreement.

And here, the dispute as to infringement,

ownership access, and damages is all closely related to

the agreement.

The other side argued that that's not the case.

But one of the examples was -- well, on the damages side,

for example, they would seek damages based upon sales

using the configurator.  Well, that immediately implicates

a question of apportionment; that is, if they're going to

be surveying or looking at consumer reliance upon the

configurator, not all of which came from Topalsson.

Obviously, it's undisputed that images, various IP that

went into that configurator either had always belonged to

Rolls-Royce U.K. or had been deliverables for which

Rolls-Royce paid, and then under the agreement are the

exclusive IP of Rolls-Royce U.K.

So that's why we feel it's clear that this

dispute is closely related to the agreement and that,

therefore, this independent basis for holding nonparties

subject to the exclusive jurisdiction clause makes sense.

In their brief, Your Honor, they allege -- in

their responsive brief, they allege infringement in

real time generation of, quote, Images and videos of

display features and views of Rolls-Royce cars.  This is
also alleged in the first amended complaint at
paragraphs 312 and 13.  However, the agreement expressly
provides that, quote, Current available 3D master models,
soft party modeling, and technical content models,
unquote, for various Rolls-Royce models was from a
Rolls-Royce U.K.  That's Poser, Exhibit 6 at 45.

So clearly here, Your Honor, I think we've all
been struggling with the line between what they're
claiming to be infringed or to be infringing and who is on
what relates directly and closely to the agreement.

The line between images and software belonging
to Rolls-Royce U.K. and any protectable software owned by
Topalsson to display such images definitely has a causal
or logical relation to the agreement and is going to
require interpretation of the agreement.

Hoffman, in his reply declaration at paragraphs
3 to 5, also gets into this in considerable detail.

So those are the main points, Your Honor.  So I
don't think -- I can get into details about whether the
language of the agreement applies to the nonparties.  But
I don't think that that is determinative, given this clear
holding of *Manetti-Farrow*.  I'm happy to go into that for
your edification.

THE COURT:  I don't think that's necessary.  I,

1    obviously, have to go back and look at this case and then

2    decide as a top-level issue whether or not I just missed

3    it.

4           MR. FROEMMING:  Understood.  Understood.

5             Suffice it to say, Your Honor, if you'd indulge

6    me for 30 seconds, just so I can fill out the canvas here

7    a little bit.

8           THE COURT:  Okay.

9           MR. FROEMMING:  That in Clause 44.4 of Section 7 of

10   the agreement, Topalsson was obliged, as I said, to

11   commence any dispute arising from, in connection with, or

12   related to the agreement in England.  And the agreement

13   was for the, quote, Benefit of Rolls-Royce Motor Cars and

14   relevant BMW group companies.  And there's no limitation

15   in that clause to that benefit.

16         The exclusive jurisdiction clause is also

17   engaged in respect of any dispute arising from, in

18   connection with, or related to the agreement.  And when

19   you take a step back, Your Honor, and look at this

20   agreement, clearly, any such disputes would most naturally

21   involve Rolls-Royce Limited of the U.K. as a contract

22   party who would need to sue Topalsson in England.

23         So to the extent they're arguing otherwise, we

24   think it's a little bit artificial and unrealistic to

25   suggest that the parties contemplated that that BMW AG or

1    Rolls-Royce N.A. would go it alone in Germany or anywhere

2    else.

3              Let me shift to the second of the three issues,

4    if I may.  And that is forum non conveniens.  I believe,

5    from a quick skim of the tentative, Your Honor, that you

6    had stated in the tentative that given Your Honor's

7    ruling, based largely on the first of the two prongs of

8    *Manetti-Farrow*, that you didn't need to look at a

9    conventional or full forum non conveniens analysis with

10   the full review of the public and private factors and

11   consideration -- the usual test, even assuming there had

12   been no exclusive jurisdiction clause whatsoever.

13             And here, Your Honor, a traditional forum non

14   conveniens analysis is an independent reason and basis,

15   independent of the exclusive jurisdiction clause, which we

16   believe clearly supports this dispute between the German

17   plaintiff and the German defendant, BMW, as well as

18   Rolls-Royce, which is based in London, obviously, not

19   being litigated in California.

20             Two quick points --

21        THE COURT:  Aren't the dealers here, though?

22        MR. FROEMMING:  They are.  But again, when you look

23   at the forum non conveniens point, right, that's only a

24   small part of the analysis.  And here's why.

25             The two basic prongs of a full forum non

1    conveniens analysis are, okay, would the plaintiff have an

2    adequate alternative forum in England?  And then second,

3    if it does -- and I'm not sure that that's strongly

4    countered at this point -- does the balance of private and

5    public interest factors favor dismissal?  Okay.

6        And it's clear, Your Honor, under the Ninth

7    Circuit's case law, for example, *Lueck* -- L-u-e-c-k -- *v.*

8    *Sundstrand Corp.* that a German plaintiff's effort to sue

9    in California merits little, if any, weight.

10       There's plenty of case law in the Ninth Circuit

11   that where a plaintiff is not based in California --

12       THE COURT:  Right.

13       MR. FROEMMING:  -- that court held that, quote, We

14   have further held that a foreign plaintiff's choice of

15   forum -- and I assume that means maybe even a foreign

16   plaintiff in Reno, right, much less Germany -- we have

17   further held that a foreign plaintiff's choice of forum

18   merits less deference than that of a plaintiff who resides

19   in the selected forum and the showing required for

20   dismissal is reduced, unquote.

21       So first, adequacy of the forum.  Topalsson has

22   failed to meet its burden to show that it has, quote, No

23   remedy at all in England.  That's the Ninth Circuit's

24   *Creative Tech* case, 61 F.3d 696 at 701 from 1995.  And the

25   two technical arguments, Your Honor, that they made in

1    their response really fall short.

2            The English court's jurisdiction over

3    non-English property disputes is clearly limited only

4    where the proceedings are principally concerned with the

5    question of title or the right to possession.  That's the

6    *Bundy* case.

7            And here, as even the judge found in the

8    anti-suit injunction opinion that was issued the other

9    day, the Defendants have all agreed to jurisdiction --

10    including the dealers, have all agreed to jurisdiction and

11    service in England.

12            So clearly, there's an adequate forum.  Counsel

13    would point to whether the judge -- the English judge

14    thinks that the one forum is better than another.  But the

15    Ninth Circuit's test for the first prong of traditional

16    forum non is, is there an adequate forum.  And there is.

17            Next, to the factor balance.  First, the private

18    factors.  These all or virtually all favor dismissal, and

19    we's believe clearly so, Your Honor.  That same case I

20    mentioned a few minutes ago, *Lueck v. Sundstrand*, says

21    that a court should, quote -- should evaluate, quote, The

22    materiality and importance of the anticipated evidence and

23    witnesses' testimony, and then determine their

24    accessibility and convenience to the forum, unquote.

25    236 F.3d 1137 at 1146, Ninth Circuit, 2001.

1           I mention that because the facts here are rather
2    stark.  When you look at the Ninth Circuit's first factor,
3    for example, Your Honor, residence of the parties and
4    witnesses, the Ninth Circuit is clear that this is not a
5    game of counting, tabulating the residency of the
6    defendants.  And if the Plaintiff happened to have, in its
7    first amended complaint, named more California residents
8    than not, then a forum non argument should be rejected.
9           That's just not the case.  Here, it's undisputed
10   that BMW AG resides in Germany.  And it's undisputed that
11   all of the material witnesses to defend against
12   Topalsson's software infringement claims are in England or
13   Germany.
14          We put in declarations on this from every single
15   Defendant.  It's undisputed that no -- no U.S.-based
16   witnesses have any knowledge or documents to defend
17   against Topalsson's software infringement allegations.
18          Now, the Plaintiff talks about, Well, this was
19   shown or displayed, right, in allegedly -- in California
20   Rolls-Royce showrooms, right.  But obviously, the big
21   issue here is, was there infringement or not?  And all of
22   these dealers have come forward, as well as Rolls-Royce
23   North America and basically said, We haven't got a clue
24   what the agreement says about who owns what, and so we're
25   in no position to evaluate, really, a big issue, if not

1   the biggest issue, of whether the software dispute here

2   involves infringement or not.  Okay.

3           The next factor is forum non conveniens to the

4   litigants.  I think it's clear, Your Honor, that England

5   is more convenient to BMW AG and to Topalsson as well.

6   And the other Defendants, again, have taken that argument

7   away by agreeing that, Look, we're submitting to

8   jurisdiction and service.  We'll go to England.

9           The other factors, Your Honor, are access to

10  physical evidence, other sources of proof, cost of

11  bringing witnesses to trial.

12          Here, again, the material sources of proof for

13  the defense -- Plaintiff only talked about where the

14  evidence is for their claims, where they claim it is, even

15  though it's mostly in Germany.  The material sources of

16  proof for the defense are in England or Germany.

17          And, again, we, here, are eight hours ahead of

18  Munich.  We're seven hours -- no we're eight hours ahead

19  of England, and we're nine hours ahead of Germany.  So

20  hailing these witnesses from BMW and Rolls-Royce to

21  address the software allegations and who owns what under

22  the agreement is going to completely uproot them from all

23  of their work, obviously, for weeks.

24          In terms of rounding out the private factors

25  favoring dismissal, Your Honor, the other two that come to

 1   mind are enforceability of a judgment.  We've made our

 2   argument about personal jurisdiction, and we'll get to

 3   that in a minute.  And the other is interesting.

 4   Sometimes we're used to sort of those throwaway catch-all

 5   clauses of other practical problems.  Well, here, it's

 6   important by Plaintiff's own admission.  They make a big

 7   deal, both in their original complaint and in their first

 8   amended complaint, about this German third-party

 9   Mackevision, who supposedly was complicit in infringing

10   software that was then distributed by Rolls-Royce

11   North America in the U.S.

12          But it's not disputed that this Court lacks

13   personal jurisdiction over Mackevision.  And, in fact, we

14   can point this out the -- even the British judge in the

15   opinion on the anti-suit injunction acknowledged that

16   Mackevision is likely to be a witness.  So it's yet

17   another factor that we believe compellingly favors the

18   Defendants and dismissal under the private factors.

19          Briefly, Your Honor, on the public factors,

20   right.  We lumped together the first several to stay

21   within the page limit, among other things, local interest

22   in the lawsuit, burden on local courts, costs of resolving

23   dispute unrelated to a particular forum, right.

24          This, again, is, by all accounts, a worldwide

25   rollout of a software product to Rolls-Royce dealers

1   around the world.  So this is not as though people were

2   sitting in England saying, We really want to design

3   something here for these five Rolls-Royce dealers in

4   California.  It's just not how it worked.  And the initial

5   allegations they made about environmental compliance and

6   things are totally unrelated to the software at issue and

7   to any question of local interest or, for that matter,

8   specific personal jurisdiction over the core claims pled.

9           A number of these cases -- we didn't mention

10   this in the brief, but if you look, for example, at

11   *Creative Tech*, the Ninth Circuit case from 1995, 61 F.3d

12   696 at 704.  There, the Court, in dealing with these

13   particular public interest factors in a traditional forum

14   non conveniens analysis, pointed out that there, the

15   plaintiff was not American.  And it was not a case of

16   piracy of American-made products or the like, and that

17   that was providing context for the Court's finding that

18   local interest in the lawsuit and so forth did not favor

19   keeping the case all the way over here in California.

20           The other public factor, Your Honor, is the

21   Court's familiarity with the governing law.  And, again,

22   Topalsson admits that English law governs the substantive,

23   the substantive contract issues apart from EJC and

24   12(B)(3) issues.

25           And, obviously, English courts have plenty of

1    familiarity with applying English law in the context of

2    U.S. software copyright infringement claims.

3         Again, if you look more generally at the *Bundy*

4    case, it's remarkable how much U.S. courts, both in the

5    Ninth Circuit and the Second Circuit, have been able and

6    willing to get into this.

7         So that's really the main point with respect to

8    forum non, Your Honor.  We know Your Honor has more

9    discretion there to grant or deny a traditional forum non

10   motion.

11        But, again, if we step back and look at what

12   this is, it's a software dispute over software contracted

13   to be developed between a German plaintiff and English

14   company, right, where the English affiliate, the English

15   company's affiliate, BMW in Munich, was supposedly

16   complicit and did all these bad things, which we deny, and

17   we would show didn't happen, right.

18        But this is so fundamentally a case that is

19   based in Europe where the witnesses in the U.S. have no

20   clue as to the core issues of infringement.  The documents

21   certainly aren't here.  It all has to come from Europe.

22        So with respect to personal jurisdiction, Your

23   Honor, I pointed out that -- I believe I pointed out that,

24   Your Honor, whereas here, the allegations are

25   controverted, that the Court should not just take those at

1    face value for purposes of finding specific personal

2    jurisdiction over BMW AG.

3            Again, the context of this, and it's not

4    disputed, is that this was a world -- a development of

5    software for distribution and deployment worldwide.

6            You pointed out, Your Honor, in your tentative,

7    that Topalsson -- that, basically, there's no general

8    jurisdiction.  So the real question is as to the next

9    option, right.

10           And here, let me just highlight a couple of

11   quick statements.  Topalsson's U.K. counsel back in the

12   hearing on July 6th, acknowledged that quote, If, for

13   example, BMW AG did some copying in Germany, that couldn't

14   be copyright infringement in the U.S., unquote.  That's

15   the Plaintiff's Callahan declaration, Docket 537,

16   Exhibit 7, page 32.

17           And here, Your Honor, the record evidence is

18   that Rolls-Royce North America LLC, based in New Jersey,

19   was the one to distribute the visualizer to Rolls-Royce

20   dealers throughout the U.S., including Germany.

21           There's no evidence, Your Honor, that BMW AG did

22   anything -- anything in the U.S., much less relating to

23   Plaintiff's specific claim in this case.

24           The one thing the Plaintiff alleges or argues in

25   its brief is that, well, they imply that BMW AG arranged

1    for these AWS instances on a server through which dealers

2    could access the accused software.

3           And we put in declaration evidence through

4    Mr. Hoffman, for example, pointing out that AWS was chosen

5    because it offered -- surprise, surprise -- a worldwide

6    rollout through AWS instances wherever they might be in

7    the world.

8           So it's not as though -- there's no evidence

9    that BMW went out -- or even an allegation, that BMW went

10   out and called, and said, you know, We want these -- we

11   want AWS to serve up this software for -- exclusively or

12   specifically for Rolls-Royce dealers in California or even

13   just for Rolls-Royce dealers in the U.S.

14          The whole point was it's -- the contract was

15   through a BMW AG contracting party, not Mackevision,

16   but -- the name escapes me -- another company, which

17   essentially facilitated this.  And so basically, you sign

18   up, you check the box or do whatever you do for worldwide

19   hosting, and they arrange it.

20          And sure, they have a server for North America,

21   and they probably have one for Asia, and they probably

22   have one for the Middle East, whatever.  But --

23      THE COURT:  I'm not sure how that helps you.  They

24   knew that it would be served up to dealers in California.

25   So why isn't that enough to confer specific jurisdiction

1    as related to this product?

2        MR. FROEMMING:  For two reasons, Your Honor.  First,

3    the general case law is clear.  And, in fact, the

4    Plaintiffs try to pooh-pooh it.  But it's clear, Your

5    Honor, that merely introducing a product into the stream

6    of commerce is not sufficient to anchor an argument of

7    specific jurisdiction, right.

8            They say, Well, BMW, Rolls-Royce knew who

9    Rolls-Royce's dealers were in California.  Well, that's

10   true.  It's also true that they knew who their dealers

11   were around the United States.  But simply knowing who

12   your customers are going to be for a product that you

13   launch into the stream of commerce worldwide does not

14   support a finding of specific personal jurisdiction.

15           In fact, Your Honor, we cited a couple cases

16   that specifically consider the issue of AWS or other

17   server instances.  And those courts have considered the

18   issue and concluded, Look, arranging for a server is

19   insufficient to support a finding of specific jurisdiction

20   over infringement claims like this.

21           Again, the Hoffman reply declaration gets into

22   this for particular factual detail.  So those are sort of

23   the comments I had.

24           Your Honor had noted one of the paragraphs out

25   of the recent English opinion on the anti-suit injunction

1  motion.  If it might be helpful to the Court, I could take

2  a couple minutes and just give you some more detail on

3  this 43-page decision, whatever it was.  Because, clearly,

4  they weren't applying the right law.  And the law that

5  they were applying is completely contrary to what we've

6  been talking about for the last half hour.

7       THE COURT:  Well, I mean, I don't know about

8  applying the right law.  They were not applying the law

9  that I'm applying and bound to apply here.  So I don't

10  think -- I don't think that's necessary.  I'm not viewing

11  the U.K. decision as legal authority as to what I have to

12  decide here.  I view it as an intervening fact that has

13  some impact on the factual determination as related to

14  this motion, including, for example, you know, whether or

15  not there's an adequate forum over there.

16       I think that it is not dispositive of any issue,

17  but I think it was appropriate for Plaintiff to file it

18  and for me to consider it because it's a fact that I think

19  is pertinent to the decision, even if not dispositive of

20  anything.

21       MR. FROEMMING:  And I understand Your Honor's final

22  statement there.  But if I could take just two or

23  three minutes, if I could keep it to that --

24       THE COURT:  Okay.

25       MR. FROEMMING:  -- to point out some other aspects

1   as to why this decision should have no impact and how, if

2   anything, factual observations by the judge there actually

3   support dismissal here.  These are paragraphs that,

4   obviously, Plaintiff hadn't gotten into.  And we didn't

5   want to -- we didn't want to file an unauthorized

6   supplementary reply brief once we saw this yesterday.

7           THE COURT:  Right.

8           MR. FROEMMING:  So I figured the time is now.

9           THE COURT:  Okay.

10          MR. FROEMMING:  At paragraph 107 of the English

11  opinion, from the other day, the judge said that he has,

12  quote, Starting point that an EJC, exclusive jurisdiction

13  clause, does not cover claims against the third parties,

14  unquote, is obviously contrary to Ninth Circuit law and

15  would, in our view, emasculate this well-established

16  Ninth Circuit law that we talked about under

17  *Manetti-Farrow*.

18          Take, for example -- and, again, there are

19  numerous courts that have followed this.  I cited some.

20          One Northern District California Court sort of

21  got into this, Your Honor.  It's *Ultratech, Inc., v.*

22  *Ensure* -- E-n-s-u-r-e -- *Nanotech (Beijing), Inc.*, 108

23  F.Supp 3d 816 at 822 to 23 N.D. Cal. 2015.  A little bit

24  different context, but here's what that court said, Your

25  Honor.

1       Quote, The premise that a nonparty could only be
2   subject to a forum selection clause, if she agreed to be
3   so bound, swallowed the rule -- there's an ellipsis before
4   swallowed -- swallowed the rule of *Manetti-Farrow* by
5   effectively precluding nonparties for being subject to the
6   forum selection clause, since a person's agreement to be
7   personally bound by the agreement would make that person a
8   party to the agreement.
9       There are other ways too.  Your Honor mentioned
10  the issue of adequacy of the forum.  And there are a
11  couple places where the recent opinion, the English
12  opinion applying not our law gets into this.
13      The Court -- the English judge at paragraphs 157
14  and 173 confirmed the adequacy of an alternative forum in
15  England by noting, quote, It is true that the defendants
16  here have agreed to the jurisdiction of this Court and
17  accept service on solicitors acting for them here, end
18  quote.
19      So I mentioned that because the Plaintiff tries
20  to make arguments that, Well, there aren't U.K. gateways
21  for jurisdiction and so forth.  And here's an English
22  judge who's familiar with the gateway law for jurisdiction
23  and basically saying that's not an impediment because all
24  the Defendants, including the California dealers, have
25  agreed to accept service and jurisdiction by a solicitor

1   in England for litigation there.

2          The English court also, at paragraph 166, simply

3   assumed or opined, quote, That BMW AG is active in the

4   U.S., unquote, by arranging AWS instances.

5          Again, Your Honor, I think if the Court goes

6   back to those cases, as well as the general principle of

7   Ninth Circuit and Supreme Court law, that merely placing

8   something in the stream of commerce is not sufficient,

9   that takes care of that.  And so this is why we believe

10  the English Court's opinion also confirms that dismissal

11  is warranted even under a conventional full forum non

12  conveniens analysis.

13         We pointed out, Your Honor, paragraph 102 where

14  the Court said that this dispute is -- does relate to the

15  agreement and is covered by the exclusive jurisdiction

16  clause.  We would submit, Your Honor, that in light of

17  *Manetti-Farrow,* that's virtually the end of the analysis

18  with respect to whether, under *Manetti-Farrow,* the

19  exclusive jurisdiction clause should be deemed to cover

20  this entire dispute and -- and this litigation with the

21  parties.

22         There, at 102, the Court said, quote, Looking

23  realistically at the likely shape of the dispute,

24  engendered by the amended complaint, I have come to the

25  view that it is covered by the EJC.  There is likely to be

specific recourse by RUK -- that's his abbreviation for

Rolls-Royce Motor Cars Limited England -- to one or more

of the terms of the agreement which deal with intellectual

property rights.  And there will have to be a detailed

examination of exactly what transpired between the parties

when they were dealing with each other for the purpose of

the agreement.

         Over all, it seems to me, this is a dispute

which does, indeed, arise from or is in connection with or

relates to the agreement.

         We would submit, Your Honor, this motion isn't

his.  But that finding that this is a dispute -- again,

Topalsson agreed to submit any dispute relating to the

agreement to adjudication in England or Wales.  This goes

a long way to support a finding that either under the EJC

analysis of *Manetti-Farrow* or, alternatively, under a

forum -- a full forum non analysis, that dismissal is

warranted.

         The Court made other observations about the

location of evidence that I think is also relevant to

Your Honor's consideration of forum non conveniens, the

full analysis, right.

         At paragraph 167, the english judge said quote,

Evidence would have to come into California from England

and Germany because the Defendants will rely on there

1    being no internal "upstream" infringement.

2          Again, that's not really disputed on the facts,

3    Your Honor.

4          The second quote worth mentioning is where at

5    the same paragraph, 167, Your Honor, the english judge

6    says, quote -- and I alluded to this earlier -- Evidence

7    from Mackevision on the creation of the fallback

8    configurator is also likely to be required and Mackevision

9    is based in Munich, unquote.

10          So this is just that judge, but clearly taking a

11    very different view of forum-non-conveniens-related facts

12    than Topalsson did when they simply tried to walk away

13    from its allegations of Mackevision by claiming that --

14    that their location is simply a red herring for purposes

15    of a full forum non conveniens analysis.  That's just not

16    the case.

17          The Court made a couple of other observations,

18    Your Honor, that at the end of the opinion -- and I think

19    they don't -- they don't warrant much.  This is my last

20    slide, anyway.  That the English judge made some broad --

21    made a broad statement that it could not be viewed as a

22    burden for, quote, Large commercial corporations, unquote,

23    to conduct litigation in California, at 167.

24          But, again, that ignores the facts, and we

25    believe Ninth Circuit law -- and clearly, there's no large

1    commercial corporation exception under Supreme Court or

2    Ninth Circuit law for personal jurisdiction or otherwise.

3          The Court also made -- opined that, quote, The

4    territoriality point becomes relevant again in favor of

5    Topalsson based on his having "gone to California and

6    observed what was happening in various Rolls-Royce

7    showrooms."  That's paragraph 169.  That's irrelevant,

8    obviously, to the Court's lack of -- whether there's

9    personal jurisdiction over BMW AG or not.

10         So suffice it to say, Rolls-Royce U.K. is

11   appealing the opinion.  But we really believe, Your Honor,

12   if Your Honor goes back to look at that -- that additional

13   holding from *Manetti-Farrow,* that that dictates a

14   different result from the tentative.  That's the first

15   point.

16         The second is that, Your Honor, we submit,

17   respectfully, should it go through the forum non analysis,

18   the traditional one -- that is, even if you set aside --

19   if you ignore the EJC and *Manetti-Farrow*'s other holding,

20   even if you ignore that, the full forum non argument on

21   these facts clearly warrants dismissal.  This is a

22   European case.

23         And then finally, we don't think there's

24   personal jurisdiction over BMW AG with respect to the

25   facts in this case and the governing law.

1      THE COURT:  Thank you.

2          Ms. Bader.

3      MS. BADER:  Thank you, Your Honor.  Good morning --

4   still morning.  I just wanted to make sure.

5          Okay.  I'm going to try to keep it brief.  I'm a

6   big believer in if you're ahead, probably say less.  So

7   I'm going to have a few points from Defendants'

8   presentation.

9          So I want to start with *Manetti-Farrow*.  So that

10  case -- I think that is a good case to look at, actually.

11  One of the cases, and a few of them that he also mentioned

12  in his argument, the *TAAG Linhas* and the *Graham* case,

13  something that sticks out from those is that there's a

14  named party in each of those cases that is actually a

15  party to the agreement with the forum selection clause or

16  the EJC, whichever way you want to call it.  I like forum

17  selection clause.

18         Gucci Parfum, which was one of the Defendants in

19  that case, was a party to the forum selection clause

20  agreement in *Manetti-Farrow*.  It's so true with *Holland

21  America*, another case that they cited in their briefing.

22         And in the *TAAG* case, we have a party that

23  stepped into the shoes of the party that was subject to

24  the forum selection clause through a merger.  They

25  acquired the assets and liabilities.  Likewise, in Graham,

```
 1    Graham also was a successor entity, so stepped into the
 2    shoes of the party that was a part of that agreement.
 3           So here, what we've got, we've got a U.S.
 4    copyright case, right.  We've named, very specifically,
 5    Defendants, a majority of whom located in this district.
 6           We've also identified the Rolls-Royce --
 7    Rolls-Royce North America entity.  And then the parent
 8    entity, the BMW, who is a German entity.  None of them are
 9    parties to the agreement.  Obviously, we agree with the
10    tentative on that.
11           Despite pointing to a number --
12        THE COURT:  But you are, right?
13        MS. BADER:  Correct.  Absolutely.  Obviously, we
14    want to file a U.S. copyright case.  We chose California,
15    which is where the greatest number of the Rolls-Royce
16    dealerships where this configurator software is used;
17    that's where that occurs.  It's also where the greatest
18    number of the acts of infringement have occurred under the
19    U.S. copyright.  That's all U.S.  And the majority of the
20    acts are in California.
21           So if we're looking at the specific acts here,
22    California makes sense.  That's why we filed it here.  And
23    none of the acts of infringement took place outside of
24    U.S. with respect to the U.S. copyrights.
25           Now, importantly, the Defendants are not parties
```

1    to the agreement.  But if we're going to look to that

2    agreement, which counsel did several times, another

3    provision that's important to consider is Section 43.1,

4    which says, Nothing in this agreement shall confer or is

5    intended to confer on any third party any benefit or the

6    right to enforce any term of this agreement under the

7    contract's rights of Third Parties Act of 1999.

8              So if we find that that's in conflict with

9    another provision that he's read, well, I guess U.K. law

10   applies to interpret that contract, and the U.K. court has

11   already spoken on that point and found that it does not

12   apply to nonparties.

13             So even if you determine that the forum

14   selection clause could apply -- I don't want to belabor

15   that point, but I do want to take just a moment to talk

16   about the wrapping up of the claims here and whether you

17   can find that you have to look at interpretation of the

18   agreement to see if you need to interpret the agreement to

19   make a ruling on the copyright claim.  And here, you

20   don't.

21             So it's undisputed that the four copyright

22   registrations here cover what's been called in the U.K.

23   litigation supplier software, which is Topalsson's

24   software.  It exists.  And it was first published well

25   before any relationship with Rolls-Royce U.K.

1          So the copyrights are covering software and code

2     existing prior to any agreement.

3          The infringements that we've alleged have taken

4     place in the U.S. after the agreement was terminated.

5          When you're doing a copyright infringement case,

6     particularly one with code, you're essentially doing a

7     side-by-side analysis, right?  We're looking at the

8     deposit material code covered by the copyright

9     registrations.  We're looking at the software, the

10    infringing software.  And we're looking to see if it was

11    copied to see if it's the same thing.

12         None of that requires interpretation of the

13    agreement.  None of it requires looking at, well, this was

14    contributed by Rolls-Royce, and this wasn't.  Because

15    we're talking about code that existed before the

16    relationship.

17         So while I appreciate that Defendants want to

18    continuously transform this into a Rolls-Royce U.K. must

19    be in this case and it's their contacts that matter, they

20    don't.  Because we don't need to look at the contract to

21    determine the copyright claim.  And that does come from

22    *Manetti.*  It said, A copyright claim could be subject to a

23    forum selection clause in a contract if it requires

24    interpretation of the contract.  And that's actually in

25    the body of the case, not in footnote 5.

```
 1              So here, we don't have that.  We don't need to
 2    look at it and do interpretation of the contract to
 3    determine this case.
 4              So that is the forum selection clause issue.
 5              We don't believe it applies.  We think Your
 6    Honor is correct that it applies only to the parties.
 7              And turning to the forum selection -- or, I'm
 8    sorry, the forum non conveniens argument.  So let's say
 9    you agree, stick with your tentative, forum selection
10    clause doesn't apply, but maybe you should do this forum
11    non analysis.
12              Again, Rolls-Royce U.K. is not here.  They're
13    not a party to the case.  It is fairly incredible that we
14    are arguing that this jurisdiction is not convenient for
15    at least five parties who do business here and reside
16    here, another entity that's in the U.S., and then the
17    parent entity, BMW Germany, based on the context of a
18    nonparty to this case, which is Rolls-Royce U.K.  That is,
19    essentially, what Defendants are asking this Court to do;
20    find that this is inconvenient because someone who's not a
21    party to this case resides in the U.K.
22         THE COURT:  There is some persuasiveness to me,
23    though, that the parties that are here, the Defendants
24    that are here, don't have a lot of knowledge about the --
25    sort of the technical aspect of the infringement.
```

1    Clearly, there will be witnesses here that can say, That's

2    the software that we use in our dealership.

3         MS. BADER:  Uh-huh.

4         THE COURT:  But in terms of witnesses that are,

5    like, We contracted with AWS to propagate this software

6    out to the greater Internet for people to use, including

7    our dealers --

8         MS. BADER:  Uh-huh.

9         THE COURT:  -- none of those witnesses is going to

10   be here, right?

11        MS. BADER:  So what we pleaded is that it's -- we

12   believe it's BMW AG that, because they have a centralized

13   IT department --

14        THE COURT:  Uh-huh --

15        MS. BADER:  -- who has contracted with -- or

16   whatever the procedure is -- with Amazon Web Services AWS,

17   for this instance, which I like to analogize in my head to

18   the apartment and the apartment building, and the building

19   is the server.

20            But the point is, from those pleadings and those

21   facts, is that BMW AG intentionally needs to have those

22   AWS instances near or in the locations where the dealers

23   who are going to be accessing the configuration software

24   are going to be using it in the showrooms, right.  You

25   need to have it from a -- from a speed perspective.

1          THE COURT:  Right.  Right.

2          MS. BADER:  And they know where their largest market

3     is.  They know where their largest dealers are.  They know

4     where the -- where the biggest use of that software is

5     going to happen.  And they want it there.  They want it in

6     the U.S.  And they want it in their largest market, here

7     in California.

8               So to say that BMW -- which is a named party,

9     which is why we've named that party, who would have the

10    information based on their centralized IT department and

11    putting it on the AWS servers, that's why they're a named

12    party here.

13              As far as the actual convenience of that

14    information -- this comes up a lot in transfer motions as

15    well, right -- the reality of litigation at this point is,

16    one, we don't -- we don't need a ton of information,

17    right.  We need code versus code so we can do our

18    side-by-side comparison.  And much of it -- it's not,

19    like, boxes of documents that are getting hauled over from

20    Germany, right.  It's largely electronic.

21         THE COURT:  Yeah, I'm not worried about that.

22         MS. BADER:  Yeah.

23         THE COURT:  I'm just worried about the people that

24    are going to authenticate that stuff, This is a code that

25    we loaded on to the AWS server.

```
 1        MS. BADER:  Sure.  And I'm not going to say that a

 2   litigation can't get a little bit complex like that, but

 3   that's just true in any technology case, right.

 4        You know, Mr. Topal has managed to come over

 5   here for this hearing and is headed on back.  It's not

 6   unheard of for a large major corporation like BMW to

 7   defend itself in California, where it has done in other

 8   cases.

 9        I understand that it might be more convenient

10   for them if we went over there to them.  But the purpose

11   is that the infringements are here.  This is a U.S.

12   copyright case.  And they can be found here.

13        Additionally, the one point that I wanted to

14   make that -- I think, actually, Your Honor mentioned that

15   he had used it from the U.K. decision that we submitted

16   yesterday as a fact of what has happened in the case.  It

17   is important to note from that what the U.K. court found

18   regarding whether U.K. was a viable forum.

19        You know, we talked a lot about these gateways.

20   And Defendants' counsel identified a couple provisions in

21   the contract that I just wanted to highlight.  So the

22   Court there noticed there are real difficulties in

23   establishing gateways into the English courts with these

24   Defendants -- again, five California dealers, a

25   North American Rolls-Royce entity, and then the German BMW
```

1    entity -- based on a U.S. copyright claim.  So that's a

2    U.S. property, dealing with U.S. infringements, damages

3    that are incurred in the U.S., having a way into the

4    English courts to deal with that, accepting that they have

5    said, We'll submit to jurisdiction.  We'll accept service

6    to our solicitors.  There are still concerns about

7    actually having an English court hear that case.

8          So it's not clear, actually, that the U.K. court

9    is a viable forum for the U.S. copyright claims, which are

10   the ones at issue here.  And, of course, the end of the

11   day, the U.K. court said, Yeah, we're not going -- we're

12   not going to force that forum selection clause against the

13   nonparties to this action.

14         I mean, the very basis --

15         THE COURT:  Well, I think that's -- when I first was

16   informed of the U.K. decision, I was like, Well, that

17   determines whether or not they're a viable option.  But

18   upon further reflection, I don't think that's the case.

19   He's just -- he's just said that, I'm not going to haul

20   them in here pursuant to the forum selection clause.

21   That's not a statement that, You can't come in here on

22   your own and sue them in the U.K. courts.

23         MS. BADER:  Sure.  And I understand that.

24         But I think that there's still a question -- I

25   believe we've submitted declarations -- on whether there's

1    actually a path forward.  As I understand it -- and I'm

2    not going to stand here and pretend that I am super

3    knowledgeable of U.K. laws.  But I'm going to rely on the

4    declarations we've submitted.

5         THE COURT:  Sure.

6         MS. BADER:  That there are instances of -- you know,

7    it's not sort of as perfunctory as we file a case here in

8    the U.S., we get a summons, and we can go serve that on

9    the Defendant.

10        My understanding is that there is a little bit

11   more to actually be able to have access to the English

12   courts, to actually have your day in court there.  But I

13   will rely on our declaration that we submitted on that

14   point.

15        Separately, on the forum non conveniens issue,

16   it is a little unclear exactly which Defendants that

17   specifically relies to.  It is a hard one to understand

18   from the perspective of the dealer Defendants located here

19   in California where, clearly, they're here.

20        For Rolls-Royce North America, it's not entirely

21   clear if they're fully making that argument, that they

22   can't litigate here in the U.S.  They haven't raised a

23   personal jurisdiction issue, so they're not contesting the

24   Court has jurisdiction here.  And it's also unclear

25   exactly what evidence that they would be unable to do here

1   in the California court that would necessitate moving all

2   the way over to the U.K. and Germany.  So it's really

3   about BMW AG and whether it's convenient there and what

4   evidence there would be.  And again, the evidence is code,

5   side-by-side code.

6          And we also have identified that we believe it

7   is BMW's IT group that controls these AWS servers, and we

8   haven't seen anything contradicting that from the

9   Defendants.

10          So just briefly on the personal jurisdiction

11   issue.  So personal jurisdiction is just raised by the BMW

12   AG case.  And I actually would direct the Court to the

13   case we cited in our briefing, which was *Riot Games v.* --

14   I'm going to pronounce it wrong -- it's either *Suga* or

15   sugar [sic].  Where that's a very -- that's a good case to

16   use as an analogy, which is, obviously, why we cited it.

17          It's one where a foreign game developer put

18   their game on the App Store and Google Play intentionally

19   putting it -- no other connections to U.S. -- but put it

20   on those locations for U.S. customers to, obviously,

21   download, pay for, play, enjoy, so purposely directing

22   that, that conduct into the United States.  Which, if

23   you're a foreign defendant and you are challenging

24   personal jurisdiction, if you've not identified another

25   forum in the U.S. where you could be hauled into court,

1    then we don't look at the California contacts, we look at

2    contacts with the U.S. as the forum.

3          So the question is not necessarily BMW AG's

4    contacts and purposeful direction of activity into just

5    California.  It's into the U.S.  And that's under just the

6    Federal Rule of Civil Procedure 4(k)(2).

7          And *Riot Games* walks through that analysis, the

8    reason they were able to come into court.  This is a

9    Central District of California case again.  They found

10   personal jurisdiction was proper because they directed the

11   activities of making the game available in the United

12   States for U.S. customers.

13         In the same way, BMW has intentionally and

14   purposefully put the configuration of software on these

15   AWS instances intentionally in the U.S. for reasons of

16   speed and efficiency for its U.S. dealers to be able to

17   use that configuration software in the showrooms.

18         Additionally, they provide IT support.  They

19   have a centralized IT system, and all of that comes into

20   play into making this -- the infringing software available

21   in the U.S.

22         Further, on just a burden point on the personal

23   jurisdiction issue, where there is no jurisdictional

24   discovery, the only burden on the Plaintiff is to show

25   prima facie showing of facts and the complaints that would

1    support personal jurisdiction, which we have done here,

2    which Your Honor has recognized in the tentative, and

3    which is reflected in the *Riot Games* case.

4            So mindful of my opening statement, if there's

5    any other questions from the Court, I'm happy to answer

6    those.  But, obviously, we appreciate the tentative and

7    would say that, that's correct.

8            THE COURT:  All right.  Thank you.

9            MR. FROEMMING:  May I, Your Honor?

10           THE COURT:  Yes.

11               Just a second.

12                   *(Discussion held off the record.)*

13           MR. FROEMMING:  Let me just go seriatim through

14   responses to Ms. Bader's comments.

15               First, as Your Honor pointed out, we can all

16   agree, Topalsson GmbH is a party to the services

17   agreement.

18               Second, artful pleading cannot emasculate the

19   governing precedent under the well-established rule of

20   *Manetti-Farrow*, that parties and nonparties are to be held

21   to exclusive jurisdiction clauses where the alleged

22   conduct relates closely to the contractual relationship.

23           THE COURT:  What about this idea -- I understand her

24   argument to be that this is not closely related to the

25   contractual relationship because you don't need to

1   actually interpret the contract at any point in order to

2   determine whether or not the software that was used

3   infringes or not.

4       MR. FROEMMING:  You absolutely need to, at two

5   levels, Your Honor.  First, even just looking at her sort

6   of narrow argument, right, you need to understand who

7   owned what software.  This agreement is a complicated

8   agreement that -- that defines and provides what

9   deliverables go to Rolls-Royce U.K.  That agreement

10  defines what software and other data belongs to whom.

11      THE COURT:  Well, except that the preexisting

12  copyrights -- I mean, if that's correct factually, that

13  all of the software copyrights at issue here preexisted

14  this contract, what difference does it make?

15          Are you saying that the contract confers

16  Topalsson's prior existing copyright rights to the entity

17  in the U.K.?

18      MR. FROEMMING:  No.  No.  It goes to the

19  infringement question.

20      THE COURT:  Okay.

21      MR. FROEMMING:  So it appears that what they're

22  going to argue, or would like to argue, is that the

23  visualizer or configurator that Rolls-Royce distributed

24  worldwide was some derivative --

25      THE COURT:  Right.

1       MR. FROEMMING:  -- work of their preexisting

2  copyrights.

3       THE COURT:  That is my understanding, yes.

4       MR. FROEMMING:  And they say -- they say now, and

5  they said in their papers, although they weren't always

6  saying it, that the copyrights that they're suing on

7  predated any relationship with Rolls-Royce.  Okay.

8       They started to say in their responsive brief,

9  Well, there's more than just the copyrights.  They define

10  the accused software as the BMW or the Rolls-Royce

11  configurator, and the configurator has other aspects.

12  It's all in the Topalsson declaration.

13       They start to say, Well, these other aspects are

14  also somehow protectable to them and infringed.  But even

15  if you assume that their alleged copyrights are limited to

16  what is in those four registrations that predate the

17  relationship with Rolls-Royce, and even if you assume that

18  Topalsson is the exclusive owner of all the rights to

19  those four copyright registrations, there's still a major

20  issue of contract there because of the process.

21       The process involved Rolls-Royce providing

22  certain IP to Topalsson, working with Topalsson to have

23  additional software developed.  Okay.  And then getting

24  something back to use in connection with the creation and

25  development and rollout of a configurator.

```
 1            That back-and-forth process involved different
 2   pieces of IP, including, but not limited to, the copyright
 3   registrations that they had before the relationship.  And
 4   under this agreement, certain of the software that they
 5   provided or certain elements of the software that they
 6   provided belong to Topalsson, and that certain other IP
 7   belonged, from before the relationship as well, to
 8   Rolls-Royce U.K.  And so any look at the accused software
 9   is going to have to involve a look at the contract to sort
10   out, Okay, well, is this material -- is this accused
11   software supplier software that belongs exclusively to
12   Topalsson?  Or is it some other deliverable that is some
13   combination?  In which case, that which Rolls-Royce owns
14   has to be vetted out from that copyrighted software that
15   Topalsson provided in order to do any sort of infringement
16   analysis.
17        THE COURT:  But is that a contract interpretation
18   issue?  But let me -- can I just go back to Ms. Bader for
19   one second.
20            But let me give you an -- a specific example.
21   So you're comparing the two codes.  And there's a
22   subroutine in the two codes that paints cars red.
23   Rolls-Royce's defense is, Well, we already had that
24   subroutine.  That wasn't something that Mr. Topalsson gave
25   to us.  That's something that we were doing.  And now its
```

1   combined into this gigantic thing that you say is

2   infringing.

3          That's -- doesn't -- does that implicate -- I

4   mean, is that closely related to the contract?

5       MS. BADER:  So just a couple things on that.  The --

6   when you're doing that comparison, so in a copyright case,

7   they would show -- they would need to show evidence that

8   they did that before, right, that they owned that before,

9   whatever that feature was.

10      THE COURT:  Right.

11      MS. BADER:  But they could just show that from their

12  own files and record.  There's nothing about that that

13  deals with contract interpretation.

14      THE COURT:  Okay.

15      MS. BADER:  And additionally, the U.K. court already

16  determined that the preexisting supplier software was

17  owned by Topalsson that's the subject of the copyrights.

18  That's already something that's been determined.  So

19  ownership is determined.

20      THE COURT:  Right.  I understand.  Okay.

21      MR. FROEMMING:  The answer to your question, Your

22  Honor, it is closely related, and it does require

23  interpretation.  Because you have to -- you have to

24  interpret the contract.  You have to understand what BMW

25  owned that it put into the process and became part of the

software, as well as what Rolls-Royce bought.  So there
are two pieces of this.

For example, there's references to 3D models,
right, of BMW vehicles and so forth, right.  Rolls-Royce
U.K. Limited provided IP depicting 3D models of
Rolls-Royces, for example.  And so Topalsson was supposed
to work with that and develop software to augment that,
right.

But what the accused software is, obviously is
going to require some interpretation to understand for any
jury to begin to sort out, okay, well, who owns that?  If
that's the subroutine for painting the car red, well, is
that in the agreement?  Who owns that?  Because even if
Topalsson developed some portion of the software, right,
and supplied that, and even if -- which it didn't -- it
ended up in the accused software, the question is well,
who owns it?

And between the ITT, this huge detailed
specification of what Rolls-Royce was contributing and
what Topalsson was to do, between that and the services
agreement, it can be a complicated question to sort out.
Okay, well, who owns this?  And to the extent which the
Court found in its judgment finding them liable for breach
of the agreement, where the court found that, yeah, BMW
paid for various deliverables, right.

So, so long as these were deliverables for which Rolls-Royce paid, and so long as they weren't supplier software, as defined in the agreement, even if Topalsson contributed to or created that, that belongs under the agreement. That is the IP of Rolls-Royce. And the agreement says title to that IP vests exclusively in Rolls-Royce. So you can't get away -- you can't get away from the contract.

The second and the last point to this general subject, Your Honor, is while counsel likes to focus on a simplistic side-by-side comparison of the code, right, what does the first amended complaint say?

Mr. Topal -- or Topalsson GmbH goes on about -- presumably, with a view to saying this to a jury -- that he looked at certain views and images on a screen at some Rolls-Royce dealer, whether it was in Colorado or Abu Dhabi, and surmised that this -- these views -- these images could only -- could only have come from his copyrighted software. Okay. You can imagine him trying to make that -- his counsel trying to make that in their opening statement and through witnesses to a jury, right.

So that's an allegation that the Defendants are going to have to respond to. They're going to have to defend against that. And, as we pointed out in our briefs, we have to rely upon the agreement and what it

1  says that Rolls-Royce owns so that we can debunk some

2  notion that an image or view that Mr. Topalsson or, you

3  would allege, some consumer viewed on a screen somewhere,

4  sort out whether that image came originally from

5  Rolls-Royce, was supplier software that would belong to

6  Topalsson, or was it deliverable for which Rolls-Royce

7  paid and is, therefore, their sole property under the

8  agreement.

9       Now, so I think we were back, Your Honor, on the

10  basic point, that artful pleading can't emasculate this

11  second important holding of Manetti-Farrow.  The original

12  complaint, obviously, has been superseded by the first

13  amended complaint.  But Your Honor is aware that the Court

14  can take the original complaint as a judicial admission

15  and consider that in the overall context.

16       In terms of authority, I think I've cited enough

17  cases for one morning.  But if you'd indulge me with one

18  more.  *PennyMac Loan Services LLC v. Black Knight,* C.D.

19  Cal. February 13, 2020.  It's cited in our opening brief

20  at page 9, lines 15 to 16.  It's another one involving the

21  issue of nonparties; indeed, a defendant who would not

22  have had a relationship with the plaintiff but for the

23  agreement with the nonparty.

24       Otherwise, Your Honor, counsel went on about

25  paragraph 42.1 of the British judge's opinion.  Again,

1    that overlooks the fact that he was looking at English law

2    and that federal law governs the issues before Your Honor

3    this morning.

4            Next, they point out again -- the one thing we

5    can agree on is that they seem to be claiming now that

6    their copyright software is limited to registered

7    material, predated the relationship with Rolls-Royce,

8    right.  But in their briefs, they started to say, Well,

9    some of this accused software infringes that.

10           And then Mr. Hoffman, in his reply

11   declaration -- I think it was Hoffman -- came back and

12   pointed out, Wait a minute, the software that they're

13   talking about in their brief is not the software that they

14   claim to have registered a copyright to before the

15   relationship.

16           And they literally quote -- Mr. Hoffman quotes

17   language, and it may be in Butcher's as well,

18   Emma Butcher's declaration replies, quote language from

19   the U.K. trial where with Topalsson's U.K. counsel sitting

20   there, they're acknowledging that this particular

21   software, which they apparently say is accused software,

22   was worked out at considerable effort between the parties.

23           So this clearly -- that software that Topalsson

24   was talking about in the U.K. trial didn't predate the

25   relationship between the parties.

1           And then we -- again, we get to -- I think the

2    gateway issue is a red herring, Your Honor.  It didn't

3    hold up the English judge even on the recent ASI opinion

4    from twice noting that the Defendants -- all the

5    Defendants here have agreed to submit to the jurisdiction.

6    And, obviously, moreover, when this case is dismissed and

7    this case is refiled in England by Topalsson GmbH,

8    presumably, they would include Rolls-Royce U.K. as a party

9    as well.

10          With respect to witnesses, Your Honor, on

11   forum non, the Ninth Circuit's case law in its rule, from

12   *Lueck* on down, talks about the location, burden,

13   materiality of evidence, including witnesses.  And it just

14   says witnesses.  It doesn't see party witnesses, Your

15   Honor.

16          And what's abundantly clear so far is that

17   Rolls-Royce as well as -- Rolls-Royce and Mackevision

18   witnesses in Germany who are nonparties are going to be

19   involved in defending these claims.  Okay.  So to simply

20   say -- again, this is not a game of Simon Says, We've

21   amended and named five Defendants who are in Rolls-Royce;

22   game over.  That ignores a more holistic look.  So --

23   yeah.

24          And they talk about BMW.  But, again, they have

25   not identified any witnesses for the defense on

1    infringement, on software infringement in the U.S.

2            As we pointed out, BMW AG doesn't have any

3    employees in the U.S.  They didn't do anything in the U.S.

4    And so this whole issue is going to be a little bit

5    complex.

6            At the end of the day, Your Honor, the alleged

7    conduct relates closely to the agreement.  Independently,

8    a conventional forum non analysis, given that these poor

9    dealer Defendants don't have any idea how to begin to

10   defend these allegations, warrants dismissal.  And, again,

11   I think, Your Honor, a fair look at the controverted facts

12   and the law, both on stream of commerce and the

13   insufficiency of AWS instances, warrants a finding that

14   there's no specific personal jurisdiction over BMW AG with

15   respect to the claims that are pled, and the overall look

16   in the record in this case.

17       THE COURT:  What do you make of her argument just

18   now that Section 43 precludes these Defendants from

19   benefiting from the forum selection clause?

20       MR. FROEMMING:  If you indulge me for a second.

21   I've got some notes on the agreement.  Let me see if they

22   include anything about that provision.

23       THE COURT:  Okay.

24       MR. FROEMMING:  Did that -- did that provision come

25   up in the judge's opinion the other day?

1       MS. BADER:  Yesterday's opinion, yes.

2       THE COURT:  I don't think so.  I think she was just

3  referring to the fact that Section 43, apparently, says

4  expressly, We're not conferring any rights to nonparties.

5       MR. FROEMMING:  Please bear with me here.

6            I ask because if -- if the British opinion

7  didn't even refer to that provision, I would be scratching

8  my head how that could be so relevant here.

9            One moment, please.

10      THE COURT:  Well, either it's not binding authority

11  on me or it is.  I think you've taken the position that

12  it's not, so why don't we stick with that.

13      MR. FROEMMING:  Agreed, Your Honor.  I think in this

14  flurry of argument, I managed to have misplaced my notes,

15  which include a lot of other contract points for why the

16  English judge was wrong, even under British law.  But your

17  main point, I think, is the one to keep in mind.

18      THE COURT:  Okay.  All right.

19            Yes, Ms. Bader.  And then I have to give the

20  court reporter a break.

21      MS. BADER:  Two very short points.  On the *PennyMac*

22  case, that case involved claims -- Sherman Act claims that

23  the contract that contained the forum selection clause

24  was, itself, anticompetitive.  And so the contract was

25  very much central to the claims in that case.

1          And then separate, a completely separate point,

2     the software at issue here has exact time stamps in it.

3          THE COURT:  Wait.  Which software, the supplier

4     software or the infringing software?

5          MS. BADER:  Certainly the supplier software.

6          THE COURT:  Okay.

7          MS. BADER:  Generally, code has some annotations,

8     time stamps in it.  And this is an expert -- expert's are

9     going to do the side-by-side.  They're going to see the

10    time stamps.  So when you're doing the side-by-side

11    analysis to determine what was created when -- you're

12    going to see that in the actual code, as opposed to having

13    to go to this interpretation of this agreement to see who

14    did what.

15         THE COURT:  Okay.

16         MS. BADER:  Thank you.

17         THE COURT:  All right.  Thank you.

18         MR. FROEMMING:  The point about time stamping wasn't

19    in their brief.  But even if all the software was time

20    stamped, well, to the extent that, that supplier software

21    which was to be delivered in 2020 is time stamped after

22    the creation of the copyrighted -- the four copyrighted

23    pieces of software that predated the relationship, the

24    time stamp was simply the beginning of the contractual

25    analysis.  Okay.  Here's time-stamp software from March of

1 | 2020.

2 |       Okay.  Now the question is who owns it?  Is it a

3 | deliverable that Rolls-Royce bought?

4 |     THE COURT:  I think I understand that argument.

5 |     MR. FROEMMING:  All right.  Thank you.

6 |     THE COURT:  The matter is taken under submission.

7 | We'll issue an order as soon as we can.

8 |       Thank you.

9 |

10 |     (At 12:22 p.m. proceedings were adjourned.)

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

--oOo--

CERTIFICATE


        I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United
States.


Date:  May 22, 2024



                        /S/_____WIL S. WILCOX_____

                           U.S. COURT REPORTER
                             CSR NO. 9178

[1] 57/17

MR. DAVIDSON: [1] 3/8

MR. FROEMMING: [29]

MR. SMITH: [1] 3/18

MS. BADER: [19]

THE CLERK: [1] 3/4

THE COURT: [47]

**-**

--oOo [1] 56/11

**/**

/S [1] 57/16

**0**

01823 [2] 1/8 3/4
0218 [1] 2/14

**1**

102 [2] 27/13 27/22
107 [1] 25/10
108 [1] 25/22
10:58 [2] 1/18 3/2
1137 [1] 15/25
1146 [1] 15/25
12 [1] 19/24
12:22 [1] 56/10
1351 [1] 8/3
1354 [1] 8/3
15 [1] 50/20
157 [1] 26/13
16 [1] 50/20
166 [1] 27/2
167 [3] 28/23 29/5 29/23
169 [1] 30/7
1700 [1] 2/19
173 [1] 26/14
18 [2] 1/17 3/1
1988 [1] 5/16
1990 [1] 8/3
1995 [2] 14/24 19/11
1999 [1] 33/7

**2**

2 [1] 42/6
20001 [1] 2/18
20001-2113 [1] 2/18
2001 [1] 15/25
2009 [1] 8/16
2015 [1] 25/23
2018 [1] 9/17
202 [3] 2/4 2/19 2/19
202-626-1700 [1] 2/19
202-879-3939 [1] 2/19
2020 [1] 9/16
55/21 56/1
2023 [2] 1/17 3/1
2024 [1] 57/13
2113 [2] 2/18 2/24
2113-243-2539 [1] 2/24
213 [1] 2/23
213-243-2559 [1] 2/23
22 [1] 57/13
23 [3] 1/8 3/4 25/23
23-cv-01823-WLH [1] 1/8
2300 [1] 2/5
236 [1] 15/25
236 F.3d 1137 [1] 15/25
243 [2] 2/23 2/24
2539 [1] 2/24
2559 [1] 2/23
28 [1] 57/6
2941 [1] 2/6

**3**

3 [2] 11/18 19/24
30 [1] 12/6
30 seconds [1] 12/6
310 [2] 2/5 2/6
310-473-2300 [1] 2/5
310-473-2941 [1] 2/6

## 3

312 [1]  11/3
32 [1]  21/16
334 [1]  8/15
350 [1]  1/23
357 [1]  2/14
3939 [1]  2/19
3D [4]  11/4 25/23
 48/3 48/5

## 4

4 [1]  42/6
42.1 [1]  50/25
43 [3]  24/3 53/18
 54/3
43-page [1]  24/3
43.1 [1]  33/3
4311 [1]  1/23
44.4 [1]  12/9
45 [1]  11/7
4500 [1]  2/4
473 [2]  2/5 2/6

## 5

5 [4]  5/15 6/1 11/18
 34/25
50th [1]  2/22
51 [1]  2/18
512 [1]  6/13
513 [1]  5/14
514 [2]  5/15 6/1
537 [1]  21/15
555 [1]  2/22

## 5600

5600 [1]  2/9
5601 [1]  2/10

## 6

6 [1]  11/7
61 [2]  14/24 19/11
626 [1]  2/19
636 [1]  2/14
636-357-0218 [1]
 2/14
66211 [2]  2/9 2/13
696 [2]  14/24 19/12
6th [1]  21/12

## 7

7 [2]  12/9 21/16
700 [2]  2/8 2/13
701 [1]  14/24
7015 [2]  2/8 2/13
704 [1]  19/12
753 [1]  57/5
777 [2]  2/9 2/10

## 8

816 [1]  25/23
821 [1]  8/15
822 [2]  8/15 25/23
879 [1]  2/19

## 9

9 [1]  50/20
90012 [1]  1/24
90071 [1]  2/23
913 [2]  2/9 2/10

## 913-777-5600

913-777-5600 [1]
 2/9
913-777-5601 [1]
 2/10
91302 [1]  2/5
915 [1]  8/3
9178 [2]  1/22 57/17

## A

abbreviation [1]
 28/1
above [1]  57/8
above-entitled [1]
 57/8
absolutely [2]  32/13
 44/4
Abu [1]  49/17
Abu Dhabi [1]
 49/17
abundantly [1]
 52/16
accept [3]  26/17
 26/25 39/5
accepting [1]  39/4
access [4]  10/5 17/9
 22/2 40/11
accessibility [1]
 15/24
accessing [1]  36/23
according [1]  6/17
accounts [1]  18/24
accused [8]
acknowledged [2]

# A

acknowledged... [2]  18/15 21/12
acknowledging [1]  51/20
acquired [1]  31/25
Act [2]  33/7 54/22
acting [1]  26/17
action [1]  39/13
activities [1]  42/11
activity [1]  42/4
acts [4]  32/18 32/20 32/21 32/23
add [1]  6/25
address [1]  17/21
adequacy [3]  14/21 26/10 26/14
adequate [4]  14/2 15/12 15/16 24/15
adjourned [1]  56/10
adjudication [2]  9/22 28/14
admission [2]  18/6 50/14
admits [1]  19/22
Advanced [1]  9/17
Aereas [1]  8/2
affiliate [2]  20/14 20/15
affiliates [1]  8/14
affirmed [1]  8/11

AG's [1]  42/3
agreement [61]
Airlines [1]  8/2
al [2]  1/9 3/5
allegation [2]  22/9 49/22
allegations [8]
allege [3]  10/23 10/24 50/3
alleged [6]
allegedly [1]  16/19
alleges [1]  21/24
alluded [1]  29/6
alone [1]  13/1
alternative [2]  14/2 26/14
alternatively [1]  28/16
although [1]  45/5
Amazon [1]  36/16
amended [8]
America [7]
American [3]  19/15 19/16 38/25
American-made [1]  19/16
analogize [1]  36/17
analogy [1]  41/16
analysis [20]
anchor [1]  23/6
Angeles [4]  1/20 1/24 2/23 3/1

Angola [1]  8/2
annotations [1]  55/7
answer [3]  7/13 43/5 47/21
anti [3]  15/8 18/15 23/25
anti-suit [3]  15/8 18/15 23/25
anticipated [1]  15/22
anticompetitive [1]  54/24
apartment [2]  36/18 36/18
App [1]  41/18
apparent [1]  9/7
appealing [1]  30/11
appearances [2]  1/25 3/6
Appendix [1]  8/15
Appendix 821 [1]  8/15
applied [1]  4/13
applies [8]
apply [8]
applying [7]
apportionment [1]  10/11
appreciate [2]  34/17 43/6
approach [1]  6/15
aren't [3]  13/21

# A

aren't... [2]  20/21 26/20
argue [2]  44/22 44/22
argued [2]  6/9 10/7
argues [1]  21/24
arguing [2]  12/23 35/14
argument [14]
arguments [2] 14/25 26/20
arise [1]  28/9
arising [2]  12/11 12/17
arrange [1]  22/19
arranged [1]  21/25
arranging [2]  23/18 27/4
artful [2]  43/18 50/10
artificial [1]  12/24
ASI [1]  52/3
Asia [1]  22/21
aspect [1]  35/25
aspects [3]  24/25 45/11 45/13
assets [1]  31/25
assume [4]  5/2 14/15 45/15 45/17
assumed [1]  27/3
assuming [1]  13/11

augment [1]  48/2
August [2]  1/17 3/1
authenticate [1] 37/24
authority [3]  24/11 50/16 54/10
Avenue [1]  2/18
AWS [14]

# B

B [1]  19/24
Bader [5]  2/7 3/10 31/2 46/18 54/19
Bader's [1]  43/14
balance [2]  14/4 15/17
basic [2]  13/25 50/10
basis [4]  4/20 10/21 13/14 39/14
Bayerische [2]  1/9 3/5
bear [1]  54/5
becomes [1]  30/4
Beijing [1]  25/22
belabor [1]  33/14
believer [1]  31/6
belong [2]  46/6 50/5
belonged [2]  10/15 46/7
belonging [1]  11/12
belongs [3]  44/10

ben [3]  2/3 2/6 3/9
benefit [4]  5/24 12/13 12/15 33/5
beyond [1]  5/3
biggest [2]  17/1 37/4
binding [1]  54/10
black [2]  7/17 50/18
BMW [37]
BMW's [1]  41/7
body [1]  34/25
Boulevard [3]  2/4 2/8 2/13
bound [4]  7/7 24/9 26/3 26/7
box [1]  22/18
boxes [1]  37/19
breach [1]  48/23
brief [13]
briefing [3]  8/1 31/21 41/13
briefs [2]  49/25 51/8
British [4]  18/14 50/25 54/6 54/16
broad [2]  29/20 29/21
building [2]  36/18 36/18
Bundy [2]  15/6 20/3

**B**

burden [6]
business [1]  35/15
Butcher's [2]  51/17
51/18

**C**

c [2]  2/12 14/7
C.D [1]  50/18
CA [4]  1/24 2/5
2/23 3/1
Cal [2]  25/23 50/19
Calabasas [1]  2/5
CALIFORNIA [28]

Callahan [1]  21/15
canvas [1]  12/6
car [1]  48/12
Caroline [1]  2/7
Carrie [1]  3/10
Carrie Bader [1]
3/10
carrie.bader [1]
2/10
cars [4]  11/1 12/13
28/2 46/22
catch [1]  18/4
catch-all [1]  18/4
causal [2]  9/14
11/14
central [3]  1/2 42/9
54/25
centralized [3]

CERTIFICATE [1]
57/2
certify [1]  57/5
challenging [1]
41/23
China [1]  9/17
choice [2]  14/14
14/17
chose [1]  32/14
chosen [1]  22/4
Circuit [20]
Circuit's [9]
citation [1]  6/1
cite [1]  8/10
cited [11]
Civil [1]  42/6
claim [7]
claiming [3]  11/10
29/13 51/5
claims [14]
clause [39]
Clause 44.4 [1]
12/9
clauses [6]
clear [11]
closely [15]
clue [2]  16/23 20/20
Co [1]  8/15
code [13]
codes [2]  46/21
46/22
coincidentally [1]

colleague [1]  3/17
College [2]  2/8 2/13
color [1]  9/15
Colorado [1]  49/16
combination [1]
46/13
combined [1]  47/1
commence [1]
12/11
comments [2]  23/23
43/14
commerce [4]  23/6
23/13 27/8 53/12
commercial [2]
29/22 30/1
companies [1]
12/14
company [2]  20/14
22/16
company's [1]
20/15
comparison [3]
37/18 47/6 49/11
compellingly [1]
18/17
complaint [10]
complaints [1]
42/25
complex [2]  38/2
53/5
compliance [1]  19/5
complicated [2]

**C**

complicated... [2] 44/7 48/21
complicit [2] 18/9 20/16
concerns [1] 39/6
concluded [1] 23/18
conduct [7]
confer [3] 22/25 33/4 33/5
Conference [1] 57/10
conferring [1] 54/4
confers [1] 44/15
configuration [3] 36/23 42/14 42/17
configurator [9]
confirmed [1] 26/14
confirms [1] 27/10
conflict [1] 33/8
conformance [1] 57/9
connection [5] 9/14 12/11 12/18 28/9 45/24
connections [1] 41/19
considerable [2] 11/18 51/22
consideration [3] 4/9 13/11 28/21

consumer [2] 50/12 50/3
contain [1] 9/12
contained [1] 54/23
contemplate [1] 7/9
contemplated [1] 12/25
contemplation [3] 7/16 7/23 9/7
content [1] 11/5
contested [1] 5/1
contesting [1] 40/23
context [7]
continuously [1] 34/18
contract [29]
contract's [1] 33/7
contracted [3] 20/12 36/5 36/15
contracting [1] 22/15
contractual [7]
contradicting [1] 41/8
contrary [2] 24/5 25/14
contributed [2] 34/14 49/4
contributing [1] 48/19
controls [1] 41/7
controverted [2] 20/25 53/11

convenience [2] 15/24 37/13
conveniens [15]
convenient [4] 17/5 35/14 38/9 41/3
conventional [4] 4/17 13/9 27/11 53/8
copyright [20]
copyrighted [4] 46/14 49/19 55/22 55/22
copyrights [9]
core [2] 19/8 20/20
corollary [1] 8/17
Corp [1] 14/8
corporate [2] 3/12 8/14
corporation [2] 30/1 38/6
corporations [1] 29/22
countered [1] 14/4
countless [2] 5/12 7/14
court [53]
court's [5] 15/2 19/17 19/21 27/10 30/8
Courthouse [1] 1/23
courts [12]
cover [4] 9/12

## C

cover... [3]  25/13
27/19 33/22
covered [3]  27/15
27/25 34/8
covering [1]  34/1
created [2]  49/4
55/11
creation [3]  29/7
45/24 55/22
Creative [2]  14/24
19/11
CSR [2]  1/22 57/17
customers [3]  23/12
41/20 42/12
cv [2]  1/8 3/4
CV-23-01823 [1]
3/4

## D

damages [4]  10/5
10/8 10/9 39/2
data [1]  44/10
Davidson [4]  2/3
2/4 3/9 3/9
DC [1]  2/18
de [1]  8/2
dealer [3]  40/18
49/16 53/9
dealers [18]
dealership [1]  36/2
dealerships [1]
32/16

debunk [1]  50/9
decide [2]  12/2
24/12
decision [8]
declaration [8]
declarations [3]
16/14 39/25 40/4
deemed [2]  7/19
27/19
deeming [1]  8/12
deeper [1]  6/8
defend [5]  16/11
16/16 38/7 49/24
53/10
defendant [6]
defendants [26]
Defendants' [3]
3/20 31/7 38/20
defending [1]  52/19
defense [4]  17/13
17/16 46/23 52/25
deference [1]  14/18
defined [1]  49/3
deliverable [3]
46/12 50/6 56/3
deliverables [4]
10/16 44/9 48/25
49/1
delivered [1]  55/21
deny [2]  20/9 20/16
department [2]
36/13 37/10
depends [1]  10/2

depicting [1]  48/5
deployment [1]
21/5
deposit [1]  34/8
derivative [1]  44/24
design [1]  19/2
Despite [1]  32/11
detail [3]  11/18
23/22 24/2
detailed [2]  28/4
48/18
details [1]  11/20
determination [1]
24/13
determinative [1]
11/22
determined [3]
47/16 47/18 47/19
develop [1]  48/7
developed [4]  8/18
20/13 45/23 48/14
developer [1]  41/17
development [2]
21/4 45/25
Dhabi [1]  49/17
dictates [1]  30/13
difference [1]  44/14
difficulties [1]
38/22
direct [1]  41/12
directed [1]  42/10
direction [1]  42/4
discovery [1]  42/24

**D**

discretion [1] 20/9
Discussion [2] 4/3
43/12
dismiss [2] 1/15
3/20
dismissal [12]
dismissed [1] 52/6
display [2] 11/1
11/14
displayed [1] 16/19
dispositive [2]
24/16 24/19
dispute [20]
disputed [3] 18/12
21/4 29/2
disputes [4] 9/6
9/13 12/20 15/3
distinction [1] 6/25
distribute [1] 21/19
distributed [2]
18/10 44/23
distribution [1]
21/5
district [8]
DIVISION [1] 1/3
dlgla.com [1] 2/6
Docket [1] 21/15
Docket 537 [1]
21/15
documents [3]
16/16 20/20 37/19

download [1] 51/22
drill [1] 6/7
dwell [1] 8/1

**E**

e [3] 14/7 25/22
25/22
E-n-s-u-r-e [1]
25/22
East [1] 22/22
edification [1]
11/24
effect [2] 9/11 9/18
effectively [1] 26/5
efficiency [1] 42/16
effort [2] 14/8
51/22
eight [2] 17/17
17/18
eight hours [2]
17/17 17/18
EJC [6]
electronic [1] 37/20
elements [1] 46/5
ellipsis [1] 26/3
Email [5] 2/6 2/10
2/14 2/20 2/24
emasculate [3]
25/15 43/18 50/10
Emma [1] 51/18
Emma Butcher's
[1] 51/18
employees [1] 53/3

enforce [1] 33/6
enforceability [1]
18/1
enforced [1] 5/20
enforcement [1]
5/18
engaged [1] 12/17
engendered [1]
27/24
England [18]
english [26]
enjoy [1] 41/21
Ensure [1] 25/22
entails [1] 5/19
entirely [3] 4/18
4/19 40/20
entitled [1] 57/8
entity [9]
environmental [1]
19/5
Erise [4] 2/8 2/12
3/10 3/11
eriseip.com [2]
2/10 2/14
escapes [1] 22/16
essentially [4] 5/14
22/17 34/6 35/19
established [2]
25/15 43/19
establishing [1]
38/23
et [2] 1/9 3/5
et al [1] 1/9

## E

Europe [2]  20/19
 20/21
European [1]  30/22
evaluate [2]  15/21
 16/25
evaluation [1]  10/1
evidence [15]
examination [1]
 28/5
examples [1]  10/8
exception [1]  30/1
exclusive [19]
exclusively [3]
 22/11 46/11 49/6
Exhibit 6 [1]  11/7
Exhibit 7 [1]  21/16
existing [2]  34/2
 44/16
exists [1]  33/24
expert [1]  55/8
expert's [1]  55/8
expressly [2]  11/3
 54/4
extent [3]  12/23
 48/22 55/20

## F

F.2d. [1]  8/3
F.2d. 1351 [1]  8/3
F.3d [3]  14/24
 15/25 19/11
F.3d 696 [1]  14/24

face [1]  21/1
facie [1]  42/25
facilitated [1]  22/17
fact [10]
factor [5]  15/17
 16/2 17/3 18/17
 19/20
factors [8]
facts [9]
factual [3]  23/22
 24/13 25/2
factually [1]  44/12
failed [1]  14/22
fall [1]  15/1
fallback [1]  29/7
familiarity [2]
 19/21 20/1
Farrow [19]
Farrow's [1]  30/19
favor [4]  14/5 15/18
 19/18 30/4
favoring [1]  17/25
favors [1]  18/17
Fax [4]  2/6 2/10
 2/19 2/24
feature [1]  47/9
features [1]  11/1
February [1]  50/19
February 13 [1]
 50/19
Fed [1]  8/15
federal [5]  5/9 5/20

file [4]  24/17 25/5
 32/14 40/7
files [1]  47/12
fill [1]  12/6
fills [1]  7/25
final [1]  24/21
finally [2]  4/21
 30/23
Floor [1]  2/22
Flower [1]  2/22
flurry [1]  54/14
focus [2]  7/15 49/10
footnote [4]  5/8
 5/21 6/19 34/25
footnote 5 [1]  34/25
force [1]  39/12
foregoing [1]  57/6
foreign [5]  14/14
 14/15 14/17 41/17
 41/23
format [1]  57/9
forum [70]
forum non [1]
 52/11
forum-non-conveni
ens-related [1]
 29/11
Friday [2]  1/17 3/1
Froemming [3]
 2/17 3/16 4/1
Fuller [1]  9/1
fundamentally [2]

## F

**fundamentally... [2]**
 5/6 20/18

## G

**G [1]**  2/17
**game [6]**
**Games [3]**  41/13
 42/7 43/3
**gateway [2]**  26/22
 52/2
**gateways [3]**  26/20
 38/19 38/23
**general [4]**  21/7
 23/3 27/6 49/9
**generation [1]**
 10/25
**German [7]**
**Germany [14]**
**gets [4]**  8/4 11/18
 23/21 26/12
**gigantic [1]**  47/1
**gmail.com [1]**  1/24
**GmbH [5]**  1/6 3/5
 43/16 49/13 52/7
**Google [1]**  41/18
**gotten [1]**  25/4
**governed [1]**  8/6
**governing [3]**  19/21
 30/25 43/19
**governs [4]**  5/9
 6/19 19/22 51/2
**Graham [5]**  8/24

**[8/25] [7] [4] [31/25]**
 32/1
**Granada [1]**  2/4
**grant [1]**  20/9
**greater [1]**  36/6
**greatest [2]**  32/15
 32/17
**group [6]**
**GTSI [1]**  8/25
**Gucci [1]**  31/18

## H

**HAC [3]**  2/11 2/15
 2/20
**hailing [1]**  17/20
**happy [2]**  11/23
 43/5
**haul [1]**  39/19
**hauled [2]**  37/19
 41/25
**Healthcare [1]**  9/17
**hearing [3]**  3/21
 21/12 38/5
**helpful [1]**  24/1
**here's [4]**  13/24
 25/24 26/21 55/25
**hereby [1]**  57/5
**herring [2]**  29/14
 52/2
**highlight [2]**  21/10
 38/21
**Hoffman [6]**
**hold [1]**  52/3

**holding [8]**
**holdings [3]**  5/8
 6/22 9/10
**holistic [1]**  52/22
**Holland [1]**  31/20
**HON [1]**  1/4
**Honor [73]**
**Honor's [4]**  6/18
 13/6 24/21 28/21
**hosting [1]**  22/19
**hour [1]**  24/6
**hours [4]**  17/17
 17/18 17/18 17/19
**HSU [1]**  1/4
**huge [1]**  48/18
**huh [3]**  36/3 36/8
 36/14

## I

**I [95]**
**I'm [17]**
**I've [2]**  50/16 53/21
**ideal [1]**  7/10
**ignore [2]**  30/19
 30/20
**ignores [2]**  29/24
 52/22
**image [2]**  50/2 50/4
**images [6]**
**imagine [1]**  49/19
**immediately [1]**
 10/10
**impact [2]**  24/13

## I

impact... [1]  25/1
impediment [1]
26/23
implicate [1]  47/3
implicates [1]  10/10
imply [1]  21/25
importance [1]
15/22
Inc [3]  8/15 25/21
25/22
inconvenient [1]
35/20
incredible [1]  35/13
incurred [1]  39/3
indeed [3]  6/13
28/9 50/21
independent [4]
4/20 10/21 13/14
13/15
independently [2]
4/16 53/7
individual [1]  8/5
indulge [3]  12/5
50/17 53/20
Industries [1]  8/14
information [3]
37/10 37/14 37/16
informed [1]  39/16
infringed [3]  10/2
11/10 45/14
infringement [19]

infringements [3]
34/3 38/11 39/2
infringes [2]  44/3
51/9
infringing [6]
initial [1]  19/4
injunction [3]  15/8
18/15 23/25
instance [1]  36/17
instances [8]
insufficiency [1]
53/13
insufficient [1]
23/19
intellectual [1]  28/3
intend [1]  7/3
intended [1]  33/5
intent [3]  7/15 7/22
9/8
intentionally [4]
36/21 41/18 42/13
42/15
interest [5]  14/5
18/21 19/7 19/13
19/18
internal [1]  29/1
International [1]
8/23
Internet [1]  36/6
interpretation [14]
intervening [1]
24/12
introducing [1]

## J

Jersey [1]  21/18
jfroemming [1]
2/20
John [2]  2/17 3/16
Jonathan [2]  2/21
3/17
jonathansmith [1]
2/24
Jones [3]  2/17 2/22
3/16
jonesday.com [2]
2/20 2/24
judge [15]
judge's [2]  50/25
53/25
judgment [2]  18/1
48/23
judicial [2]  50/14
57/10
July [1]  21/12
July 6th [1]  21/12
jump [1]  4/6
jurisdiction [53]
jurisdictional [1]

IP [10]
irrelevant [1]  30/7
issue [29]
issued [2]  3/20 15/8
issues [6]
ITT [1]  48/18

## J

jurisdictional... [1] 42/23
jury [3] 48/11 49/14 49/21

## K

k [2] 14/7 42/6
Knight [1] 50/18
knowing [1] 23/11
knowledgeable [1] 40/3
KS [2] 2/9 2/13

## L

L [2] 1/4 14/7
L-u-e-c-k [1] 14/7
lack [1] 30/8
lacks [1] 18/12
language [3] 11/21 51/17 51/18
large [3] 29/22 29/25 38/6
largely [2] 13/7 37/20
largest [3] 37/2 37/3 37/6
launch [1] 23/13
law [35]
laws [1] 40/3
lawsuit [2] 18/22 19/18
legal [2] 7/1 24/11

letterment [1] 7/17
levels [1] 44/5
liabilities [1] 31/25
liable [1] 48/23
light [1] 27/16
likes [1] 49/10
limit [1] 18/21
limitation [1] 12/14
limited [8]
lines [1] 50/20
lines 15 [1] 50/20
Linhas [2] 8/2 31/12
literally [1] 51/16
litigants [1] 17/4
litigate [1] 40/22
litigated [1] 13/19
litigation [6]
LLC [2] 21/18 50/18
loaded [1] 37/25
Loan [1] 50/18
local [4] 18/21 18/22 19/7 19/18
location [3] 28/20 29/14 52/12
locations [2] 36/22 41/20
logical [2] 9/13 11/15
London [1] 13/18
Los [4] 1/20 1/24 2/23 2/25

Louisiana [1] 2/18
Lueck [3] 14/7 15/20 52/12
lumped [1] 18/20
Lydia [2] 2/12 3/11
lydia.raw [1] 2/14

## M

M [1] 2/3
Mackevision [8]
main [5] 4/6 4/10 11/19 20/7 54/17
major [2] 38/6 45/19
majority [2] 32/5 32/19
managed [2] 38/4 54/14
Manetti [21]
Manetti-Farrow [19]
Manetti-Farrow's [1] 30/19
Manila [1] 8/14
March [1] 55/25
market [2] 37/2 37/6
master [1] 11/4
material [6]
materiality [2] 15/22 52/13
matter [4] 19/7 34/19 56/6 57/8

## M

McNeal [2]  2/21
3/17
merely [3]  6/20
23/5 27/7
merger [1]  31/24
merits [2]  14/9
14/18
Middle [1]  22/22
mindful [1]  43/4
misplaced [1]  54/14
missed [1]  12/2
models [5]  11/4
11/5 11/6 48/3 48/5
moment [2]  33/15
54/9
moments [1]  4/5
mostly [1]  17/15
motion [6]
motions [1]  37/14
Motor [2]  12/13
28/2
Motoren [2]  1/9 3/5
Mr. [10]
Mr. Froemming [1]
4/1
Mr. Fuller [1]  9/1
Mr. Hoffman [3]
22/4 51/10 51/16
Mr. Topal [2]  38/4
49/13
Mr. Topalsson [3]

Ms. [5]  3/11 31/2
43/14 46/18 54/19
Ms. Bader [3]  31/2
46/18 54/19
Ms. Bader's [1]
43/14
Ms. Lydia Raw [1]
3/11
Munich [3]  17/18
20/15 29/9

## N

n [1]  25/22
N.A [1]  13/1
N.D [1]  25/23
namely [1]  5/9
Nanotech [1]  25/22
narrow [1]  44/6
near [1]  36/22
necessary [2]  11/25
24/10
necessitate [1]  41/1
nine [1]  17/19
nine hours [1]
17/19
Ninth [27]
Ninth Circuit [1]
25/16
non [28]
non conveniens [1]
35/8
non-English [1]

non-signatories [2]
6/10 7/7
none [5]  32/8 32/23
34/12 34/13 36/9
nonparties [17]
nonparty [3]  26/1
35/18 50/23
North [7]
North America [6]
North American [1]
38/25
Northern [1]  25/20
Note 5 [2]  5/15 6/1
noticed [1]  38/22
notion [1]  50/2
number [5]  3/4
19/9 32/11 32/15
32/18
numerous [1]  25/19
NW [1]  2/18

## O

object [1]  8/5
obliged [2]  9/20
12/10
observation [1]
6/19
observations [3]
25/2 28/19 29/17
observed [1]  30/6
Official [1]  1/22
omitted [1]  6/2

# O

Ondova [1]  8/15
oOo [1]  56/11
opening [3]  43/4 49/21 50/19
opined [2]  27/3 30/3
opinion [14]
opposed [1]  55/12
option [2]  21/9 39/17
order [4]  4/15 44/1 46/15 56/7
original [3]  18/7 50/11 50/14
originally [1]  50/4
overall [2]  50/15 53/15
Overland [2]  2/9 2/13
overlooks [1]  51/1
owned [5]  11/13 44/7 47/8 47/17 47/25
owner [1]  45/18
ownership [2]  10/5 47/19
owns [10]

# P

p.m [1]  56/10
PA [2]  2/8 2/12
page [9]

page 512 [1]  6/13
page 513 [1]  5/14
page 514 [2]  5/15 6/1
page 9 [1]  50/20
painting [1]  48/12
paints [1]  46/22
papers [1]  45/5
paragraph [7]
paragraph 102 [1]  27/13
paragraph 166 [1]  27/2
paragraph 169 [1]  30/7
paragraph 42.1 [1]  50/25
paragraphs [5]  11/3 11/17 23/24 25/3 26/13
paragraphs 157 [1]  26/13
paragraphs 312 [1]  11/3
parent [2]  32/7 35/17
Parfum [1]  31/18
Park [3]  2/4 2/9 2/13
part [3]  13/24 32/2 47/25
participants [1]

parties [22]
party [20]
path [1]  40/1
pay [1]  41/21
PennyMac [2]  50/18 54/21
people [3]  19/1 36/6 37/23
perfunctory [1]  40/7
person [1]  26/7
person's [1]  26/6
personal [19]
perspective [2]  36/25 40/18
persuasiveness [1]  35/22
pertinent [1]  24/19
phrase [1]  9/12
pieces [3]  46/2 48/2 55/23
piracy [1]  19/16
place [2]  32/23 34/4
plaintiff [22]
plaintiff's [6]
Plaintiffs [1]  23/4
play [3]  41/18 41/21 42/20
pleaded [1]  36/11
pleading [2]  43/18 50/10
pleadings [2]  5/3

# P

pleadings... [1] 36/20
pled [2] 19/8 53/15
plenty [2] 14/10 19/25
point [26]
points [5] 11/19 13/20 31/7 54/15 54/21
pooh [2] 23/4 23/4
pooh-pooh [1] 23/4
poor [1] 53/8
Poser [1] 11/7
position [2] 16/25 54/11
possession [1] 15/5
practical [1] 18/5
precedent [1] 43/19
precept [1] 7/1
precludes [1] 53/18
precluding [1] 26/5
predate [2] 45/16 51/24
predated [3] 45/7 51/7 55/23
preexisted [1] 44/13
preexisting [3] 44/11 45/1 47/16
premise [1] 26/1
presentation [1]

PRESIDING [1] 1/4
pretend [1] 40/2
prima [1] 42/25
principally [1] 15/4
principle [1] 27/6
private [5] 13/10 14/4 15/17 17/24 18/18
PRO [3] 2/11 2/15 2/20
problem [1] 7/6
problems [1] 18/5
procedure [2] 36/16 42/6
proceedings [4] 1/14 15/4 56/10 57/8
process [4] 45/20 45/21 46/1 47/25
product [4] 18/25 23/1 23/5 23/12
products [2] 8/23 19/16
prong [1] 15/15
prongs [2] 13/7 13/25
pronounce [1] 41/14
proof [3] 17/10 17/12 17/16
propagate [1] 36/5

proper [1] 42/10
property [4] 15/3 28/4 39/2 50/7
protectable [2] 11/13 45/14
provision [5] 33/3 33/9 53/22 53/24 54/7
provisions [1] 38/20
public [5] 13/10 14/5 18/19 19/13 19/20
published [1] 33/24
purposeful [1] 42/4
purposefully [1] 42/14
purposely [1] 41/21
purposes [2] 21/1 29/14
pursuant [2] 39/20 57/5

# Q

quarrel [1] 7/1
question [13]
questions [1] 43/5
quick [3] 13/5 13/20 21/11
quote [27]
quotes [1] 51/16

**R**

raised [2] 40/22 41/11
range [1] 5/23
Raw [2] 2/12 3/11
real time [1] 10/25
realistically [1] 27/23
reality [1] 37/15
recent [3] 23/25 26/11 52/3
recognized [1] 43/2
record [6]
recourse [1] 28/1
red [4] 29/14 46/22 48/12 52/2
reduced [1] 14/20
reference [2] 7/22 9/13
references [1] 48/3
refiled [1] 52/7
reflected [1] 43/3
reflection [1] 39/18
registered [2] 51/6 51/14
registrations [5] 33/22 34/9 45/16 45/19 46/3
regulations [1] 57/10
rejected [2] 6/11 16/8

relation [1] 10/13
relationship [17]
reliance [1] 10/12
relies [1] 40/17
rely [4] 28/25 40/3 40/13 49/25
remarkable [1] 20/4
remedy [1] 14/23
Reno [1] 14/16
repeated [3] 6/22 7/14 7/17
replies [1] 51/18
reply [4] 11/17 23/21 25/6 51/10
reporter [3] 1/22 54/20 57/17
REPORTER'S [1] 1/14
representative [1] 3/12
required [2] 14/19 29/8
reside [1] 35/15
residence [1] 16/3
residency [1] 16/5
residents [1] 16/7
resides [3] 14/18 16/10 35/21
resolved [1] 6/16
resolving [1] 18/22
respectfully [1] 30/17

response [1] 15/1
responses [1] 43/14
responsive [2] 10/24 45/8
result [1] 30/14
review [3] 3/22 4/5 13/10
rights [5] 28/4 33/7 44/16 45/18 54/4
Riot [3] 41/13 42/7 43/3
rollout [3] 18/25 22/6 45/25
Rolls [62]
Rolls-Royce [59]
Rolls-Royce's [2] 23/9 46/23
Rolls-Royces [1] 48/6
Room [1] 1/23
rounding [1] 17/24
Royce [59]
Royce's [2] 23/9 46/23
Royces [1] 48/6
RUK [1] 28/1
rule [6]
ruling [2] 13/7 33/19

**S**

s [3] 25/22 57/16 57/16

**S**

sales [1]  10/9
scope [1]  5/10
scratching [1]  54/7
screen [2]  49/15
 50/3
second [13]
seconds [2]  6/7 12/6
Section [5]  12/9
 33/3 53/18 54/3
 57/5
Section 43 [2]
 53/18 54/3
Section 43.1 [1]
 33/3
Section 7 [1]  12/9
seek [1]  10/9
selected [1]  14/19
selection [25]
sense [2]  10/22
 32/22
seriatim [1]  43/13
serve [2]  22/11 40/8
served [1]  22/24
server [6]
servers [2]  37/11
 41/7
service [5]  15/11
 17/8 26/17 26/25
 39/5
services [4]  36/16
 43/16 48/20 50/18

setting [1]  4/18
seven [1]  17/18
seven hours [1]
 17/18
shall [1]  33/4
shape [1]  27/23
Sherman [1]  54/22
shift [1]  13/3
shoes [2]  31/23 32/2
short [3]  7/13 15/1
 54/21
shown [1]  16/19
showrooms [4]
 16/20 30/7 36/24
 42/17
sic [1]  41/15
side [14]
sides [1]  3/22
sign [1]  22/17
signatories [3]  6/10
 7/7 9/4
Simon [1]  52/20
simplistic [1]  49/11
single [1]  16/14
skim [1]  13/5
slide [1]  29/20
small [1]  13/24
Smith [2]  2/21 3/17
soft [1]  11/5
software [67]
sole [1]  50/7
solicitor [1]  26/25
solicitors [2]  26/17

**39/6**

Solutions [1]  8/24
soon [1]  56/7
sources [3]  17/10
 17/12 17/15
South [1]  2/22
specific [12]
specification [1]
 48/19
speed [2]  36/25
 42/16
spite [1]  9/3
spoken [1]  33/11
stamp [2]  55/24
 55/25
stamped [2]  55/20
 55/21
stamping [1]  55/18
stamps [3]  55/2
 55/8 55/10
stand [1]  40/2
stark [1]  16/2
starting [2]  3/6
 25/12
state [4]  3/6 5/14
 6/3 6/17
stated [1]  13/6
statement [5]  24/22
 29/21 39/21 43/4
 49/21
statements [1]
 21/11
STATES [6]

# S

stay [1]  18/20
stenographically [1]  57/7
step [2]  12/19 20/11
stepped [2]  31/23 32/1
stick [2]  35/9 54/12
sticks [1]  31/13
Store [1]  41/18
stream [4]  23/5 23/13 27/8 53/12
Street [3]  1/23 1/23 2/22
strongly [1]  14/3
struggling [1]  11/9
submission [1]  56/6
submit [9]
submitted [4]  38/15 39/25 40/4 40/13
submitting [1]  17/7
subroutine [3]  46/22 46/24 48/12
substantive [2]  19/22 19/23
successor [1]  32/1
sue [3]  12/22 14/8 39/22
suffice [2]  12/5 30/10
sufficient [4]  3/22 4/9 23/6 27/8

sugar [1]  41/15
suggest [1]  12/25
suing [1]  45/6
suit [3]  15/8 18/15 23/25
Suite [3]  2/4 2/8 2/13
summons [1]  40/8
Sun [1]  9/16
Sundstrand [2]  14/8 15/20
super [1]  40/2
superseded [1]  50/12
supplementary [1]  25/6
supplied [1]  48/15
supplier [8]
support [6]
supporting [1]  4/20
supports [1]  13/16
Supreme [2]  27/7 30/1
surmised [1]  49/17
surprise [2]  22/5 22/5
surveying [1]  10/12
swallowed [3]  26/3 26/4 26/4
sweeped [1]  7/4
swept [1]  9/8
Swiss [1]  8/7

switch [1]  9/15
system [1]  42/19

# T

TAAG [3]  8/1 31/12 31/22
tabulating [1]  16/5
Tech [4]  8/24 8/25 14/24 19/11
technical [3]  11/5 14/25 35/25
technology [1]  38/3
tentative [12]
term [1]  33/6
terminated [1]  34/4
terms [4]  17/24 28/3 36/4 50/16
territoriality [1]  30/4
test [5]  7/17 7/22 7/22 13/11 15/15
testimony [1]  15/23
Thank [8]
third-party [1]  18/8
three minutes [1]  24/23
throwaway [1]  18/4
time [11]
time-stamp [1]  55/25
times [3]  5/12 7/15 33/2
title [3]  15/5 49/6

# I

title... [1]  57/6
ton [1]  37/16
top-level [1]  12/2
Topal [2]  38/4 49/13
Topalsson [34]
Topalsson's [6]
totally [1]  19/6
traditional [5] 13/13 15/15 19/13 20/9 30/18
transaction [1]  5/23
Transamerica [2] 8/2 8/5
transcript [3]  1/14 57/7 57/9
transfer [1]  37/14
transform [1]  34/18
transpired [1]  28/5
Treating [1]  6/15
trial [3]  17/11 51/19 51/24
tries [1]  26/19
turning [1]  35/7
twice [1]  52/4

# U

u [2]  14/7 25/22
U.K [35]
U.S [40]
U.S. [1]  16/15
U.S.-based [1]

Uh [3]  36/3 36/8 36/14
Uh-huh [3]  36/3 36/8 36/14
Ultratech [1]  25/21
unable [1]  40/25
unauthorized [1] 25/5
unclear [2]  40/16 40/24
understanding [3] 4/24 40/10 45/3
undisputed [5] 10/14 16/9 16/10 16/15 33/21
unheard [1]  38/6
UNITED [6]
unquote [8]
unrealistic [1] 12/24
unrelated [2]  18/23 19/6
uproot [1]  17/22
upstream [1]  29/1
us [1]  46/25
usual [1]  13/11

# V

v [9]
value [1]  21/1
vehicles [1]  48/4
Ventures [1]  8/23

versus [1]  37/17
vests [1]  49/6
vetted [1]  46/14
viable [3]  38/18 39/9 39/17
VICE [3]  2/11 2/15 2/20
videos [1]  10/25
virtually [2]  15/18 27/17
visualizer [2]  21/19 44/23
vs [1]  1/8

# W

Wales [2]  9/22 28/14
walk [1]  29/12
walks [1]  42/7
warrant [1]  29/19
warranted [2] 27/11 28/18
warrants [3]  30/21 53/10 53/13
Washington [1] 2/18
we's [1]  15/19
Web [1]  36/16
weight [1]  14/9
well-established [2] 25/15 43/19
Werke [2]  1/9 3/5
WESLEY [1]  1/4

# W

West [1]  1/23
WESTERN [1]  1/3
whatsoever [1]
 13/12
whereas [2]  4/25
 20/24
wherever [1]  22/6
whichever [1]
 31/16
who's [2]  26/22
 35/20
Wil [2]  1/22 57/16
wil.wilcox [1]  1/24
Wilcox [2]  1/22
 57/16
willing [1]  20/6
witnesses [16]
witnesses' [1]  15/23
WLH [1]  1/8
world [4]  7/10 19/1
 21/4 22/7
worldwide [6]
worried [2]  37/21
 37/23
worth [1]  29/4
wrapping [1]  33/16

# Y

Yesterday's [1]
 54/1
you'd [2]  12/5
 50/17

Your Honor's [1]
 28/21