UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

| | | |
|---|---|---|
| TOPALSSON GMBH, | ) | Case No. CV 23-1823-WLH (PVCx) |
| | ) | |
|     Plaintiff, | ) | Los Angeles, California |
| | ) | Thursday, August 8, 2024 |
|        v. | ) | 10:00 A.M. to 10:47 A.M. |
| | ) | |
| BAYERISCHE MOTOREN WERKE AG, | ) | TELEPHONIC HEARING |
| et al., | ) | |
| | ) | |
|     Defendants. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

Appearances:                See Page 2

Deputy Clerk:           Marlene Ramirez

Court Reporter:        Recorded; CourtSmart

Transcription Service:   JAMS Certified Transcription
16000 Ventura Boulevard #1010
Encino, California  91436
(661) 609-4528

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:       Erise IP PA
                          By:  LYDIA C. RAW
                          7015 College Boulevard, Suite 700
                          Overland Park, Kansas  66211
                          (636) 357-0218
                          lydia.raw@eriseip.com

                          Erise IP PA
                          By:  CAROLINE A. BADER
                          7015 College Boulevard, Suite 700
                          Overland Park, Kansas  66211
                          (913) 777-5600
                          carrie.bader@eriseip.com


For the Defendants:       Jones Day
                          By:  JOHN G. FROEMMING
                          51 Louisiana Avenue, NW
                          Washington, D.C.  20001-2113
                          (202) 879-3939
                          jfroemming@jonesday.com

                          Jones Day
                          By:  JOHN R. O'DONNELL
                          555 South Flower Street, 50th Floor
                          Los Angeles, California  90071
                          (213) 489-3939
                          jodonnell@jonesday.com

LOS ANGELES, CALIFORNIA, THURSDAY, AUGUST 8, 2024, 10:00 A.M.

THE CLERK:  Good morning.  We're here today on the record.  Calling Case CV 23-1823, *Topalsson v. BMW, et al.*

Counsel, state your appearance for the record.

LYDIA C. RAW:  Good morning, Your Honor.  Lydia Raw from Erise IP for Plaintiff Topalsson.

CAROLINE A. BADER:  And also, Carrie Bader for Erise IP for Plaintiff Topalsson.

JOHN G. FROEMMING:  Good morning, Your Honor. John Froemming, Jones Day Washington, counsel for the dealer defendants.

JOHN R. O'DONNELL:  Good morning, Your Honor. John O'Donnell with Jones Day on behalf of defendants as well.

THE COURT:  Thank you, all, and good morning to you all.  Can you hear me okay?

MS. RAW:  Yes, Your Honor.

THE COURT:  Thank you.

Good morning and welcome.  Thank you for being here.  We're here on a hearing which I set on plaintiffs' request for issuance of a letter of request.  As the parties know, on June 10th plaintiffs filed a request for issuance of a letter of request seeking evidence from nonparty Rolls-Royce Motor Cars Limited, which is located in the United Kingdom.  That was docket No. 76.  On June 21,

defendants filed their opposition to this request, which was Docket No. 83.  On June 28th, plaintiff filed his reply in support of the request, which is Docket No. 88.  There were also -- which I saw some requests to file documents under seal, which I've looked at, and I likely would grant those, just to let you know.

So here, this motion presents, I think, a very interesting issue.  It's plaintiffs' request to seek a letter of request from the United Kingdom with respect to documents that it seeks related to Mr. Topalsson's -- I'll call it his "software creation," which he alleges is being infringed upon by defendants.  So I'll hear from plaintiffs.  It is plaintiffs' burden, I think, and again, this motion presents some interesting issues.  So I'll have questions for counsel on both sides.

I'll begin with either Ms. Raw or Ms. Bader.

MS. RAW:  Thank you, Your Honor.  I'll be presenting for Topalsson today.

I do have a very brief summary of some of the factual history of this case that -- as it relates to the letter of request, but I'm happy to skip that, if you would prefer, based on the descriptions in the motions in this case.

THE COURT:  Well, you know, I think it would be helpful.  I'm particularly interested in what happened in the

United Kingdom judgment and how it pertains to this request. So I think it would be helpful to have a little historical background.

MS. RAW:  Yes, Your Honor.

So in this case the Plaintiff Topalsson is a company that makes configurator software.  That's just a special form of software that allows individuals to customize whatever it is that they want, and then the software will in real time provide images and videos of that customized product to the customer.  In this case it was applied to some vehicle configurations, so if you want certain colors on your car or stitching or any other details like that in your vehicle.  Topalsson entered into an agreement with Rolls-Royce Motor Cars Limited, which is a U.K. company, in about 2020 -- er, 2019.  Excuse me.  That agreement was ultimately terminated, the parties walked away, and it resulted in a breach of contract litigation.

The conclusion of that litigation -- the judge in that case made a number of statements about who owned what under that agreement, most importantly for this case, any of the Topalsson underlying software.  So that's, like, his underlying DTE software.  There's some Sologic, which falls under that very software.  His underlying software remains Topalsson's property.  It was only certain deliverables apart from that which were the property of Rolls-Royce under that

agreement, the relevant provisions that are also pulled out from that very long opinion in Topalsson's declaration in this case.

THE COURT:  Ms. Raw, let me interrupt.

With respect to what the United Kingdom court found remained Topalsson's, is that -- we'll call it that "particular creation," I'll say.  Is that at issue here in this case?

MS. RAW:  Yes, Your Honor.  Yes, Your Honor.  At issue in this case, there are two versions.  It's Release 5 and 6 of Topalsson DTE and VARY software.  Topalsson did file U.S. registrations on that software.  So it's very clear what the software at issue is this case.  And there's -- that underlying software was developed before the agreement with Rolls-Royce was even entered into, and so for that reason, it remains Topalsson software under the agreement because it is his underlying software as he entered into that contract with Rolls-Royce.

THE COURT:  Okay.  Thank you.  You may go ahead.

MS. RAW:  During that breach of contract litigation, Topalsson became aware that Rolls-Royce had moved forward with a new configurator landscape and in doing so provided certain materials of Topalsson's to those third parties.  Some of the letter request -- requests go to what was specifically provided to those third parties.  All we

know at this point is, at least in one instance, a third party was told to master something similarly to how Topalsson had done it.  Beyond that we don't know yet what exactly was told to those third parties, and that's part of the subject of the letter request documents beyond the source code.  So that --

THE COURT:  Another interruption.

Have you tried to obtain the materials that you're seeking in the letter of request from the dealers, from the -- I'll call them the "dealers themselves," and what has been their response?

MS. RAW:  Yes, Your Honor.  That was what we did first.  So we filed our request to the dealers.  They have said that they do not have these documents, they have said they do not have the underlying source code, and in fact, they actually pointed us to Rolls-Royce North America, which is an entity in New Jersey, and they said they obtained the software from them.  We then filed a subpoena for Rolls-Royce North America, and they have told us that they, too, do not have the underlying source code.  They just have, presumably, some executable software, and without comparing the underlying source code to Topalsson's underlying source code, the basis for literal copyright infringement cannot be shown, and so that is the reason why we are now seeking the underlying source code from Rolls-Royce Motor Cars Limited in

the U.K.

I will also note that we did request -- because counsel for the defendants is the same counsel that did represent Rolls-Royce Motor Cars Limited earlier in this case.  They were previously a defendant.  They were dismissed because of the foreign selection clause in the agreement.  But because it's the same counsel, we did have some requests earlier in this case to see if there was some agreement we could reach where it could be voluntarily provided -- that is allowed under U.K. law -- and were unable to reach agreement that way as well, and so this remains the only option available to us to actually access the source code that is the basis for this case.

THE COURT:  Okay.  Thank you very much, Ms. Raw.  I appreciate it.

So either Mr. Froemming or Mr. Donnell, question -- same question I asked plaintiff's counsel.  Do you agree that the London U.K. judgment with respect to the issues that are in this case that Topalsson does own the -- I'll call it the "software rights" to what is -- not to say that the alleging conduct is true but that he does own the rights to what's charged in the complaint?  I think it's a first --

MR. FROEMMING:  Sure.  Hi, Your Honor.  John Froemming.  I'll take a stab at it, and Mr. O'Donnell is close to a number of the details from being over the

documents.  So, if he has anything to fill in, I may defer to him if that's all right.

THE COURT:  Of course.

MR. FROEMMING:  I think that's overstated, Your Honor.  The plaintiff has alleged copyright in certain DTE and VARY software for which they claim to have copyright registrations, but it's not at all clear what software they're claiming to be protectable and infringed in this case.  There's been a lot of back and forth about that, and our understanding of the record of the U.K. case is that much, if not most, of the material that was provided by Topalsson to Rolls-Royce Motor Cars was purchased by Rolls-Royce Motor Cars as part of the software development agreement and thereafter became their property.  So that was covered in a number of places both in the underlying document, in the tender offer document that's incorporated by reference with that agreement, and was addressed to some degree by the U.K. court.  There's also a category called "bespoke software" that I don't think is disputed belongs to Rolls-Royce Motor Cars as well.

What's part of the confusion here, Your Honor, is that we have not yet gotten an articulation or even a listing from the plaintiff of what software elements or features they claim to be both protectable and infringed per the *Abarca* case that cites the Ninth Circuit case and the other

authority in our response.

THE COURT:  So let me just think about this.  If -- and when I saw the -- I think the -- well, let me put it this way: If the U.K. court did say that Rolls-Royce now owned whatever Topalsson created and gave to them, right -- because it was my understanding it was provided late and Mr. Topalsson was compensated in some way for the work that he did, right.  He didn't work for free.  But if Rolls-Royce now owned an approved or changed -- which it's been a number of years.  I would think that software improvements happen all the time.  So maybe they took whatever Mr. Topalsson created, tinkered with it, changed it, made it their own. Would -- and if the London court found that that was now owned by Rolls-Royce, then it would seem to me that Mr. Topalsson would not have a copyright infringement claim at all, right, if that were the case.

And I guess what you're saying is that you need factually to figure out if whatever he did -- I guess whatever -- this is hard for me to say because I think both parties have to show their cards.  And this is where I think it gets difficult because, you know, plaintiff is saying, "Well, I can't really tell you what you all did that was wrong without me seeing what you have," and you're saying, "Well, show us what you have" -- or "explain to us what you say is infringing without us having to show you what we

have."  So it's kind of like a -- you know, it's like "tail wagging the dog," and I think you said "cart before the horse" -- I think both of you used that.  And it is that kind of situation to me.  It appears to be that way.

MR. FROEMMING:  It's very difficult for Your Honor to sort this out for a couple of reasons.  Number one, to your -- to the first part of your question, right, whether whatever was further developed by Topalsson belongs to him or not depends on a couple of things.  First of all, whether that which was further updated or development belonged to him in the first place, right, and; second, whether whatever alleged development occurred is in fact protectable, as opposed to merely functional, right.

So that depends on the usual test -- Ninth Circuit and otherwise -- about looking at given that software is functional, the orderly way is to -- in a copyright case is to identify: Okay.  What is the -- What is -- at least initially by contentions or otherwise -- What's -- What are the features, what are the elements that the plaintiff is claiming to be protectable and infringed? right, so that there's an orderly way to go about discovery.

It's not unlike, Your Honor -- and you may have more experience with this than I do -- a patent case where you may have both sides with very different views of the facts, but generally the way to try to get down to brass

tacks is to have contentions so that the plaintiff identifies: Okay. What is protected -- whether it's patentable or copyrightable -- and what do they claim to be infringed? And then you sort of sort that out and narrow down from there.

It's more complicated here, Your Honor, because of the history here. The background, which we touched upon a little bit in the briefing -- and I don't think at the end of the day this is disputed, at least at a high level -- is that Rolls-Royce Motor Cars, BMW Group had various data files, and Rolls-Royce, for example, had their own 3D data files -- pictures, for example -- of their cars, right, pictures from certain angles on the outside and the inside and so forth, and then, as part of this development agreement process, Rolls-Royce Motor Cars provided certain data files to Topalsson to work on. Okay?

And I think it's further no longer disputed that among all that data -- those 3D images and files that were Rolls-Royce property to begin with and then were provided to Topalsson for further processing -- included certain three-digit and five-digit configuration strings in the data files and all that, and then Topalsson was hired to provide certain development there. That ended up not working and not being on time, and so Rolls-Royce, facing the then imminent launch of their new Ghost luxury automobile, had to figure

out some fallback solution.  So they went back to a preexisting software development -- developer to come up with some kind of an 11th-hour stopgap so that they would have some kind of real-time imaging in time for the fall -- I think it's 2020 -- launch of the Ghost car.  Okay?

So that's sort of the background for why this makes it even more complicated, but at the end of the day, what the plaintiff here is seeking is all of Rolls-Royce Motor Cars's source code for its showroom visualizer to be used in dealer showrooms -- all of it regardless of their not having identified, or at least listed initially, their basis for: Okay.  What are the protectable elements or features that they claim to be infringed?

And then they go beyond that -- we set this out, Your Honor, in our papers, but the only allegations that they made about what the accused software is -- going to your prior question from a few minutes ago -- was in paragraph 54 of the First Amended Complaint where they refer essentially to the new showroom visualizer that was to be essentially constructed and rolled out in 2019 and '20.  The website -- Rolls-Royce Motor Cars website and the Rolls-Royce website configurator had been around for years earlier in some iteration, and that was public knowledge.  So the plaintiff --

THE COURT:  Your papers -- you say ten years,

right?  That Rolls-Royce had some type of software for this configuration of vehicles as far back as ten years ago; is that correct?

MR. FROEMMING:  Hundred percent.  Hundred percent correct.

So the plaintiff was well aware of that.  It would be like going on Google.com or Lexis.com -- that's all available, but there's no reference to that anywhere in their First Amended Complaint.  So the only accused software -- their phrase, Your Honor -- in the First Amended Complaint was the new showroom visualizer or the new configurator.  So their request now is not only for all of the source code for that but all of the source code for the website configurator, which they don't -- defendant dealers don't even own -- that's Rolls-Royce Motor Cars -- as well as other iterations.

The other limitation, Your Honor, of note is the following: Counsel for the plaintiff pointed out that they initially filed this case against Rolls-Royce Motor Cars U.K., BMW AG, Rolls-Royce North America, LLC -- which is a sub of Rolls-Royce Motor Cars England -- as well as these five Los Angeles-area Rolls-Royce dealers.  Okay?  We moved to dismiss based on the foreign selection clause of the underlying development agreement between Topalsson and Rolls-Royce Motor Cars U.K.  They then exercised their right under Rule 15 to amend.  They did so, dropping Rolls-Royce

Motor Cars, the nonparty from whom they're seeking discovery now, and then we had to move again to dismiss out everybody. Judge Hsu dismissed out BMW AG, the parent, in effect, and Rolls-Royce Motor Cars -- Rolls-Royce North America, leaving these five dealers, who have no clue what the source code is, no access to this source code -- no idea whatsoever.  So they're sitting here going, "What in the world's going on?"

We then go to the First Amended Complaint, Your Honor, to see what was alleged as to the only remaining defendants in the case, and essentially what they allege in the case as to the defendants is that these five remaining dealer defendants supposedly used the underlying source code or software but the law -- the copyright law is clear -- is that -- as you may know, under copyright law you have a right of reproduction, you have a right of public display, but the law, as set forth in our brief, is clear that mere use is not actionable for copyright infringement.  So what -- where's the beef as to a discovery request with respect to the dealer defendants?  Right.

So all that they allege is that supposedly copies were -- well, they're asserting in the briefing that copies were made when the software loads by the dealers, but, a, it's not in the complaint.  It also is not true and makes no sense that by just accessing a public website that the user then has access to the underlying source code.  That's just

not how -- that's just not how it works.  Even Topalsson agrees that the source code is in the back end, and I don't think there's any dispute that that back end where the source code is, is inaccessible.  So that leaves us with very little basis for understanding or for warranting a request with respect to the only remaining dealer defendants in this case.

THE COURT:  Okay.  Thank you very much, Mr. Froemming.  I'll give Ms. Raw or Ms. Bader a chance to respond.

MS. RAW:  Thank you, Your Honor.

Lots to respond to here, but I want to back up and start with the ruling from the U.K. because I disagree with some of the representations that were made about that ruling, and I would like to actually read two provisions just so that we're clear on what we're talking about.

The first provision is actually from the contract between the two parties.  So there was some question from Your Honor earlier about what happens when Topalsson has modified its software or its made something under the agreement, like what of that is Rolls-Royce's; what is not?  The agreement answers that question.  It's in paragraph 32 of that agreement, and it states (reading):  Notwithstanding any other provision of this agreement, intellectual property rights and any supplier software used or created by the supplier -- that's Topalsson, and it lists DTE, which is at

issue in this case as a supplier software -- the intellectual property rights and any supplier software used or created by the supplier in providing the services, including but not limited to any modifications or improvements to such supplier's software, will be owned by the supplier -- and that's Topalsson.

Based on that provision, when you go to the judge's order -- and this I'm reading -- this quotation we put in Topalsson's declaration. It's on the docket, Document 78-2. this is at paragraph 34. The judge says that the deliverables -- in this paragraph she's -- she explains that the deliverables going to Topalsson but then says, "Deliverables comprised [the] documents, goods, materials, and information to be provided by Topalsson under the Agreement. It does not appear to include software developed by Topalsson whether falling within the definition of Supplier Software or Bespoke Software."

It's based on that provision of the agreement and that finding by the U.K. judge that we're saying the DTE code is Topalsson's code, and there's no real dispute as to what of that belongs to Rolls-Royce. It doesn't belong to Rolls-Royce. And in addition to that, they can come inspect the code that we filed the registration on. They can see that the dates on that code predate the agreement with Rolls-Royce. So anything that Topalsson had that's DTE, even

if they used it with Rolls-Royce as part of that agreement, it still remains Topalsson's code.

Now, there may be separate deliverables and separate things that he made that they have rights to that they purchased, but that underlying code -- which by the way, they actually said in the U.K. case, "We definitely don't use that. That's not something" -- you know, "That's not something we've continued to use," when all of the indications visually from the software, even from the mere argument that they made today of "Hey, at the last minute we had to go find someone else who could make us some software that could do this real-time generation," there was no one else in the industry who could do real-time generation at that time. So either this last-minute supplier somehow made up a new feature that they had never presented to anyone else before in an incredibly short time frame or elements of Mr. Topalsson's software were in fact used that they had no right to continue to use because those elements were not created for Rolls-Royce in the first instance. Those are preexisting parts of this software. That's why there's a case here.

The second issue that I want to turn to here is this question of what is protectable? What about Topalsson's code is at issue? There is a breadth here, and there's a breadth because Topalsson was hired to develop a sole

configurator landscape, and that is what some of these deliverables he provided to Rolls-Royce related to is this landscape.  It's this entire back end of software that you are then able to use different front ends to access, whether, like, directly from your computer, an online resource.  That's the core of what he provided.

In that core there are certain requirements for data to be compatible with his underlying software, the software he owns.  One of those requirements is that data has to be in a certain format.  That means that you've got this three-digit code; you've got an underscore; you've got a color combination.  This format of the data was not previously used by Rolls-Royce.  This format of the data is what Topalsson was using under the agreement.  There are things that they are welcome to continue using, but if you're going to continue using data that's in Topalsson's specific format, that's a strong indication that you're using underlying code also because the underlying code is what is designed to read data in that format.  That is the additional reason why we believe that the underlying source code is infringing here.

Also, that format of data -- that's used throughout the system.  It's not like there's some little piece of this code that we can section off and say, "Look, if there's infringement, it's going to be right here.  It's just going

to be this little part."  That's not consistent with what we see visually from the code.

Mr. Topalsson personally visited every dealership. He personally identified "Hey" -- and we list it in the complaint -- "Hey, these are the things I'm seeing that are really specific to what my code does and how my code does it, and I can't prove, unless I see the code, that you stole my code, but goodness, like, this is a smoking gun.  If I look at the code underlying how real time is being done on how you're angling your wheels, how this lighting -- how all of these features are actually happening" -- and in the online configurator you can see that it's using that string format that is his proprietary string format, and that's the online visualizer that's supposed to have been around for a decade. Great, there's some software that's been around for a decade, but we know that when the release of this new vehicle happened in late 2020 that online software was updated and now has this new vehicle and now uses this new code string, which is the same one that the proprietary software that is at issue in this case uses.

THE COURT:  Thank you very much, Ms. Raw.

Any response, Mr. Froemming or Mr. O'Donnell?

MR. FROEMMING:  Yes, briefly, Your Honor, that --

THE COURT:  Quite a convincing argument, I must say.

MR. FROEMMING:  Well, Mr. O'Donnell may want to jump in with specifics, but let me respond to a couple of these points at a high level.

Counsel chooses her words carefully when she says Topalsson's software belonged to Topalsson.  Yes, that which belonged to him belonged to him, but obviously there was substantial software that was developed and was to be delivered and was to be provided to us to -- not to us -- to Rolls-Royce Motor Cars as part of the agreement that everybody agrees became Rolls-Royce's property under that agreement, and there is -- there's really no dispute that wide categories of Deliverables -- with a capital "D" under the agreement -- belong to Rolls-Royce Motor Cars.  Indeed, we laid out a broad argument in response to their particular motion identifying examples of what Rolls-Royce Motor Cars owns that they don't deny belongs to Rolls-Royce Motor Cars, and on reply they only took issue with a very small portion of that.  They don't dispute that under the agreement Rolls-Royce Motor Cars (inaudible) owns the DeltaGen, the 3D models, the so-called "POS logic" files, the sort of digital key for visualizing this stuff, and other corresponding configuration materials.

As I said, they don't disagree that, as the basis for the deliverables, which they were to provide, Rolls-Royce gave Topalsson their existing 3D model files that included

three-digit codes that Mr. Topal claimed didn't exist and that Rolls-Royce retained rights in those files.  In fact, at page 9 of their reply brief, Your Honor, notwithstanding counsel's comment of a few minutes ago, they say that they're not claiming rights in the number of digits.  Because they initially in their brief said, "Well," they created this three-digit color string and that belongs to them.  To the extent that that was ever used subsequently, that's copyright infringement -- quite apart from any source code allegation.  But we came back and pointed out with an example that Rolls-Royce had three-digit code strings before.  So they've been backing off of that.

At the end of the day, Your Honor, this is not -- this is a familiar situation both in patent and trade-secret cases.  Source code is recognized as being so private and so valuable that courts act as gatekeepers before just giving adversaries wholesale access, even under a protective order, to all of the source code.  And it's a usual tactic of plaintiffs to try to say, "Well, we'll get back to you on what we contend is protectable and infringed, but first show me your trade secrets.  Show me all of your source code first, and then we'll get back to you."  It's -- again, it's a familiar dance by plaintiffs to try to draft around that.

Finally, she said that -- counsel said that, again, the format was not previously used, but I think I pointed out

how it was used in the past.  This is at most a dispute, in this context, about data files and not source code.  So it scarcely justifies their request for all the source code.

With that, I'm going to stop in case Mr. O'Donnell has anything more responsive for you.

MR. O'DONNELL:  Just to add, Your Honor, that they've now mentioned a few times that there were particular features that they thought were infringing in the software, but at the end of the day, they haven't provided us with a concrete list of any these things to justify what source code they think is relevant in this case.  And that's -- our objection is that this is such an overly broad request to seek all of the source code without first giving us some idea of what they claim to be protected and infringing just to kind of reasonably narrow the scope of what the request should be.

THE COURT:  Thank you, Mr. O'Donnell.  I appreciate that.

And, you know, you all know that relevance is -- it's not the highest bar, right.  In order for the documents which are sought to be ordered, they have to be relevant, and they have to be proportional to the needs of the case.

You know, I'm thinking -- and this-- I guess this is a question for plaintiff.  If you are entitled to some of the source code, wouldn't you limit it to, maybe, the code --

new -- any new code written after March 2020 that relates to your specific DTE and VARY software?  Would you be satisfied with that?

MS. RAW:  So as to the dates, absolutely, and in fact the request already lists 2020, but further clarifying that it's a specific March 2020 date, that's already the intent of the request and especially as to the online configurator.  It's just new code after that date.  If it preexisted, it's not useful to us.  It could not be evidence of infringement, anyway.

Our concern is, if we say "relating to DTE and VARY," it's unclear to us that the plaintiffs -- what the plaintiffs are actually going to give us there because their allegation is that they haven't used any DTE and VARY code; so therefore they would just give us nothing and say, "We haven't used DTE and VARY."  We don't believe that's true, but there's no way for us to identify how their code that we haven't seen before is structured, where in that code they have include the DTE and VARY code, or even, frankly, which portions of the code are relying on this proprietary format -- which, by the way, we've been consistent that it's not just three digits.  It's a three-digit underscore.  You've got the color code.  It's a whole combination.  But nevertheless, to provide more specificity on what code we've never seen before is very difficult to do, and that's really

the crux of why there is a breadth here

And it is not disputed, also, that the showroom visualizer was -- is entirely new with not at least that -- presumably that front-end portion was not previously there. We had discussed in the past excluding -- to the extent there's third-party dependencies in that code, we're more than happy to exclude those.  For example, we believe that it likely runs on a third-party software called "Unreal Engine." We don't need that portion of the code.  Like, if any third-party sections -- there are things that we know that we can section off but very few of them.  That's the portion we're at.  I don't know what other detail we can provide for what part of it we need because I don't know what part of it they use Topalsson's code in.

MR. FROEMMING:  May I respond, Your Honor?

THE COURT:  Yes.  Go right ahead, Mr. Froemming.

MR. FROEMMING:  Sure.  Your Honor is quite right that the general rule in the garden-variety discovery context of relevance is not the highest bar.  We would note, however, that, when it comes to discovery of third parties, more vigilance is to be exercised, and that is also true with respect to foreign discovery, particularly with the U.K. and their constraints on fishing expeditions.

I don't think, Your Honor, that your suggestion really would narrow things down.  They allude -- they have

alluded in conversation to, again -- they're claiming that certain features in their source code or software are protectable and infringed, and it seems to me that it would be an orderly way to move the ball forward and try to narrow things down to have them identify features that they claim are protectable copyrights belonging to them and infringed.

MS. RAW:  Your Honor, may I respond --

THE COURT:  Ms. Raw, what's your response to that? I think I already know your response, that you can't do that, but I'll hear from you.

MS. RAW:  Sure.  So there is no case in this district that has held that that is the requirement when you've never seen the source code, and we're talking about literal lines of code.  In any event, they can come inspect exactly the source code at issue in this case.  We provided them -- I believe it was, like, a 30-something-page list of all of the portions of that source code that are third-party -- are not protectable, but the remaining elements are Topalsson's protectable lines of source code.  In effect, they want us to go line by line and list out all that the source code contains.  That's what's protectable.  It's not a small feat, and it's not a small amount of code.  Frankly, it would just be reproducing the code itself at this point.

MR. FROEMMING:  Your Honor, that list they did provide is a "red herring."  That's a listing of material

from third parties that they recognize is not protectable, sort of the "tail of the dog," right.  What the case law is clear about in the Ninth Circuit and elsewhere is that you've got to identify what you're claiming is protectable amongst your software because of the functionality of software.  It's functional.  And so you identify, at least at a high level, what features are you claiming, as they allude to, are protectable and infringe, and then go from there.

MS. RAW:  Your Honor, I respectfully disagree with the representation of the case law.  And just very briefly, I would highlight that we cite an Eleventh Circuit decision which explains why this is impossible quite well.  So that's the *Compulife Software v. Newman* case.  You can't prove that something is protectable.  You can only prove that it doesn't fall into one of the categories of things that are not protectable.  That's how source code protectability works.  We've identified everything that Topalsson itself has created and therefore has rights to, and at this stage of the case, that's appropriate.

Now, he is absolutely correct.  Once we get further in the case -- when we're talking about summary judgment, for example, which was the case in the *Apple Computer v. Microsoft* case cited by both sides -- in that case in the context of summary judgment, an expert did provide a very specific list looking at both codes, and it was a list of

hundreds of elements that were the same between one and the other.  Those were the ones that were protectable and infringed.  But there's no way for us to identify the lines of our code that are infringed at this point because we have not seen the other side's code.

In almost every single case they cite, it was in the context of someone asking for more code once they'd already received the code for the allegedly infringing product.  That was already the case in -- that was already the case in the *Teradyne* litigation, and there are other: *In re Apple and AT&T* case.  That was the issue is that there was already code; they were looking for more code.  So there were things they could identify that were infringed because they could see the AQS code.  That's not the case we have here.  There's no further information we can provide with the information that we actually have available to us.

MR. FROEMMING:  Your Honor, I think Mr. O'Donnell had something to say in response to your prior question.

THE COURT:  Go right ahead, Mr. O'Donnell.

MR. O'DONNELL:  We just wanted to point out that they had mentioned that there wasn't a case that talked about the literal elements, and we wanted to point out that in their reply brief they misrepresented the *Abarca* case to say it was limited to nonliteral elements.  That case also dealt explicitly with literal elements as well, which is the source

code, and said that, when you have literal elements in source code, you still need to identify these key features.

MR. FROEMMING:  So we're not looking at this point, Your Honor, for lines of code necessarily, but again, at least some good-faith identification of the elements or the features in their code that they claim is protectable and infringed.

MR. O'DONNELL:  And just to add to that, too, in the *Abarca* case, they found that it was particularly necessary when part of the code is on its -- is facially protected by some sort of license or an agreement.  In *Abarca* there was a license to at least a part of the code, which necessitated why there needed to be a list of key features. Here, we still have an agreement where there's at least a dispute about what is owned by (inaudible) party, and therefore it's necessary for them to point out what they're claiming they believe is protectable beyond the scope of that agreement.

THE COURT:  Okay.  Thank you.  Thank you, all.

I guess one final question I have is -- again, and I've already asked this, but if I were to rule that the -- and I'm not saying I will, but if I were to rule that the letters of request should go forward, is there any way to narrow it so that plaintiff receives only what he is seeking and not anything else that's -- that would not be necessary

for this case?

And then, secondly, is there a protective order in place that would take care of any issues that defendants may have?

MS. RAW:  To your second question, there is a protective order in case -- in this case.  It has specific provisions for source code.  It was negotiated between the parties.  I've not heard any allegation that the provisions are not sufficient here.  That's also attached to the letter of request and is referred to in the letter of request, such that Rolls-Royce Motor Cars Limited can produce under that agreement.

As far as limiting what we are seeking, we can absolutely limit it by the date range.  We can absolutely exclude third-party dependencies in that code.  We can absolutely exclude anything that was part of the online configurator that preexisted that date.  We don't care about any of that.  Beyond that, it is -- Topalsson was hired to create the whole configurator landscape, and then they ultimately put out this whole new configurator landscape. I'm not aware of any other portions of that code which can be excluded because I'm not aware of any other portions of the code that cannot reasonably be expected to have some of Topalsson's software in it.

THE COURT:  Okay.  Thank you, Ms. Raw.

Anything else, Mr. Froemming?

MR. FROEMMING:  Yes.  Two points, Your Honor.

First, the exclusions that she proposes really don't exclude very much at all given the timing consideration.

And counsel makes a (inaudible) reference to "landscape."  I'm not even sure what that means.  We are constrained by what they pled in the First Amended Complaint, and nowhere do they challenge the online -- the website, which is owned by a former party, now nonparty, Rolls-Royce. So with respect to limiting the scope of any order, Your Honor, they did not and still they can't allege any plausible theory for how the public, preexisting Rolls-Royce nonparty website infringes the copyrights with respect to the dealers.  We've got -- they don't point to -- they can't point to a single case where a user who accesses a third-party website like Rolls-Royce's can be liable for copyright infringement of confidential source code that the user -- here, the L.A.-area Rolls-Royce dealer -- can't even access themselves.

I mean, the Ninth Circuit in *Perfect 10* said that for both the right of reproduction, the right of display there has to be some copy, at least, in the computer's memory.  And as I said earlier, it doesn't make sense for somebody to -- that somebody could publicly display

confidential crown jewel source code just by accessing a website, and they don't dispute that the Rolls-Royce source code is not displayed when you access the website. It's not publicly displaying source code. So they don't dispute as well that the right -- the copyright right of reproduction clearly requires a copy to be stored, but that's not how these websites operate.

And they, also, as I said, admit the software is in the back end, where the dealers can't see it, and the Ninth Circuit, even in *Perfect 10* and the subsequent *Synopsys* case, recognized that even caching -- c-a-c-h-i-n-g -- temporary copying by the computer internally -- constitutes a fair use. So at the very least, the request for source code as to unpled content of the nonparty website is beyond the pale.

THE COURT: Okay. Thank -- and thank you all, again.

I'll end with what I started, that this is -- started with, with this is a very interesting issue. Haven't yet made up my mind. I think there's some thinking on my part that I need to do. So I'll take this matter under submission, and I will issue a written order, hopefully in the near future because I know you have deadlines coming up.

MR. FROEMMING: Your Honor, may I make one point for the record about the scheduling issue?

THE COURT:  Sure.

MR. FROEMMING:  Thank you.

As you may have seen, the fact discovery deadline already passed on July 17th.  That's Docket 69 in the scheduling order.  And the hearing on the motion before Judge Hsu to modify the schedule had been set for a hearing on July 19th, when the plaintiff emailed the Court, but Judge Hsu has since continued that hearing to September 20, little over a month from now, and we understand under Local Rule 1614 that only Judge Hsu can modify the scheduling order, and then in the meantime, the plaintiff over the last couple days filed a stipulated request for stay and a proposed order staying the case until Judge Hsu's next scheduled hearing for September 20.  So we believe that the plaintiffs' letter of request, request should also be denied at this time for that reason alone.

THE COURT:  Well, I'm not sure I follow your logic, but I'll take that into consideration, Mr. Froemming.

MR. FROEMMING:  Sure.  Sure.  My point is simply our understanding is that discovery is over -- the discovery deadline is passed and only Hsu can rule on the motion of whether to reopen discovery for a letter of request to the U.K. or not.

THE COURT:  Okay.  Well, but I note that the request was filed way back before, right.  It was filed on

June 10th by plaintiffs so -- but I understand what you're saying.  Thank you.

MR. FROEMMING:  Yeah.  Yeah.  Thank you.

THE COURT:  Thank you, all, and have a good rest of your day.

MR. FROEMMING:  You too, Your Honor.

THE CLERK:  This court is adjourned.

(Proceedings adjourned at 10:47 a.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa                     August 22, 2024
Julie Messa, CET**D-403            Date
Transcriber